# Exhibit 6

Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
2                   MANHATTAN DIVISION
3            CASE NO.:  1:24-CV-07544-AS-RFT
4

       BRUCE CAMERON DAVIDSON,
5

                    Plaintiff,
6        vs.
7      BLANKENSHIP DRY GOODS LLC,
8                    Defendant.
       _____/
9
10

              ZOOM VIDEOTAPED DEPOSITION OF
11
                    TORY LENZO
12
13
14
15
16            Wednesday, July 9, 2025
17             10:05 a.m. - 1:02 p.m.
18
19
20            VIA VIDEOCONFERENCE
21
22
23
24        Stenographically Reported By:
25         Dawn Scott, Stenographer

Page 2

1    APPEARANCES:
2
     On behalf of Plaintiff:
3
          CRISCIONE RAVALA, LLP
4         250 Park Avenue
          7th Floor
5         New York, New York 10177
          (800)583-1780
6         BY:  GALEN CRISCIONE, ESQ.
          gcriscione@lawcrt.com
7
8    On behalf of Defendant:
9         SRIPLAW
          41 Madison Avenue
10        25th Floor
          New York, New York 10010
11        (929)200-8446
          BY:  JORDAN ABISROR, ESQ.
12             JOSEPH DUNNE, ESQ.
               REBECCA KORNHAUSER, ESQ.
13        jordan.abisror@sriplaw.com
14
15
16   ALSO PRESENT:  MICHAEL ABARCA, Videographer
17
18
19
20
21
22
23
24
25

Page 3

1                    I N D E X

2   WITNESS                              PAGE

3   TESTIMONY OF TORY LENZO

4        Direct Examination by MR. ABISROR        5

5   Certificate of Oath                  122

6   Certificate of Reporter              123

7

8                    E X H I B I T

9   Plaintiff's Exhibit  Description            Page

10  Exhibit 1 Notice of taking deposition        12

11  Exhibit 2 Initial disclosures                26

12  Exhibit 3 First amended complaint            38

13  Exhibit 4 Blankenship's websiteinfringement  45

14  Exhibit 5 First set of interrogatories       60

15  Exhibit 6 Answers to interrogatories         62

16  Exhibit 7 Answer to complaint, affirmative   66

                defenses, counterclaim and jury

17              demand

18  Exhibit 8 Copyright registration             81

19  Exhibit 9 Notice letter to Blankenship       86

20  Exhibit 10 Follow-up notice letter           92

21  Exhibit 11 Blankenship photo deck            96

22  Exhibit 12 05/09/2025 letter                 117

23

24

25

Page 4

1    Thereupon,

2    the following proceedings began at 10:05 a.m.:

3              THE VIDEOGRAPHER:  We're now on the

4         record, time is 10:05 a.m. on July 9th, 2025.

5         Please note that this deposition is being

6         conducted virtually.  Quality of recording

7         depends on the quality of camera and internet

8         connection of participants.  What is seen from

9         the witness and heard on screen is what will be

10        recorded.  Audio and video recording will

11        continue to take place unless all parties agree

12        to go off the record.

13        This is Media Unit 1 of the video-recorded

14        deposition of Tory Lenzo taken by counsel for

15        the plaintiff in the matter of Davidson versus

16        Blankenship Dry Goods, LLC, filed in the United

17        States District Court, Southern District of New

18        York.

19        This deposition is being conducted

20        remotely using virtual technology.  Counsel

21        attending will now state their appearances and

22        affiliations for the record.

23             MR. ABISROR:  Good morning.  For the

24        plaintiff, Jordan Abisror.  Also joining is

25        partner of my firm, Joseph Dunne; Rebecca

1       Kornhauser, an associate for observational

2       purposes, as well as my client, Bruce Cameron

3       Davidson is joining.

4           MR. CRISCIONE:  Good morning.  Galen

5       Criscione, Criscione Ravala, LLP, on behalf of

6       defendant.

7           THE VIDEOGRAPHER:  The court reporter can

8       now swear in the witness.

9           THE STENOGRAPHER:  Please raise your right

10      hand.

11          Do you swear or affirm that the testimony

12      you are about to give will be the truth, the

13      whole truth, and nothing but the truth?

14          THE WITNESS:  Yes.

15          THE STENOGRAPHER:  You may put your hand

16      and, Counsel, you may proceed.

17          MR. ABISROR:  Great.

18  Thereupon:

19                  TORY LENZO,

20  a witness named in the notice heretofore filed,

21  being of lawful age and having been first duly

22  sworn, testified under oath as follows:

23                  DIRECT EXAMINATION

24    BY MR. ABISROR:

25      Q.   Good morning, Mr. Lenzo.  Nice to see you

Page 6

1   again.  Thank you for making the time to speak with

2   me today.  I really appreciate it.

3             As I mentioned before, I'm Jordan.  Today

4   I will be taking your deposition, the objective of

5   which is just to get to the bottom of what happened

6   here, you know, obviously, color in the claim and

7   just -- yeah.

8             So just a few things I want you to note

9   before we get going.  The court reporter is going to

10  need a clear record, so, please, when I ask a

11  question, let me complete my question before you

12  answer.  I will do the same.  When you have an

13  answer, I will let you say whatever you need to say

14  and then I will ask the next question.

15            If you need to take a break, we can take

16  breaks, just let me know.  If you need to go to the

17  bathroom, water, whatever you need, just let me know

18  and we'll take a break.  Although, I will say, if

19  there's a question on the table, I will prefer you

20  answer the question before we take that break,

21  that's all I ask.

22            If you don't understand a question, please

23  let me know and I will try to rephrase it for you.

24  Also, if you're going to answer, please answer

25  verbally.  You know, we can't -- the court reporter

Page 7

1    can't pick up head nods or thumbs up; I'm going to
2    need you to say "yes" or "no" to whatever question I
3    ask so the record is clear.
4             If your attorney instructs you not to
5    answer, don't answer.  But if they object to
6    something, such as the form of the question but they
7    say you can answer, please proceed with answering
8    the best you can.
9             Again, if you need it to be reworded or
10   anything of that nature, let me know and I can try
11   my best to accommodate that.
12            Yeah.  That's all I had for you in terms
13   of, you know, the rules.
14            I just want to start, you know -- first
15   question:  Do you understand that you are under an
16   obligation to tell the truth throughout this
17   deposition?
18       A.   Yes.
19       Q.   Great.  Have you reviewed any documents or
20   spoken with anyone in preparation for today's
21   deposition?
22       A.   The documents from SRipLaw?
23       Q.   I'll break it down.  Have you reviewed any
24   documents in preparation for today's deposition?
25       A.   Sure.  We received documents from SRip and

Page 8

```
 1    we presented documents as well.
 2          Q.    Okay.  Do you know what those documents
 3    were?  Can you name them for me?
 4          A.    They -- it would be the same documents
 5    that SRip presented to our group --
 6          Q.    Okay.
 7          A.    -- in reference to the interrogatories and
 8    vice versa what we presented to SRip to, you know,
 9    the interrogatories.
10          Q.    So you're referring to Blankenship's
11    interrogatory responses, that's what you're
12    referring to?
13          A.    And SRips ans- you know --
14          Q.    Okay.  Okay.  I gotcha.  Thank you.
15                Did you speak with anyone outside of
16    counsel?  Actually, did you speak with counsel in
17    preparation for today's deposition?
18          A.    Sure.
19          Q.    I won't ask for the contents of that
20    conversation, but just want to make sure.
21                Again just -- I should ask this:  To
22    begin, what is your full name and address for the
23    record?
24          A.    Tory Lenzo.  Do you want the business
25    address or home address?
```

```
 1        Q.   Let's do both.  Let's do your home address
 2   first and then we'll do the business one.
 3        A.   21 East 73rd New York, New York 10021.
 4   For business, 16 Greenwich Avenue, Greenwich,
 5   Connecticut 06830.
 6        Q.   Great.  Thank you.  Have you been deposed
 7   before?
 8        A.   No.
 9        Q.   Okay.  Is there anyone in the room with
10   you right now?
11        A.   No.
12        Q.   Okay.  What is your current occupation and
13   employer?
14        A.   Blankenship Dry Goods.
15        Q.   Great.  What is your position to
16   Blankenship Dry Goods?
17        A.   Owner.
18        Q.   Owner.  All right.  Curious, how did you
19   get into this business?  Were you always into --
20   sorry.  Let me start over.
21             What what does Blankenship Dry Goods do?
22        A.   We are a manufacturer of apparel and we
23   have a storefront.
24        Q.   Great.  How did you get -- I'm curious,
25   how did you get into that?  Were you always
```

Page 10

1   fashion-oriented?  Were you designing clothes

2   growing up?  How did you get to Blankenship?

3        A.    There remains -- I think, as we've seen

4   here, a lot of domestic manufacturing still going on

5   in New York City.

6        Q.    Yeah.

7        A.    I was able to, you know, learn through

8   domestic manufacturing how to start a company.

9   That's it.

10       Q.    So it's safe to say you've always been

11  interested in fashion, you decided you wanted to

12  start your own fashion business and the appeal of

13  starting something U.S. based or New York City

14  based --

15       A.    Fine.

16       Q.    -- is what --

17       A.    Yeah.

18       Q.    Great.  Just curious how you got here.

19            Okay.  How did you prepare for this

20  deposition?  I know I asked you what you reviewed

21  and, you know, the conversations.  But how did you

22  prepare for today's deposition?

23       A.    Spoke to my attorney.

24       Q.    That's all, just spoke to your attorney?

25       A.    I also received the interrogatories from

```
                                          Page 11

 1   you guys.

 2        Q.   You received them -- when did you receive

 3   those?

 4        A.   Prior to answer -- I don't know the exact

 5   date at this point.

 6        Q.   Okay.  It wasn't today -- you didn't

 7   receive the interrogatories today?

 8        A.   No.

 9        Q.   Okay.

10        A.   But I'm saying you had sent me these,

11   that's also preparation.

12        Q.   Great.  What is your highest level of

13   education that you've completed?  Did you go to

14   college for Blankenship -- for fashion?  Sorry.

15        A.   No.  But I went to college, yes.

16        Q.   Great.  Where did you go to school?

17        A.   NYU.

18        Q.   What did you study at NYU?

19        A.   Finance.

20        Q.   Science?

21        A.   Finance.  Sorry.

22        Q.   Finance.  Finance.

23             So from finance to fashion, that's

24   atypical.  That's cool.

25             I am going to share my screen now.  Give
```

Page 12

```
 1   me a moment.  It might take a second.  Okay.  This
 2   is Exhibit 1.
 3          A.   One second -- excuse me.
 4              MR. ABISROR:  Can we go off the record for
 5          a second?
 6              THE VIDEOGRAPHER:  Sure.  Going off the
 7          record, the time is 10:14 a.m.
 8              (Recess 10:14 a.m. until 10:15 a.m.)
 9              THE VIDEOGRAPHER:  Okay.  We're back on
10          the record, the time is 10:15 a.m.
11              (Thereupon, the notice of taking
12          deposition was marked as Plaintiff's 1.)
13     BY MR. ABISROR:
14          Q.   Great.  I am sharing my screen now.  Here
15   we go.
16              Please let me know if you can see that.
17          A.   No.  Is it same exhibit that you provided?
18          Q.   I provided your attorney with every
19   exhibit.
20          A.   You want me to just pull it up, because
21   it's not coming up on your screen.
22              MR. CRISCIONE:  I don't see it either.
23     BY MR. ABISROR:
24          Q.   Does that work?
25          A.   Yeah.  Go ahead.
```

1       Q.    Okay.  All right.

2       A.    I see.

3       Q.    Can you see -- everyone see that?

4             MR. CRISCIONE:  Yes.

5     BY MR. ABISROR:

6       Q.    Can you recognize this document,

7   Mr. Lenzo?

8             MR. DUNNE:  Jordan, can you maximize it to

9       the full screen.  It will make it a little

10      larger.

11      A.    Can you scroll down holistically?  It's

12  five pages?

13      Q.    Yes.

14      A.    Was this the document where you were

15  asking questions?

16      Q.    This is the document that I served to --

17      A.    Okay.

18      Q.    -- your counsel for deposition today.  As

19  you'll notice, it says the date, today's date and

20  time, it's 30(B)(6) notice, meaning were deposing

21  you as a corporate representative of Blankenship Dry

22  Goods.

23      A.    I'm sorry.  Is your point that you have

24  not sent me this and you're giving it to me now?

25      Q.    No.  No.  No.  I'm just asking if you

Page 14

```
 1   recognize this document.  Have you seen it before?
 2        A.   You would have to scroll down for me to
 3   look at what --
 4        Q.   Yeah.  Yeah.  No.  No worries at all.
 5   I'll scroll down for you.
 6             THE STENOGRAPHER:  Hold on, guys.  You
 7        can't talk at the same time.
 8     BY MR. ABISROR:
 9        Q.   I'll scroll down for you, Mr. Lenzo.
10        A.   Sure.  To me, this looks like -- again, I
11   honestly -- it looks very similar questions to the
12   interrogatories.  Maybe not the exact same.
13        Q.   No.  This is a different document.  I just
14   want to confirm that you have seen it prior to
15   today's deposition.
16             Based on your testimony today, right now,
17   it appears you're unsure if you've seen it before.
18   Do I have that right?
19        A.   Please go down again, if you don't mind.
20   Sorry.
21        Q.   Yeah.  No worries.
22        A.   Galen -- may I ask my attorney?  Was this
23   the document that you sent me in regards to all the
24   documents on like -- 11 or 15 exhibits, in that ZIP
25   file?
```

Page 15

1              MR. CRISCIONE:  I believe so.  I don't
2          remember exactly when I sent it.  But it was at
3          some point, yes.
4          A.   Give me one minute to read it all.
5      BY MR. ABISROR:
6          Q.   Okay.  Well, I'm going to walk you through
7      these topics.  I just wanted to ask an introductory
8      question if you had seen it before.  If you
9      recognized it.
10         A.   I'm sorry.  Is your point that
11     basically -- okay.  You know, honestly, at this
12     point, I feel like I'm mixing potentially in my mind
13     interrogatories and this.  And -- but I'm fine to --
14     is your point that you would have liked me to review
15     this holistically prior?  I did go through the ZIP
16     file, but you know, go ahead.
17         Q.   Okay.  So based on your testimony, you're
18     unsure, you think it might have been mixed up with
19     the interrogatories.  That's fine.  I just wanted to
20     introduce the document for you.
21         A.   Okay.
22         Q.   And get a "yes" or "no" on have you seen
23     it.
24              So looking at these topics here, you know,
25     do you -- the purpose of this document is to

Page 16

1   basically set forth the topics that we expect you,

2   the deponent -- the business representative of

3   Blankenship Dry Goods to testify on.

4           So I'm going to go through each of these

5   topics, I'm going to ask you if you're prepared to

6   testify on those and if not, you will let me know.

7   If you are not, tell me who is the best person to

8   testify on those topics.  Does that sound good?

9       A.    Fine.

10      Q.    In terms of Blankenship's policies and

11  procedures for use of photographs on its website,

12  are you best person to testify on that topic?

13      A.    It's fine.

14      Q.    Fine as in yes?

15      A.    Yes, fine.

16      Q.    In terms of Blankenship's process of

17  uploading images to its website, are you the best

18  person to testify on that?

19      A.    Yes.

20      Q.    Thank you.  In terms of Blankenship's

21  policies and procedures, if any, for compliance with

22  copyright law, are you the best person to testify on

23  that topic?

24      A.    Yes.

25      Q.    In terms of Blankenship's actions, if any,

Page 17

1  for enforcement of the policies and procedures for

2  compliance with the United States copyright law, are

3  you the best person to testify on that topic?

4      A.   Sure -- yes.  I mean, the only other

5  person I can think is an attorney.

6      Q.   Okay.  No, that's totally fair to say

7  also.

8      A.   This question, I'm not -- I can't quite

9  understand fully.

10      Q.   Okay.

11      A.   I'll have to read it when you ask.

12      Q.   Number 5, are you best person to testify

13  on Blankenship's acquisition of the work at issue in

14  this case, my client's image?

15      A.   Yes.

16      Q.   Okay.  Number 6, Blankenship's

17  subsidiaries, affiliates, directors, employees

18  representatives and agents, are you the best person

19  to testify on those people --

20      A.   Yes.

21      Q.   -- at the company?

22      A.   Yes.

23      Q.   Blankenship's revenue generated from the

24  use of the work, are you the best person to testify

25  on that?

Page 18

1          A.    Yes.

2          Q.    Okay.  Blankenship's advertising,

3    marketing or sales from using my client's work, are

4    you the best person to testify on that?

5          A.    Yes.

6          Q.    All revenue information associated with

7    the work identified in the complaint, are you the

8    best person to testify on that?

9          A.    Yes.

10         Q.    All copies of the work alleged in the

11   complaint in Blankenship's possession, are you the

12   best person to testify on that?

13         A.    Sorry.  I'm -- I don't understand this one

14   in reference to possession.

15         Q.    Okay.  We'll just say -- essentially, what

16   that means is, you know -- obviously, what we're

17   alleging here is that your organization had in their

18   possession at some point or another my client's

19   work, right.

20             This question is asking for -- this topic,

21   rather, is asking for:  Are you the best person to

22   testify regarding the work being in possession of

23   your organization, that's all.  It's -- but I

24   understand.

25         A.    I mean, all -- there was also someone

Page 19

```
 1    that -- we had also -- well, am I allowed to just
 2    say that in reference to a document that we have?
 3         Q.   I'm sorry?
 4         A.   Perhaps one of our documents would be the
 5    best way to describe this.
 6         Q.   Is there -- sorry.  Is there another
 7    person who is prepared to testify on the topic
 8    listed in Number 10 besides yourself?
 9         A.   In reference -- I'm so sorry, because
10    obviously I've never done this.  In reference to
11    today's meeting or in general?
12         Q.   In general.
13         A.   I would say that we had also brought in an
14    expert regarding the existence of this document.
15         Q.   What was that expert's name?
16         A.   Scott Gibbs.  Otherwise, I can attest to
17    what he wrote.
18         Q.   Scott Gibbs.  What he wrote, are you
19    referring to --
20         A.   A document, uh-huh.
21         Q.   What document was that?
22         A.   It was from WeRecoverData.com.  In front
23    of my face, I don't have the name of it, but it was
24    presented to your firm in the documents.
25         Q.   What is the substance of that document, in
```

Page 20

1   your own words?

2       A.   The substance of the document is that

3   Scott was hired in order to run a search to

4   determine the date in which the image first was

5   presented on our URL.

6       Q.   And do you recall what the date found was

7   in that document?

8       A.   They -- no.  I remember the year and the

9   month.  I believe that in reference to -- obviously,

10  you guys have the document, too.  In reference to

11  earliest date confirmed by him would be August of

12  2020, with perspective -- possible publication in

13  March of 2019, potentially.  He doesn't -- I don't

14  know if he affirmed or not.  But potentially as far

15  back as there, but definitely of August of 2020.

16      Q.   So in this report -- this document, you're

17  saying that it was this alleged expert's opinion

18  that the image at -- alleged -- at issue in this

19  complaint, in this case, was first posted on your

20  website in August of 2020.  However, you're saying

21  that there was a prior date in March of 2019 that it

22  was posted?

23      A.   I did not say that.

24      Q.   Okay.  Sorry.  Can you -- when was the

25  image -- based on the report when was the --

Page 21

 1      A.   It's two -- there's two elements to what

 2  you're saying.  There's date of posting something or

 3  putting it on, you know, someone -- on the website

 4  and then confirmed date that it's physically there.

 5  Is that fair?  Does that make sense?

 6      Q.   Sure.

 7      A.   He can confirm and authenticate that on

 8  August of 2020, based on his expertise, that it was

 9  there.  And I believe -- I don't want -- again, I

10  don't have have the report in front of me, so I'm

11  not gonna to be --

12      Q.   You know what --

13      A.   -- exactly correct.  He stated that in

14  March of 2019 may have been the date of publication

15  based on the file's name.  That's all.

16      Q.   Okay.  I have the report.  I will come

17  back to this.  Let's finish going through these

18  topics and then we'll move on there.  Okay?

19      A.   Sounds great.

20      Q.   Okay.  Number 11, are you the best person

21  to testify regarding Blankenship's communications

22  with the plaintiff?

23      A.   Sure.

24      Q.   Number 12, are you the best person to

25  testify on Blankenship's use of my client's work,

Page 22

1    the plaintiff's work?

2        A.    Sure.

3        Q.    Are you the best person to testify on the

4    insurance policies that may provide coverage for the

5    claims in this complaint?

6        A.    I don't know.  We -- versus an insurer, he

7    or herself you mean?

8        Q.    Let me -- well, I'm not to going rephrase

9    it because it's listed there for you.  But I can

10   clarify it a little bit.

11       A.    Sure.

12       Q.    Blankenship Dry Goods, is it your

13   opinion -- sorry.  Let me withdraw that.

14              Does Blankenship Dry Goods have insurance

15   for their business?  Just general -- sorry.  Before

16   you answer.

17       A.    While we have general liability, we

18   provided a document that we were able to locate via

19   the attorney to you that there was no coverage in

20   relevance to this matter for the accusations

21   involved.

22       Q.    Great.  So just based on what you're

23   saying, you know, you are the best person to testify

24   about the insurance policies that may or may not, we

25   could say, provide coverage for the claims in this

Page 23

 1    complaint; is that true?
 2         A.    In tandem with a document perhaps -- or
 3    yeah, sure.  Why not.
 4         Q.    Yes.
 5         A.    Okay, why not.
 6         Q.    Thank you.  Are the best person to testify
 7    on Blankenship's responses to plaintiff's request
 8    for production dated on June 13th, 2025?
 9         A.    Yes.
10         Q.    Are you the best person to testify on
11    Blankenship's responses to plaintiff's request for
12    admission served on your -- served you on June 5th,
13    2025?
14         A.    Yes.
15         Q.    Are you the best person to testify of
16    Blankenship's responses to plaintiff's
17    interrogatories dated June 13th, 2025?
18         A.    Yes.
19         Q.    Are you the best person to testify on
20    Blankenship's basis for the denials in its answer to
21    the complaint?
22         A.    Because you say "basis," my interpretation
23    of that is that you're seeking a legal basis of our
24    denial.  Is that correct?
25         Q.    That would be part of it, yes.  But --

Page 24

1      A.   I would have to think that my attorney

2  would probably be the best individual from a legal

3  standpoint for a legal basis for a denial.  No?

4      Q.   Okay.

5      A.   Yeah.

6      Q.   Just so we're clear, I mean, whatever

7  basis for a legal denial your attorney -- again,

8  don't divulge any conversations between you and your

9  attorney.  But any basis that was brought forth in

10  the answer, that would have been something you

11  discussed.  You don't have to tell me what was

12  discussed, but that would have been something you

13  discussed with your attorney; is that correct?

14      A.   Okay.  That's fine, yes.

15      Q.   Yes?  Okay.  Okay.  Are you the best

16  person to testify on all facts that support

17  Blankenship's affirmative defenses in its answer to

18  the complaint?  Same kind of question.

19      A.   Really the same answer, unfortunately.

20      Q.   Okay.  I'm just --

21      A.   It feels like a legal question.  I

22  understand you're saying that I need to be privy to

23  the --

24      Q.   That's all.

25      A.   -- facts of the case, but on the same

Page 25

```
 1   token, hard to give you a certain stamp on something
 2   that I feel sounds like a legal question still.
 3        Q.   Okay.  Understood.  All right.  Last one,
 4   are you the best person to testify on Blankenship's
 5   initial disclosures serve in this action?
 6        A.    Initial disclosures served in this action.
 7   Would you please clarify for me exactly what you're
 8   referencing, please.
 9        Q.   Right.  I could potentially --
10        A.   Are you referring to our -- like a motion
11   to dismiss?
12        Q.   No.  No.  No.  Counsel -- I could pull
13   that up for you.  That might give -- take me a
14   second, though.  Okay.  I'm going to share my screen
15   again.  I'm going to mark this -- actually, let me
16   mark this as Exhibit 2.
17             MR. CRISCIONE:  Can we go off the record
18        for one second?
19             MR. ABISROR:  Sure.
20             THE VIDEOGRAPHER:  Sure.  Going off the
21        record, the time is 10:32 a.m.
22             (Recess 10:32 a.m. until 10:32 a.m.)
23             THE VIDEOGRAPHER:  We're back on the
24        record, the time is 10:32 a.m.
25             (Thereupon, the initial disclosures was
```

Page 26

1        marked as Plaintiff's 2.)

2      BY MR. ABISROR:

3        Q.   Okay.  Mr. Lenzo, your -- let me know if

4    you can see my screen.

5        A.   Go ahead.

6        Q.   Good?

7        A.   Yeah.

8        Q.   So what this is -- do you see here it says

9    defendant Blankenship Dry Goods' Rule 26 A initial

10   disclosures?

11       A.   Okay.

12       Q.   Right.  So -- just make sure the court

13   marks this as Exhibit 2 here.

14            So as you'll see here, Topic Number 19,

15   Blankenship's initial disclosures served in the

16   action.  This is Blankenship's initial disclosure,

17   do you recognize this document?

18       A.   If you can scroll down, that would be

19   helpful.  I'm so sorry.

20       Q.   Sure.  Sure.  Sure.

21       A.   Yeah.  Hold on.  That do not -- just hold

22   on, I got to read through this.

23       Q.   No worries.

24       A.   Hold on a second.  Hold on.  Would you

25   mind just reminding me the date in which we received

Page 27

1   this document?

2        Q.   This is -- you produced this document,

3   Mr. Lenzo --

4             THE STENOGRAPHER:  Hold on.

5        A.   Excuse me, I'm sorry.

6             Would you increase it now?  I apologize.

7   But at this point, because I've had two attorneys,

8   I'm thinking of the stuff I just received.  I mean,

9   I'm -- go up, please.  So this was before Galen

10  Criscione came in, right?

11    BY MR. ABISROR:

12       Q.   When did you retain Mr. Galen Criscione as

13  your attorney?

14            THE WITNESS:  Galen, do you have the date

15       of this?

16            MR. CRISCIONE:  I believe it was in April.

17    BY MR. ABISROR:

18       Q.   This document is dated March 3rd, 2025,

19  that would be before you got Mr. Criscione as your

20  attorney; is that correct?

21       A.   Okay.  I was under the impression -- I'm

22  sorry.  I was under the impression you were saying

23  that this is a document that you were submitting to

24  us, so I'm --

25       Q.   No.

Page 28

```
 1        A.    -- really kind of confused, because it
 2   didn't make sense.  Okay.  So now I'm understanding
 3   since it was Sarah Haddad, I kind of understand
 4   what's going on now.
 5        Q.    Totally understand.  You know, this is
 6   just me trying to orient you to this document
 7   because I'm going to ask some questions about it.
 8        A.    Okay.  So go up, again.  So now I need
 9   to -- if you don't mind, can I please revisit the
10   this -- the five questions in reference now that I'm
11   understanding what's going on.  Thank you.  Go
12   ahead.  Lower.  Go down, please.  Thank you.
13        Q.    Mr. Lenzo, sorry to interrupt you.
14        A.    Yeah.  Go head.
15        Q.    All I'm asking is:  Do you recognize this
16   document?  Have you seen it before?
17        A.    At this juncture -- obviously, at some
18   juncture, this document via the past attorney, I
19   would presume, must have been sent to me.  As you
20   can see by my reaction, I do not fully remember in
21   terms of what specifically or when -- you have the
22   date now, but in terms of like what portion of --
23   I'm not an attorney.  What portion of this was
24   started in tandem with Mr. Criscione coming in.
25              Obviously, I've been working with him more
```

Page 29

```
 1   so.  So a lot of these questions I don't necessarily
 2   remember when we were filing this or -- as such.  To
 3   some effect understanding, you know, what you're
 4   saying.
 5        Q.   Great.  It's perfectly acceptable if the
 6   answer is you don't know, that's okay.
 7        A.   At this point, I don't remember
 8   holistically.
 9        Q.   Okay.  That's fine.  We can move on.
10        A.   Fine.
11        Q.   Okay.  So back to this.  So in terms of
12   Topic Number 19, the question was:  Are you the best
13   person to testify on Blankenship's initial
14   disclosures served in this action?  The answer is
15   you don't know.
16        A.   I would have to say an attorney at this
17   point, again.
18        Q.   Okay.
19        A.   Unfortunately, you know, this is not the
20   attorney that put that in, so it's tough.  But I
21   would say my existing attorney probably,
22   Mr. Criscione, at this point because --
23        Q.   Okay.  Okay.  I'm going to stop sharing my
24   screen.
25             So now I'd like to ask a little bit about
```

```
                                              Page 30
 1   your business, if you don't mind.
 2            So in your own words, you know, how does
 3   Blankenship Dry Goods operate?
 4        A.   Apparel company.  We have a store, we have
 5   a website.
 6        Q.   So you have a physical location and you
 7   gave me the address?
 8        A.   Yeah.
 9        Q.   It was in Greenwich, Connecticut; is that
10   correct?
11        A.   Uh-huh.
12        Q.   What is your primary source of obtaining
13   customers?  Do you guys, you know, go to pop-up
14   shops?  Do you guys, you know, attend events for
15   clothing brands?  Are you guys big -- have a big
16   online presence?  In your own words, how do you guys
17   get your clients -- your customers?
18        A.   Just having a physical location and being
19   online, I would say.
20        Q.   Right.  So in terms of how Blankenship Dry
21   Goods makes money, it's safe to say that through
22   their physical location and through their online
23   presence, that's how you guys generate revenue, is
24   that correct?
25        A.   Yes.
```

Page 31

1       Q.    Where do your products -- sorry.
2   Withdrawn.
3             What products do you sell?  If you can be
4   as specific -- I know you said clothing.  But, you
5   know, give me a little bit more in terms of, we
6   talking hats, we talking shirts, pants, socks,
7   underwear?
8       A.    Shirts, pants, shorts, women's dresses.
9       Q.    Where do these products come from?  Are
10  you manufacturing them yourselves?  Are you
11  outsourcing?  How does that work?
12      A.    Made in New York City.
13      Q.    Made in New York City.  Are you in the
14  factory making them yourself or you hire other
15  people to do that?
16      A.    Hire people to do that.
17      Q.    How long have you guys -- sorry.
18  Withdrawn.
19            When was Blankenship Dry Goods started by
20  you?
21      A.    I'd say -- I believe 2012, in that
22  department of time.
23      Q.    Was this started solely on your own or did
24  you work with friends, family or was it all Tory?
25      A.    I'm the sole proprietor of this business.

1       Q.    Sole proprietor.  In terms of your

2   distribution of products, what is the primary way

3   you do that?

4       A.    In-stores and online.

5       Q.    Tell me a little bit more about your

6   online business.  Do you guys have a commerce --

7   e-commerce platform you use?  Do you offer your

8   products on Amazon; how does that work?

9       A.    Are you saying what is the provider of our

10  website in terms of software?

11      Q.    No.  I'm asking more along the lines of

12  you -- sorry.  Let me start over.

13          You have products listed online, correct?

14      A.    Uh-huh.

15      Q.    Clients or customers can go to your

16  website Blankenship Dry Goods and purchase products,

17  correct?

18      A.    Yep.

19      Q.    When they do that, how does that work?

20  Does it -- do you ship them, you know, on your own?

21  Are you doing this operation out of your store?  Are

22  you doing this out of your house?

23      A.    Store.  Typically, I could be doing it,

24  sometimes we have helpers.

25      Q.    How many helpers do you have?

Page 33

1        A.    That could mean coming from a factory

2    directly.   That could mean that we have someone part

3    time.

4        Q.    Okay.  So you have people --

5        A.    Yeah.  Here and there.

6        Q.    So Blankenship Dry Goods, although, you

7    are the sole proprietor, you have some people, you

8    know, helping you in terms of the commerce side of

9    it and how you guys distribute products; is that

10   correct?

11       A.    In reference to your question of -- you

12   know, you asked about -- the question I answered

13   was, you know, in reference to shipping goods out

14   and so on and so forth.

15       Q.    Sure.  In terms of your revenue from

16   Blankenship, in your own words, what percentage of

17   your revenue comes from in-store and comes from

18   online?

19       A.    I don't know off the top of my head.  I

20   would say that our in store probably is a little bit

21   more.  But I don't know off the top of my head.

22       Q.    Can you guess based on your experience,

23   you know?  Just -- I don't need a 38.2 percent

24   number.  I just need a -- some general

25   understanding.

1      A.    I don't want to say if I don't know.

2      Q.    Okay.  Fair enough.

3      A.    Yeah.  I don't know.

4      Q.    How do you keep track of sales at

5    Blankenship?

6      A.    Are you saying, how do we, like, file

7    taxes and such?

8      Q.    No.  I'm asking specifically, you know,

9    each month you obviously sell a certain amount of

10   products, right?

11          I need you to say "yes" or "no."  Sorry.

12     A.    Certainly.  I guess my confusion is, are

13   you referencing like a point of -- the e-commerce

14   website?  Does it have a customer's data, is that

15   your point?

16     Q.    I'm not asking about customer data.  I'm

17   more asking about revenue, you know.  And both with

18   the e-commerce and the in-store location.

19          I'm asking how you, Blankenship Dry Goods,

20   and you, Tory Lenzo, the sole proprietor and the guy

21   best equipped to testify on these topics.  How do

22   you track your sales?  What -- like, what's your

23   profits?

24     A.    When you say "track your sales," I guess

25   that -- the reason why I then sought clarification

Page 35

1   in terms of taxes, is that the rationale in general

2   for needing to track a sale.

3       Q.   Okay.

4       A.   Would be probably to file taxes, right?

5       Q.   Okay.

6       A.   In terms of reporting.  So that's all --

7   that was the reason I asked.  If that somewhat

8   answers your question, there are periods of time

9   where we need to file taxes and present sales

10  reports to our accountant.  As such, we -- you know,

11  that's our answer.  Because that's really the only

12  time we're doing what you're referencing.

13      Q.   Okay.  Let me try this from a different

14  angle, if you don't mind.

15      A.   Okay.

16      Q.   Okay.  Blankenship Dry Goods sells clothes

17  to their customers, correct?

18      A.   Okay.

19      Q.   I imagine you keep track of your --

20  withdrawn.

21           Blankenship sells clothes to their

22  customers.  In your guess, how often a month do you

23  track your progress with selling your products?

24      A.   It would be -- I think, then, I answered

25  your question.  Because it would be during relevant

Page 36

1    times that we're going to have to then send our

2    reporting to our accountant.  It will have to be,

3    you know --

4         Q.   So --

5         A.   -- give reports to them about --

6              THE STENOGRAPHER:  Hold on.  You guys

7         can't speak over each other.

8      BY MR. ABISROR:

9         Q.   Okay.  In terms of compiling those reports

10   that you send for tax purposes, who does that?

11        A.   In reference to a software?  I'll say

12   myself at this point --

13        Q.   Okay.

14        A.   -- a bit going around.

15        Q.   Right.  So when you compile those reports,

16   you, yourself, how do you go about that?  Do you

17   have a service that you use?

18        A.   Exporting sometimes the -- it's no

19   service.  It's just export the documents, send it to

20   the accountant.  That's it.

21        Q.   Okay.  So -- on the other side of that,

22   right, we talked about sales.  How do you keep track

23   of your costs, right, and your revenue and your

24   profit?  Is -- do you -- again, you are the person

25   who generates these reports for your taxes -- for

1   your tax purposes, how do you do that?  How do you
2   go about that process?
3        A.    That would be my accountants that are
4   doing that.
5        Q.    Okay.  So is BlankenshipDryGoods.com the
6   website for your company?
7        A.    Yes.
8        Q.    Who uploads content on the website
9   BlankenshipDryGoods.com?
10       A.    In reference to the entire website or in
11  reference to the URL in question?
12       Q.    Just generally.  I'm asking general
13  questions right now.  We'll get into the specifics.
14  Generally who up- --
15       A.    Sure.  I would say at this point, you
16  know, in terms of maintenance of the website today,
17  I would be able to maintain the website.
18       Q.    So generally you're speaking, then.  We're
19  not speaking specifics.  Generally, you are the
20  person who uploads and maintains content to
21  BlankenshipDryGoods --
22       A.    I would say I generally maintain the
23  website, yes.
24       Q.    Okay.  In terms of copyright policies,
25  does Blankenship Dry Goods have any copyright

Page 38

```
 1  policies for how images are sourced and uploaded to
 2  their website?
 3       A.   How photographic images are sourced and
 4  uploaded.  I would say that -- so in terms of
 5  policy, are you saying a written policy --
 6       Q.   Yeah.
 7       A.   -- that goes out to different individuals?
 8  While there may not be a written policy, you know,
 9  obviously we, you know, would ideally not be in that
10  situation where we have to like -- undesirable
11  situation to be in.  So ideally, you know, avoiding
12  something like this would be common sense, but
13  anyways.  There's no written policy.
14            MR. ABISROR:  Okay.  We'll push forward
15       for a little longer and, Galen, if you're good,
16       we'll take a break in the next 15 minutes.
17            MR. CRISCIONE:  Sure.
18            MR. ABISROR:  Up to you.
19            (Thereupon, the first amended complaint
20       was marked as Plaintiff's 3.)
21    BY MR. ABISROR:
22       Q.   The next document I am going to show you,
23  I will mark as Exhibit 3.  Give me a second to mark
24  it.  Okay.  Let me know when you can see that.
25       A.   Just before -- you're asking me if I see
```

1  it?

2      Q.   Yes.  Can you see the document --

3      A.   I hate to do this.  Would you mind just

4  letting me know just so I frame in the correct

5  context once again, who wrote this document and then

6  I can frame it correctly while I'm reading it and

7  then answer correctly and the date.

8      Q.   Right now I'm just asking if you can see

9  the document on your screen?

10     A.   I can see it, uh-huh.

11     Q.   Okay.  Good.  Can you see on the top here

12  it says amended complaint for copyright

13  infringement?

14     A.   Okay.  So SRipLaw sent this?

15     Q.   My client, Bruce Cameron Davidson, filed

16  this, yes.

17     A.   All right.  All right.  Fair enough.

18     Q.   Have you seen this document before?

19     A.   Yes, at the beginning.  A long time ago.

20  So I mean, at the beginning, I believe this....

21     Q.   Okay.

22     A.   Or somewhat at the beginning.

23     Q.   How long ago have you seen this document?

24     A.   I don't remember.

25     Q.   Okay.

```
                                          Page 40
 1        A.   We're here in June now.
 2        Q.   We're in July.
 3        A.   Excuse me, July.  We are?  Excuse me.
 4        Q.   Sorry.  Are you still thinking or are you
 5   good to go?
 6        A.   Excuse me.  I'm waiting for your question.
 7        Q.   Oh, I asked when you recall last seeing
 8   this.
 9        A.   I answered I don't remember the exact
10   date.  I remember somewhat at the beginning of this
11   proceedings.  During the time period in which my
12   prior attorney was working.  In that time period --
13        Q.   Okay.
14        A.   -- is my belief of when I saw this.
15   Uh-huh.
16        Q.   Okay.  I'm scrolling down.  Is this
17   information correct in Paragraph 9?
18        A.   Well, I mean -- I -- in reference to which
19   portion?  Go ahead.
20        Q.   Is Blankenship Dry Goods --
21        A.   What is -- go ahead.  Sorry.  Excuse me.
22        Q.   I'll ask a question and then you'll answer
23   and we'll go from there.  Does that sound good?
24        A.   Yeah.  Excuse me.  Yeah.
25        Q.   Is Blankenship Dry Goods, LLC, a New York
```

Page 41

1    limited liability company?

2        A.    Correct.

3        Q.    Is Blankenship Dry Goods -- is their

4    principal place of business at 16 Greenwich Ave,

5    Greenwich, Connecticut 10021?

6        A.    Correct.

7        Q.    Are you, Tory Lenzo, the registered agent

8    of Blankenship Dry Goods?

9        A.    Correct.

10       Q.    Is your home address, as you told me

11   before, 21 East 73rd Street New York, New York

12   10021?

13       A.    Correct.  I was thrown off by the

14   reference of serve.  We were served at the 16

15   Greenwich Avenue address.  But anyways.

16       Q.    And --

17       A.    Sorry.  That's all.

18       Q.    Okay.

19       A.    Other than that, correct.

20       Q.    So before we get into this, based off of

21   everything that's transpired, what is your

22   understanding of the nature of the suit alleged in

23   this complaint?  That was terrible.  Let me withdraw

24   it.

25            In your own words, what do you think is at

Page 42

1  issue in this case?

2      A.   Well, to my understanding, there is a

3  copyright infringement accusation and D -- I can't

4  remember if DCMA or DMCA accusation of -- as well

5  against our business in reference to, you know, the

6  image.

7      Q.   Great.  So it's your understanding that

8  the nature of this suit at its core is a copyright

9  infringement claim and a DMCA claim against

10 Blankenship Dry Goods, your organization?

11     A.   Correct.

12     Q.   Correct, okay.  Looking at Paragraph 10

13 here, do you recognize this image?

14     A.   Correct.

15     Q.   Correct.  In your own words, what is

16 written at the bottom of this image here?

17     A.   Well, in reference -- sorry.  I just want

18 to clarify.  You said "correct."  In reference to

19 the image, are you referring to the image on our

20 website or the image --

21     Q.   No.

22     A.   -- that I'm just seeing all eyes, if I was

23 an eye doctor looking at something or in a eye

24 doctor's.

25     Q.   We're not talking specific yet.  We're

Page 43

1    talking about generally.  In your own words, what

2    does the c copyright Cameron Davidson mean?

3         A.   I will answer it, because obviously -- I

4    can't be sure in reference to where you're saying

5    the image derives from.  I will say from point ten

6    that I see on this document under the copyright work

7    at issue, on this specific image that I'm looking at

8    in the amended complaint, there's a c Cameron

9    Davidson at the bottom.

10        Q.   In your own words, what is your

11   understanding of what that represents and what that

12   means?

13        A.   That would be a copyright mark.

14        Q.   I'm sorry.  A copyright what?

15        A.   Markmarcation [sic] of copyright.

16             MR. ABISROR:  Okay.  I'm going to stop

17        sharing my screen now.

18             MR. ABISROR:  Galen, you want to take a

19        five-minute, ten-minute break?

20             MR. CRISCIONE:  Yeah, sure.

21             MR. ABISROR:  Give him a second to go to

22        the bathroom, stretch our legs for a second?

23        We've been going at it for an hour, so...

24             MR. CRISCIONE:  Yeah.  Sure.  You want to

25        come back to 11:05?  That's like seven minutes.

1              MR. ABISROR:  Yeah.  Let's do 11:05.

2              MR. CRISCIONE:  All right.  Sounds good.

3              THE VIDEOGRAPHER:  Going off the record,

4        the time is 10:58 a.m.

5              (Recess 10:58 a.m. until 11:05 a.m.)

6              THE VIDEOGRAPHER:  We're back on the

7        record, the time is 11:05 a.m.

8     BY MR. ABISROR:

9         Q.   Great.  Okay.  So we were on -- I will

10    share my screen again.  Please confirm, Mr. Lenzo,

11    that you can see what I'm sharing.

12        A.   I see.  Uh-huh.

13        Q.   Great.  So we were on Paragraph 10 here

14    and you had said -- you know, you had noticed in the

15    context of this complaint that you recognized my

16    client's c at copyright Cameron Davidson, which is,

17    in your own words, the copyright marcation of my

18    client?

19        A.   Say that -- I'm so sorry.  Can you say

20    that again?  The first portion.

21        Q.   Sorry.  Before we left off, you had

22    identified in Paragraph 10 that at the bottom of

23    this image in the context of this complaint,

24    right -- I'm not saying --

25        A.   Uh-huh.  Fine.

Page 45

1      Q.   -- outside of this complaint?

2      A.   Yes.  The answer is yes.

3           (Thereupon, the Blankenship's website was

4      marked as Plaintiff's 4.)

5    BY MR. ABISROR:

6      Q.   Great.  So now I'm going to stop sharing

7   my screen.  I'm going to pull up another exhibit.  I

8   will mark this as -- are we on 4?  Yes.  Give me a

9   second to mark it.  Okay.

10          Please confirm when you can see my screen,

11  Mr. Lenzo.

12     A.   Okay.  Okay.

13     Q.   Yep.  So do you see here it says "Exhibit

14  2"?

15     A.   Okay.

16     Q.   Okay.  So what this is -- just giving you

17  a sense in Exhibit 3 here, it talks about how

18  Exhibit 2 was attached to the complaint and it is an

19  illustration of the copyright infringement alleged

20  of the work and we attached Exhibit 2 to that

21  complaint to illustrate the infringement.  Just so

22  you understand what this is.  This comes from us,

23  not your side.  Just want to make sure.

24          So do you recognize this website?

25     A.   Yes.

1      Q.   Is this your website --

2      A.   Yes.

3      Q.   -- Blankenship Dry Goods?

4      A.   Yes.

5      Q.   Do you maintain and upload content onto

6    this website?

7      A.   In terms of date range or just in general

8    have I ever?

9      Q.   In general.  You had testified earlier

10   that --

11     A.   I already -- yeah, I've already stated

12   that I have access to the website.

13     Q.   You have access and you --

14     A.   Sure.

15          THE STENOGRAPHER:  One at a time, guys.

16     One at a time.

17          MR. ABISROR:  Sorry.

18   BY MR. ABISROR:

19     Q.   Just want to make sure this is clear.  You

20   recognize this website, correct?

21     A.   I said yes, uh-huh.

22     Q.   Okay.  You upload content to this website,

23   correct?

24     A.   In general?

25     Q.   In general.

Page 47

```
 1        A.    You're not asking specifically about the
 2   image, for example?   Sure.
 3        Q.    You maintain this website?
 4        A.    Sure.
 5        Q.    Okay.   Scroll down here.   Do you recognize
 6   this image?
 7        A.    Yes.
 8        Q.    Is it the same image, in your opinion, as
 9   the image listed in Paragraph 10?   I will show you
10   Paragraph 10 and then I will go back.
11        A.    Is your -- I mean, I'm just going to say
12   the obvious -- I mean, is your point that you're
13   trying to have me state that there's no "c" on it;
14   is that your point?
15        Q.    No, sir.   I'm just asking if you recognize
16   that they are the same?   Sorry --
17        A.    Yeah.   I would say there -- there's no "c"
18   on this one, other than that, it was the same image.
19        Q.    Okay.   So it's your testimony, as I
20   understand it, that the image listed in Paragraph 10
21   and the image displayed on website Blankenship Dry
22   Goods, is the same image absent the c copyright
23   management information of Cameron Davidson; is that
24   correct?
25        A.    Correct.
```

Page 48

1       Q.   I know I've asked you this, but now I'm
2   going to ask you specifically.
3            In your own recollection, who uploaded
4   this image to Blankenship Dry Goods?
5       A.   So I'll answer this, first and foremost,
6   that, as you saw, with Scott's document, as well as
7   Michael Masterman -- Masterson's Document 11 that
8   you guys presented to us, this document -- or this
9   image on our website can be attributed back to
10  August of 2020, potentially into, whatever, 2019 of
11  March we had said from the report.
12           As such, it is difficult at this point,
13  because we do not have a -- at this moment, we have
14  not found a document that, you know, has anything
15  right now referencing this -- this hyperlink, this
16  image.
17      Q.   Let me ask you a different question.
18      A.   Sure.
19      Q.   It is your testimony here, you've said
20  several times, that generally, you, Mr. Lenzo,
21  upload content to Blankenship Dry Goods; is that
22  correct?
23      A.   I've said that, yeah.
24      Q.   Is there any reason that you think you did
25  not upload this image to BlankenshipDryGoods.com?

Page 49

```
 1      A.    Is there any reason I don't think I did
 2    this?
 3      Q.    Yes.
 4      A.    If the question is, did I have access to
 5    the website within the time period of 2019 to 2020
 6    to maintain it, I would say yes.  To that effect, I
 7    can also say I don't remember specifically this
 8    image and the contents -- context as you've guys
 9    have asked questions, which I'm sure is coming next
10    in reference to a source of an image.  I presume
11    that's probably the next question you're going to
12    ask.
13      Q.    Just so I understand you correctly.  I'm
14    going to go back to Exhibit 1 here.  It is your
15    testimony that you are the best person to testify on
16    Blankenship's process of uploading images to its
17    website generally?
18      A.    Sure.
19      Q.    So if there were a person at Blankenship
20    Dry Goods who would also have knowledge, you would
21    have said them, correct?  Or would the best person.
22      A.    I believe I'm the best person.
23      Q.    Okay.  So going back to this infringement.
24    In your -- if you are the best person to testify on
25    who uploaded what to BlankenshipDryGoods.com
```

Page 50

1   website, generally --

2       A.   Uh-huh.

3       Q.   -- is there any other person in your

4   knowledge that would have uploaded this image aside

5   from you, Tory Lenzo?

6       A.   Well, this, again, back dates to 2019

7   through 2020.  At this moment, we do not have a

8   tertiary or secondary document to support that.

9       Q.   Let me ask you this:  Have you -- has

10  there ever been other people who have uploaded

11  content to BlankenshipDryGoods.com?

12      A.    In this date range that is in this -- in

13  this -- in question, I do not know if there was

14  anyone else in this date range that could have been

15  involved.  So, at this point, if we find anything

16  else, we will present it.

17      Q.    What about outside this date range?

18  Generally since 2012 when Blankenship Dry Goods was

19  started until now, July 9th, 2025, has there ever

20  been other people who have uploaded content to

21  BlankenshipDryGoods.com?

22      A.    At this point, I do not know back into

23  that department of things way past the relevant

24  dates of 2019.  Because, obviously, we never even

25  were asked that prior, or to research into this.  So

Page 51

1   it's somewhat far back in our records to have the

2   exact date of this.

3        Q.   So just so I understand you correctly.

4   You founded Blankenship Dry Goods in 2012, you were

5   the sole proprietor?

6        A.   Uh-huh.

7        Q.   You said -- I asked if there were other

8   people that helped you, you said it was Tory Lenzo

9   who did, you were the sole proprietor, correct?

10        A.   Correct.

11        Q.   So it's your testimony now, that as the

12   sole proprietor of your business and as a business

13   that operates both online and in person, it is your

14   testimony that you don't know who uploads content to

15   your website BlankenshipDryGoods.com?

16        A.   I don't believe that that's what I said.

17   You had asked me about -- questions about far, far

18   back in time, like, in 2012 through 2018, prior to

19   this image.  I think that we referenced this image

20   came up 2019 to 2020, which more directed me to try

21   to find documentation potentially relevant to that

22   area.  As such, we weren't able to find, at this

23   juncture, any documentation that in that time period

24   had any relevancy as you guys had requested.  And I

25   had stated that I, too, maintain and upload on the

 1   website.  That's what I believe is more what I said.

 2        Q.   Okay.  Just one more question.  I want to

 3   make sure I hammer this down and have it clearly, if

 4   you don't mind.

 5             Today or yesterday or within the last few

 6   years, has anyone posted content to Blankenship Dry

 7   Goods other than you, Tory Lenzo?

 8        A.   In the recent past since potentially when

 9   the image has gone on to the website, is that the

10   question?

11        Q.   Yes.

12        A.   From the documentation that I have seen, I

13   would say that I'm the primary person.  I -- once,

14   again, I don't know because -- I can't say for

15   certain, once again, due to the fact this is a 2019

16   publication and -- or 2020, as the expert says, but

17   it could be 2019.  I can't say for 100 percent

18   certain there has not been any other people on

19   there.  I do know I have maintained the website,

20   though, from that time.

21        Q.   So just to clarify, you said you are the

22   primary person that -

23        A.   That's -- I think that's the most

24   realistic answer.  Because, once again, there is an

25   element where we're looking for documents, different

Page 53

```
 1    things, you know, so on and so forth.
 2         Q.   Just in and around the time of 2023, do
 3    you recall who was responsible for uploading content
 4    to Blankenship Dry Goods?
 5         A.   I don't remember exactly.
 6         Q.   But it's -- okay.
 7         A.   The point I'm making is I've maintained
 8    the -- 2023 or 2020?  Sorry.
 9         Q.   2023.
10         A.   Are you just asking because it's more --
11    more recent?  Are you saying have we had more recent
12    work done?
13         Q.   Sure.
14         A.   Whatever.  It's not my position -- I guess
15    it's a stupid question.  It doesn't make any
16    relevancy.  My answer is what it was, is that a lot
17    of this is maintained by myself.
18         Q.   Okay.  Okay.  When you were uploading
19    these images on your website, which you've testified
20    are mostly done by yourself, does it -- when you --
21    sorry, withdrawn.
22              What is the process for uploading images
23    to BlankenshipDryGoods.com?
24         A.   In reference to the image at question?
25         Q.   No.  I could rephrase it if you prefer.
```

Page 54

1      A.   No.  I'll answer.  I mean -- okay.  Fine
2   rephrase, sure.
3      Q.   Sure.  Obviously, the images on
4   BlankenshipDryGoods.com, right, these -- you can
5   still see my screen, correct?
6      A.   Uh-huh.
7      Q.   These come from somewhere else, I assume,
8   correct?
9      A.   Okay.  I'm not sure -- are you referencing
10   the Cameron image?
11      Q.   No.  I'm referencing general images on
12   your website.
13      A.   Okay.
14      Q.   So, obviously, these images come from
15   somewhere, correct, outside of the Blankenship Dry
16   Goods?
17      A.   Sure.
18      Q.   What is your process for retrieving those
19   images and uploading them to Blankenship Dry Goods?
20      A.   If I'm -- once again -- so I've answered
21   the question in -- prior to that, you know, we
22   lacked some documentation in terms of people that
23   have worked on it.  If you're asking how I
24   specifically would be able to do that, I can answer,
25   potentially, just to that.

1       Q.   Yeah.

2       A.   I -- sorry.  Yeah.

3       Q.   Continue.  Sorry.

4       A.   Okay.  Via upload button on the -- the

5    website for managing the .com.  That's it.

6       Q.   So it's my understanding when you are

7    maintaining and managing the Blankenship Dry Goods,

8    there is a button that you click that says "upload"

9    and it -- you drag or you select from your files an

10   image and it uploads to your website; is that

11   correct?

12      A.   Yes.  That's fine.

13      Q.   Where do you typically retrieve these

14   images from?

15      A.   I mean, in reference to images that -- are

16   you asking in the -- I don't know.  There's no

17   blanket answer to this.

18           I mean, are you referencing to images

19   of --

20      Q.   Okay.

21      A.   -- of apparel?  Are you referencing to

22   images of New York City, like, the New York City

23   Cameron image?  I'm sorry.

24      Q.   Let me ask more specific questions.

25      A.   Okay.

Page 56

1      Q.   You see on my screen here there's a
2   "Narragansett Lager since 1890" sweatshirt?
3      A.   Yep.
4      Q.   Where does -- in your recollection, where
5   did this image come from?
6      A.   A photographer.
7      Q.   Okay.  Did you contact that photographer
8   to upload the image?
9      A.   I'm lost -- it was -- it was probably our
10  photographer.
11     Q.   Okay.
12     A.   So when you click -- yeah.  Because we had
13  a partnership with these people.  Someone took this
14  image via a photo.
15     Q.   Is this image an image of Blankenship Dry
16  Goods product?
17     A.   Yes.
18     Q.   Does Blankenship Dry Goods hire
19  photographers to take photos of their products?
20     A.   We have.
21     Q.   Okay.
22     A.   We have.
23     Q.   Okay.  When you hire a photographer to
24  take photographs of your works, is there a license
25  agreement between Blankenship Dry Goods and the

1  photographers they hire for the project?

2      A.   In reference to -- sorry -- in reference

3  to if we hire a photographer, that we're paying

4  directly to run a shoot for us of a product?

5      Q.   Correct.

6      A.   At this juncture, I don't have these

7  agreements in hand, so I don't remember honestly.

8      Q.   Generally -- you could testify to

9  generally.  Would you say there's a license

10  agreement between you, Blankenship Dry Goods, and

11  the photographers you hire to come take photos of

12  your products and, you know, display your products?

13  I mean, I imagine, you are a -- you are in the --

14      A.   More of -- listen, once again, I don't

15  know -- we've seen different documents here in

16  reference to, you know, legalese.  I don't know

17  exactly what you're referencing.

18           I would say that more specifically it is

19  possible that there's some additional verbiage in a

20  contract, but it's also possible -- I don't remember

21  holistically every last detail when we -- you know,

22  it's a little more -- I don't know what the word is.

23  They're doing a shoot for us in the moment and

24  they're producing images back.  In terms of our

25  agreements with them, I do not remember holistically

Page 58

1    now what is stipulated line by line.

2         Q.    But you do recall there being agreements

3    between you and the photographers?

4         A.    Contractual agreement, like, written

5    fully?  I don't know at this juncture, honestly.

6    Because I -- that's a question I was not really

7    seeking documentation for other than the Cameron

8    image.

9         Q.    Okay.  All right.  We can move on.

10        A.    Okay.

11        Q.    Okay.  So scrolling down here to page 2

12   and 3.  Again, you testified you recognize that the

13   image itself listed here is the same as the image

14   listed in the Paragraph 10 as the complaint?

15        A.    Okay.

16        Q.    When you look at this image of the

17   screenshot of Blankenship Dry Goods, do you notice

18   my client's copyright -- what was the word you used

19   here "copyright marcation," do you recognize it

20   there?

21        A.    I think I answered this question already.

22        Q.    Please answer it again.

23        A.    I stated originally that I see it's the

24   similar -- same image minus a c Cameron Davidson.

25        Q.    Great.  So I just have it clear, you

Page 59

1   recognize that the image uploaded to -- my client's

2   image uploaded to your website was uploaded without

3   the copyright marcation that you had indicated was

4   present on the image in Paragraph 10?

5        A.   I said that before.  I'll say it again,

6   uh-huh.  Great.

7        Q.   In terms of -- I know I asked you about

8   the process of uploading images, right.  When you

9   retrieved work like this, do you recognize -- do you

10  recollect screenshotting the work from online?

11       A.   I do not.

12       Q.   Okay.  When you --

13       A.   I don't remember -- I'm -- go ahead.

14       Q.   When you retrieved the image, is there a

15  process that Blankenship Dry Goods' website

16  automatically formats the website that it would crop

17  the image?

18       A.   I -- I -- I -- I do not know.

19       Q.   Okay.  I am going to stop sharing my

20  screen.  There we go.

21            So when we're talking a lot about you --

22  your organization's website Blankenship Dry Goods,

23  you allude to the fact that, you know, you're the

24  guy who's best equipped to testify on this stuff.

25  You're the guy who, you know, manages and uploads

Page 60

1  content to this website.  I mean, for all intents

2  and purposes, Blankenship Dry Goods is Tory Lenzo,

3  correct?

4       A.   No.  I wouldn't say...

5       Q.   Okay.

6       A.   I think I've said that, you know, some of

7  the records and some of the information we're

8  looking towards is -- we don't have documentation

9  holistically.  I have been able to maintain the

10 website during this time.

11      Q.   When you refer to "documentation

12 holistically," what do you mean?

13      A.   Well, you guys in your -- I guess, I'm

14 referring to your interrogatories.

15      Q.   Okay.

16      A.   Where you sought out documents.  Uh-huh.

17      Q.   Okay.  We can take a look at those, if

18 that will help you orient yourself here.  Give me a

19 second.  Okay.  That's it.  Okay.  I am going to

20 share my screen again, and mark this as Exhibit 5.

21 Let me know when you can see my screen, Mr. Lenzo.

22      A.   Okay.  I see your screen.

23           (Thereupon, the first set of

24      interrogatories was marked as Plaintiff's 5.)

25

```
 1     BY MR. ABISROR:
 2        Q.    Okay.  Do you see at the top here it says
 3     plaintiff, Bruce Cameron Davidson's first set of
 4     interrogatories --
 5        A.    Okay.
 6        Q.    -- directed to defendant, Blankenship Dry
 7     Goods?
 8        A.    Okay.
 9        Q.    So just to orient you with this document,
10     this is the holistic documentation you were
11     referring to that was requested.  Sorry.  This
12     document is the document that refers to that
13     holistic documentation?
14        A.    Okay.  Okay.
15        Q.    Okay.  So just orienting you with this
16     document, right.  This is -- this document is asking
17     for answers to requests for information about who
18     might be the best person to testify; who -- you
19     know, stuff about the nature of the claim, right,
20     and what's involved here and your knowledge of that.
21              So just so we're on the same page here,
22     right, that is your understanding of it, correct?
23        A.    Okay.
24        Q.    Okay.  So on Question 6 -- actually, I
25     should pull up your responses to these.  Let's do
```

Page 62

1    that.

2         A.    Sure.

3              (Thereupon, the answers to interrogatories

4         was marked as Plaintiff's 6.)

5      BY MR. ABISROR:

6         Q.    Okay.  I'm going to be marking this as

7    Exhibit 6.  Let me know when you can see my screen.

8         A.    Go ahead.

9         Q.    Great.  So in reference to the document

10   that you've just identified as plaintiff's

11   interrogatories, this is -- you can see here

12   defendant Blankenship Dry Goods' responses and

13   objections to plaintiff, Bruce Cameron Davidson's

14   first set of interrogatories?

15        A.    Okay.

16        Q.    Correct?

17        A.    Okay.

18        Q.    So if we go down to Question 6 --

19   Interrogatory 6.  "Please identify who is the owner

20   of the website.  Blankenship Dry -- you answered;

21   Blankenship Dry Goods; right?

22        A.    Okay.

23        Q.    I had asked you prior in terms of, you

24   know, who is involved at Blankenship Dry Goods, you

25   had testified that you -- you didn't mention anyone

1    else who worked there with you.  You didn't mention

2    anyone who might help you upload content, didn't

3    mention anyone who -- you mentioned people who

4    helped you on the back end of commerce business.

5    But in terms of your online presence, correct me if

6    I'm wrong, your testimony was that it was Tory Lenzo

7    who is operating the website?

8         A.   My testimony was that -- well, that's I

9    think a derivation of what I said.  I believe I said

10   that in reference to -- obviously, the -- you've

11   asked about business nature.  Obviously, you asked a

12   question about what was the amended complaint about.

13   You said -- I responded saying a -- two accusations.

14   And so, obviously, some of the nature of this is

15   that this is somewhat in the past.  So I gave you

16   the best answer in reference to that.

17             I knew pretty much at least I had access

18   to the website during this time.  I didn't -- we

19   have not -- and then as to date, we don't have a

20   document referencing a third party.  That's what I

21   stated.

22        Q.   Okay.  So Question 6 here, "Please

23   identify who's the owner of the website."

24   Blankenship -- you answered:  "Blankenship Dry

25   Goods."

1     Q.   Is there anyone at Blankenship Dry Goods,

2  other than yourself, who would be alluded to in that

3  response?

4     A.   I believe not.  I mean -- I don't even

5  really understand the nature of the question.

6     Q.   I can rephrase it.  I can rephrase it.

7     A.   Okay.  I will say no.  I would just say no

8  at this point.  That's the correct answer.  But

9  anyways.  Is your point -- I should have answered

10  myself, is that your point?  I'm just confused by

11  the question.  I'm just going to say, no, it's the

12  business's website, so Blankenship Dry Goods,

13  uh-huh.

14     Q.   I can rephrase it for you just to make it

15  little more clear for you.  I don't want you to be

16  confused.  Let me try it again if you don't mind.

17     A.   Go ahead.

18     Q.   The answer of who is the owner of -- of

19  the website Blankenship Dry Goods, which is referred

20  to up here in our definitions, right?  It's this

21  website Blankenship Dry Goods.

22     A.   Okay.

23     Q.   The answer that you listed was Blankenship

24  Dry Goods, correct?

25     A.   Okay.

Page 65

1          Q.    Based on that answer, is there anyone at
2     Blankenship Dry Goods who would have owned or
3     managed the website BlankenshipDryGoods.com other
4     than Tory Lenzo the sole proprietor of Blankenship
5     Dry Goods?
6          A.    Is your -- okay.  I think I'm
7     understanding now where my confusion came -- is your
8     question seeking clarification if there is an
9     internal employee at Blankenship Dry Goods other
10    than Tory Lenzo, perhaps, that would have
11    maintenance of the website; is that your question?
12         Q.    Yes.
13         A.    Okay.  I would say that at Blankenship Dry
14    Goods, I would put myself as the primary individual.
15         Q.    Who is the secondary individual?
16         A.    I would not put someone in Blankenship Dry
17    Goods.
18         Q.    So you, for all intents and purposes, not
19    only the primary, you are the only person?
20         A.    Once again, because of the timeline of
21    this situation, I don't know want to say with
22    100 percent certainty that there was never anybody
23    else involved.  But I would say that I was primarily
24    always maintaining this website, uh-huh.
25         Q.    Okay.  Thank you.

Page 66

1      A.    Sure.

2      Q.    I'm going to stop sharing my screen now.

3            I'm going to bring up another document.

4  Just give me a second.

5            MR. ABISROR:  Court reporter, are we on

6        Exhibit 6?

7            THE STENOGRAPHER:  No, 7.  I believe you

8        did 6.

9            THE VIDEOGRAPHER:  Yeah.  The last one was

10        6.

11            MR. ABISROR:  Okay.  I think it's just

12        messed up here.

13            (Thereupon, the answer to complaint,

14        affirmative defenses, counterclaim and jury

15        demand was marked as Plaintiff's 7.)

16    BY MR. ABISROR:

17      Q.    Please let me know when you can see my

18  screen, Mr. Lenzo.

19      A.    Okay.  Once again -- can you just remind

20  me once again who submitted this document?

21      Q.    Right.  So at the top here, you can see it

22  says answer to complaint, affirmative defenses,

23  counterclaim and jury demand.  The first paragraph,

24  defendant Blankenship Dry Goods, LLC --

25      A.    Sarah Haddad sent this to you?

Page 67

1      Q.    Yes.

2      A.    Okay.

3      Q.    This was --

4      A.    Yes.

5      Q.    This was the response to the complaint

6   that I marked as --

7      A.    Got it.  All right.  I understand.  Go

8   ahead.

9      Q.    Great.  So have you seen this document

10  before or do you need some time to read over it?

11  Just want to make sure you understand it, because

12  I'm going to ask some questions about it.

13     A.    You can ask -- I mean, it looks like it's

14  a long document.  You can ask some questions.  I

15  may -- as you ask, maybe I'll seek to see some of

16  the pages in reference.  I mean...

17     Q.    Okay.

18     A.    I can't be sure of --  go ahead.

19     Q.    We'll walk through it a little bit, if

20  that's okay?

21     A.    All right.

22     Q.    Do see you at the top here it says answer

23  to complaint, affirmative defenses, counterclaim and

24  jury demand?

25     A.    Okay.

Page 68

1     Q.   Do you understand what that means?   In
2  your own words.
3     A.   It was the prior attorney's respondature
4  [phonetic] to the amended complaint.
5     Q.   Great.  Thank you.  Scrolling down.  Do
6  you see Point 4 here, it says, "Davidson alleges
7  that Blankenship copied Davidson's copyrighted work
8  from the internet in order to advertise, market and
9  promote its business activities.  Blankenship
10  committed the violations alleged in connection with
11  defendant's business for purposes of advertising and
12  promoting sales to the public in the course and
13  scope of Blankenship's business."  Do you see that
14  allegation?
15          I can zoom in for you if it's better for
16  you.
17     A.   Okay.
18     Q.   So, yes, you understand -- you can see
19  that?
20     A.   Okay.
21     Q.   Do you see your -- the answer, "Defendant
22  is without knowledge or information sufficient to
23  form a belief as to the truth of the allegations in
24  Paragraph Error! Reference source not found, and
25  therefore denies these allegations."

Page 69

1          Do you understand what this response

2     means, in your own words?

3          A.   Is this in reference to fair use?

4          Q.   I'm asking you, Mr. Lenzo.

5          A.   Well, I would say that I would have to

6     refer to my attorneys on this because this is -- to

7     me, this is a legal question.  It was written by my

8     prior attorney, so it would probably have to go to

9     Mr. Criscione.

10         Q.   Just so we're clear, Galen, before I --

11    before you hop in, if you want.  I'm not asking for

12    any legal opinion from you, Mr. Lenzo.  I'm just

13    asking for your opinion of what this means.  In a

14    layman's point of view, I want to understand your

15    perspective on this answer.

16         A.   Because it's an answer to one -- is this

17    our affirmative defenses?

18         Q.   This is --

19         A.   Response.

20         Q.   -- to the complaint.

21         A.   Can you go up in terms of what the header

22    is of this?  Because it's the response and that it's

23    one of -- I mean -- it's not a defense, but it's an

24    answer to your question.  I still do think this is

25    a -- in my perspective, this is a question

Page 70

1    potentially for my attorney.

2        Q.    Again, Mr. Lenzo, I'm just asking for your

3    understanding of this response and specifically what

4    this means.  Because it says here "In Paragraph

5    Error! reference source not found," and therefore

6    denies those allegations.  I want to see if you

7    understand what this answers means.

8             MR. CRISCIONE:  Objection.  Go ahead,

9         Tory, you can answer.

10       A.    Okay.  Let me read again.  I don't know.

11   I still think this is a question for my attorney.

12     BY MR. ABISROR:

13       Q.    It's okay if the answer is "I don't know,"

14   Mr. Lenzo.

15       A.    At this juncture, I would say that I would

16   have to consult my attorney, holistically, because

17   it's an answer to something we've answered prior in

18   reference to potentially the legal element of our

19   motion to dismiss, originally.

20       Q.    Okay.

21       A.    That's my perspective.  I don't know.  Or

22   not our motion to dismiss, our answers.  Uh-huh.

23       Q.    Okay.  You know what, let's do this,

24   because I have a few more questions about a few of

25   these answers.

Page 71

1      A.    Okay.

2      Q.    I don't want you to give the same answer

3  to that.

4           MR. ABISROR:  Why don't we go off the

5      record.  You and your attorney, Mr. Criscione,

6      can discuss and then we can go back on the

7      record.  Does that sound good, Galen?

8           MR. CRISCIONE:  Yep.  Sure.  That works.

9           THE VIDEOGRAPHER:  All right.  Going off

10      the record, the time is 11:41 a.m.

11           (Recess 11:41 a.m. until 11:57 a.m.)

12           THE VIDEOGRAPHER:  Back on the record, the

13      time is 11:57 a.m.

14           MR. ABISROR:  Great.

15    BY MR. ABISROR:

16      Q.    I'm going to share my screen again to show

17  you where we were.  Let me know when you can see my

18  screen, Mr. Lenzo.

19      A.    Okay.

20      Q.    Just orienting you, again, this is Exhibit

21  7, it is the answer to complaint, affirmative

22  defenses, counterclaim and jury demand filed by

23  Blankenship Dry Goods in this case.  So looking

24  again at Answer 4 -- I just want to make sure, you

25  know, you had a chance to speak with your counsel

1    now, hopefully, you can give me a little bit more.

2           I'm not asking for a legal opinion.  I'm

3    not asking for your conversations with -- that you

4    had with Ms. Haddad or Mr. Criscione, for that

5    matter.  I'm asking for in your opinion -- this is

6    making a factual assertion, what is your

7    understanding of that factual assertion?

8        A.   The factual assertion that I understand at

9    this juncture is that prior attorney denies the

10   allegations in Point 4 or Paragraph 4.

11       Q.   When you say "the prior attorney," are

12   you -- are you hinting that you didn't support this

13   attorney's position?

14       A.   I stated that it was written by the prior

15   attorney.

16       Q.   Okay.  Did you -- again, I'm not asking

17   for what you spoke about.  But did you confer with

18   your attorney when drafting this response -- when

19   this response was drafted?

20       A.   At this point -- at this juncture, all

21   I -- because it was a while back, I remember the

22   prior attorney denied the allegations in this

23   Paragraph 4.

24       Q.   So it's my understanding what you're

25   saying to me is, you're not aware of the factual

Page 73

1   assertions that went into this answer?

2           MR. CRISCIONE:  Objection.  Go ahead,

3       Tory.

4       A.   I would say that, once again, it was the

5   prior attorney that denied these allegations.

6     BY MR. ABISROR:

7       Q.   Okay.

8       A.   I didn't say anything else other than

9   this.

10      Q.   Okay.  Well, I'm going to ask a follow-up.

11      A.   Sure.

12      Q.   This may sound repetitive, but I need you

13  to be -- in as best of way you can, just -- what is,

14  in your layman's terms, not -- a lawyer's opinion,

15  I'm not asking for a lawyer's opinion.  What is your

16  factual understanding of this answer?  You can read

17  it.  Take your time.

18      A.   I believe it's a denial of the allegation

19  in Point 4 and it was written by the prior attorney.

20      Q.   Okay.  In the second part here, right, it

21  says, "The defendant further states that no creative

22  or copyrightable element of the work, the photograph

23  was used in connection with this business."

24          What is -- again, not the legal opinion.

25  What is the factual assertion that you are making in

1    this answer?

2         A.   I believe the same thing, that the prior

3    attorney is just denying the allegation in Paragraph

4    4.

5         Q.   I'm having a hard time understanding this

6    point.  I'm going to ask some clarifying questions.

7              When you say the prior attorney objected

8    or had an issue with this, you're saying that the

9    prior attorney just drafted this without consulting

10   you or they advised you that they didn't -- that

11   they wanted this response and you signed off on

12   that?  Can you clarify?

13             MR. CRISCIONE:  Objection.

14        A.   On this point, the prior attorney denied

15   the allegations in reference to us -- I'll have to

16   look back if there's any reference to me about this

17   specific point.  I do not remember at this time.

18     BY MR. ABISROR:

19        Q.   So the prior attorney -- it's your

20   testimony that you do not recall conferring with the

21   prior attorney when drafting this response?

22             MR. CRISCIONE:  Objection.

23        A.   No, I did not say that.

24     BY MR. ABISROR:

25        Q.   Okay.

Page 75

1      A.   I stated that -- you stated something

2  else.  I stated that the prior attorney denied this

3  allegation in Point 4.  You then asked more about

4  what we spoke about.  At this juncture -- at this

5  point, I don't remember holistically when we were

6  drafting this specific document what we were

7  speaking about on Point 4.

8      Q.   Okay.

9      A.   Honestly, so...

10     Q.   Let me ask it -- let me take a step back

11  here and ask a more general question.

12     Q.   Sarah Haddad was your previous attorney,

13  correct?

14     A.   Sure.

15     Q.   When you and Ms. Haddad worked together,

16  she would advise that you -- that she needed to

17  draft a responsive or an assertive document,

18  correct, to you?

19         MR. CRISCIONE:  Sorry.  I'm going to

20     object.  I feel like we're getting dangerously

21     close to --

22         MR. ABISROR:  Okay.

23         MR. CRISCIONE:  -- privileged

24     communications between him and his prior

25     attorney.

```
1              MR. ABISROR:  Withdrawn.  Fair.
2        BY MR. ABISROR:
3        Q.    Generally -- you know, I'm not asking for
4   specific documents or specific legal arguments or
5   discussions.  Generally, Mr. Lenzo, did you and
6   Ms. Haddad collaborate when drafting responses?
7        A.    Well, Galen, would that be the same
8   situation that they're asking me in reference to my
9   communications with my attorney?
10             MR. CRISCIONE:  Well, I can't advise you
11        on this.  My objection is simply, I don't want
12        you saying any sort of communications
13        between -- I'm not objecting to his current
14        question about a general consultation, though.
15      BY MR. ABISROR:
16        Q.    Please answer the question, if you can.
17        A.    Go ahead and ask it again.
18        Q.    Okay.  Generally -- I'm not talking about
19   specific documents, I'm not talking about specific
20   conversation you had with your prior counsel,
21   Ms. Haddad, but generally --
22        A.    Not talking about Point 4?
23        Q.    Not talking about Point 4.
24        A.    Fine.
25        Q.    I'm not talking about anything specific.
```

1    I'm talking generally, did you and Ms. Haddad

2    collaborate to draft responses and assertive

3    documents in this case?

4         A.    Documents were drafted by Sarah Haddad.

5         Q.    Did you collaborate with Ms. Haddad in

6    drafting those documents?

7         A.    I don't under- -- unfortunately, I don't

8    know, because I don't understand what it means.

9         Q.    Okay.  I'll ask it in a different way.

10   And I'll try to make it more simple, just so we're

11   on the same page.  I don't want you to be confused.

12   Again, this -- I understand it's a tricky

13   conversation.

14        If you're -- it's your understanding that

15   Ms. Haddad drafted documents prior to you -- in this

16   case prior to you retaining Mr. Criscione, correct?

17        A.    Okay.

18        Q.    I'm going to take that as a "yes."

19        A.    Okay, yep.

20        Q.    Generally, in your experience with

21   Ms. Haddad, when they drafted those documents that

22   you just testified she did, did you collaborate with

23   her in drafting those?

24        A.    Unfortunately, you're asking -- basically,

25   you're asking the same question.  I don't know what

Page 78

1    you mean by "collaborate."  I don't know what you
2    mean by "collaborate."
3        Q.    Without divulging any conversations,
4    without divulging any information about those
5    conversations, time, place, did you -- did you
6    communicate with Ms. Haddad or meet and confer --
7        A.    Unfortunately, it becomes a problem in
8    reference what Galen said before, you're asking me
9    once again -- you just used the word
10   "communications" with my attorney.  You just said
11   the word "communicate."
12       Q.    Okay.  Okay.
13       A.    You're asking for my communications with
14   the attorney again.  I mean, I don't know.
15       Q.    Generally, speaking -- again, unless
16   Mr. Criscione objects, I'm going to ask you to
17   answer the question, please.
18            Generally speaking, did Ms. Haddad forward
19   you drafts of the -- of any document for you to
20   review?
21       A.    Okay.
22       Q.    Is that a yes?
23       A.    Yes.
24       Q.    Okay.  So you reviewed those documents and
25   you, in a way, collaborated with Ms. Haddad,

Page 79

```
 1   correct?
 2        A.   I don't believe it's the correct word.
 3        Q.   Okay.
 4        A.   I would not say --
 5        Q.   You reviewed the documents, correct?
 6        A.   Sure.
 7        Q.   You, in some capacity -- again, not asking
 8   for specific examples or time or place.  But in some
 9   capacity, you authorized these documents to be
10   filed?
11        A.   To the best of my ability to, you know,
12   authorize.  In terms of understanding, sure, if
13   that's what you're saying.
14        Q.   Was there a document that was filed that
15   you didn't approve of?
16        A.   I do not remember.  I do not believe so.
17   I don't remember.  I don't believe so.
18        Q.   In other words, you and Ms. Haddad --
19   again, not divulging attorney-client communications
20   here.  You and Ms. Haddad, she would draft
21   documents, she would send them to you to review, you
22   would approve them and authorize them and then they
23   would be filed; is that correct?
24        A.   Okay.  Okay.
25        Q.   Okay.
```

Page 80

1      A.    I mean -- sure.  Go ahead.  Go ahead.

2      Q.    Okay.  That was my point.  That was all.

3  Okay.  So we're going to go on now.

4           I do want to ask, now that we've got that

5  cleared up here, you know, if you were reviewing and

6  you were approving these documents and if you

7  factually -- you know, what is your factual

8  understanding of this claim here?  If you testified

9  that you reviewed generally, what is the factual

10  assertion you're making there?

11     A.    Once again, because we don't have the

12  other attorney here as well, I wasn't able to, you

13  know, consult any of these answers with them.

14           In reference to this answer, what I see is

15  it's a denial of the allegation in Point 4.

16     Q.    Just to be clear, Mr. Lenzo, I'm not

17  asking for conversation with the previous attorney.

18  I'm not asking for any legal opinion at all,

19  frankly.

20           I'm asking for you, Tory Lenzo's factual

21  understanding of the sentence, "The defendant

22  further states that no creative or copyrighted

23  element of the work, the photograph, was used in

24  connection with its business," right?  You have

25  testified that you reviewed these documents, you

Page 81

1    approved them.  What is your factual understanding

2    of that -- of that answer?

3        A.    That we are denying the points made in

4    Point 4.

5        Q.    Okay.  Okay.  Scrolling down here.  We're

6    going to scroll down to Point 12 here.  Twelve, just

7    so you read it, it says, "Davidson registered the

8    work with the Registrar of Copyrights as part of a

9    group registration titled Photograph September 2015

10   to November, on December 1st, 2015, and was assigned

11   the Registration Number of VA 251061 and the

12   certificate of registration is attached hereto as

13   Exhibit 1.

14           I will show you that, just so you have an

15   understanding of that document.  I will mark this --

16   we're on 8, I believe, right.

17           MR. ABISROR:  Court Reporter, are we on 8?

18           THE STENOGRAPHER:  Yes.

19           MR. ABISROR:  Great.  Thank you.

20           (Thereupon, the copyright registration was

21      marked as Plaintiff's 8.)

22    BY MR. ABISROR:

23        Q.   Let me know when you can see my screen,

24    Mr. Lenzo.

25        A.    Okay.

1        Q.    So do you see it says "Exhibit 1" here?

2        A.    Okay.

3        Q.    Do you see here it's the Exhibit 1 that

4    was referred to -- I mean, this is your answer.  But

5    our amended complaint in Point 12 says, Davidson

6    registered the work and it was certificate -- the

7    certificate of registration is attached here as

8    Exhibit 1.  Do you acknowledge this is Exhibit 1 to

9    that?

10       A.    Okay.

11       Q.    Great.  So just orienting you to this,

12   this is the copyright registration of my client's

13   image, of the work at issue.  It is group

14   registration, as you can see here, it's photographs,

15   and it is Photograph September 2015 to November of

16   2015, do you understand that?

17       A.    Okay.

18       Q.    So going back to your answer here,

19   "Defendant denies that the certificate of

20   registration is a group registration and that the

21   photograph is part of that group."  So what is your

22   factual understanding that the certificate

23   registration is not a group registration?

24       A.    If you want an honest answer, at this

25   juncture, we would need probably the other attorney

Page 83

```
 1    once again.  Because there was different things at
 2    this juncture that were told to me from her in
 3    relationship at the time to registrations.
 4         Q.    Okay.
 5         A.    Honestly, I don't have the holistic
 6    breakdown of what she was saying to me in reference
 7    to this.
 8         Q.    Okay.
 9         A.    But that is my answer.  That's the truth.
10    So, obviously, if there was a -- if there was
11    contention about it, obviously, there was a
12    rationale from the attorney that was dictated to me.
13    In reference to the validity as such, that is the
14    pertaining answer to Point 12.
15         Q.    I'm going ask --
16         A.    That was my answer to Point 12, uh-huh.
17         Q.    Okay.  I'm going to ask it a different
18    way.
19         A.    Okay.
20         Q.    Looking at Exhibit 1, which I have marked
21    as Exhibit 8 in this deposition, is it your
22    understanding that this is a group registration of
23    photographs?  Not asking for a legal opinion.  I'm
24    just asking for as a layman, as a person, do you
25    view this as a group registration?
```

Page 84

1      A.    A valid group registration?

2      Q.    Not validity.  We're not going into that.

3  I'm just asking your impression as a layman of this

4  document.

5      A.    Well, can I just -- in reference to what

6  Ms. Haddad said, did she say valid registration or

7  just group registration in general?

8      Q.    I'm asking for your opinion.  I'm not

9  asking for Ms. Haddad's.  I will show you Ms.

10  Haddad's response --

11      A.    All right.  Well, anyways.

12      Q.    Defendant denies that the certificate of

13  group registration is a group registration.  Okay.

14            Do you factually -- your factual point of

15  view, do you believe this is not a group

16  registration?  Not talking about validity.  I'm

17  talking about a group registration.

18      A.    I will say that -- once again, the answer

19  is a denial to the Point 12.  I will say that, to my

20  memory, I do not remember, I will say, exactly what

21  myself and the attorney prior to Galen discussed in

22  in reference to this point as to how we -- how she

23  came to the conclusion and I authenticated it.

24      Q.    I'm not asking about that.  I'm asking

25  right now, right here at 12:15 p.m. on July 9th,

Page 85

1   is -- looking at this document that I have marked as

2   Exhibit 8, do you recognize this as a group

3   registration of photographs?

4        A.   As I don't know what holistically

5   registration perfectly is.  I can't be certain.  I

6   will say possibly.  Possibly, yes.

7        Q.   Okay.  The second part of that answer,

8   that the photograph -- so defendant denies that the

9   photograph is part of that group.  What is your

10  factual understanding of that assertion?  In other

11  words, what information, if any, did you have to

12  support that assertion?

13       A.   I have to go back and discuss these

14  answers, unfortunately, with the other attorney

15  holistically.

16       Q.   I'm not asking for the other attorney's

17  opinion.  I'm asking for your factual understanding

18  of them right now.

19       A.   At this point, I do not remember

20  holistically.

21       Q.   Okay, you don't remember.  Okay.

22            So I'm going to stop sharing my screen

23  now.  I will move on to another exhibit.

24            MR. ABISROR:  We are on Exhibit 9?  Yeah.

25            THE STENOGRAPHER:  Ten, yes.

Page 86

1            MR. ABISROR:  Thank you.

2            (Thereupon, the notice letter to

3        Blankenship was marked as Plaintiff's 9.)

4     BY MR. ABISROR:

5        Q.   Okay.  Mr. Lenzo, I'm sharing my screen.

6    Let me know when you can see my screen.

7        A.   Okay.  Go ahead.

8        Q.   Great.  Do you recognize this document?

9        A.   This is one of the documents, I believe,

10   that you sent in the interrogatory's attachments.

11   Or whatever -- God Allmighty.  The documents section

12   of your answers to the interrogatories, rather.

13       Q.   So what this is -- you'll see here it's

14   dated May 28, 2024, it is an email -- it is a notice

15   letter that was sent to this email

16   blankenshipdrygoods@gmail.com.  Do you own and

17   operate Blankenshipdrygoods@gmail.com?

18       A.   Okay.  Yes.

19       Q.   You do?

20       A.   Yes.

21       Q.   Okay.  So this was sent via email to that

22   email address, and it is a notice letter alerting

23   Mr. Tory Lenzo at Blankenshipdrygoods@gmail.com that

24   there has been a copyright infringement claim

25   detected.  There's -- this is before it's been

1    filed.  There's been copyright infringement claim
2    detected against your organization.
3         A.   I'm sorry.  What does that mean, detected?
4         Q.   Meaning my client will get an alert that
5    one of their images -- or they'll come across one of
6    their images, that has been posted online without
7    their authorization.
8         A.   I'm sorry.  An alert from whom?
9         Q.   I -- an alert from whom -- like, you're
10   asking for a service, is that what you're asking
11   for?
12        A.   Well, you said they --
13        Q.   Yeah.  Mr. Lenzo --
14        A.   You asked a question about detection.  I
15   don't know.
16        Q.   Mr. Criscione can ask my client about
17   that.  We're not asking --
18        A.   Okay.  I -- you referenced something, so I
19   wasn't sure it was pertinent to my --
20        Q.   All that needs --
21        A.   Yeah.  I'm not interrogating it.  That's
22   not -- I just -- you said something about he
23   received an alert via detection.  I was just seeking
24   clarification what that meant.
25        Q.   I'm using that term generally.  I'm just

Page 88

1    trying to orient you to what this document is,
2    right?  That's all I'm trying to do here.
3         A.    Uh-huh.
4         Q.    So this document is sent to your
5    organization, Blankenship Dry Goods, alerting you
6    that one of their photographs -- one of my client's
7    photographs was detected on your website and it
8    includes the image at issue.  Okay.  Then it
9    includes the link where the infringement was posted
10   and then it includes various information, you know,
11   that there was no license granted by my client, and
12   then it goes into sort of some of the recourse that
13   my client will be seeking, you know, from you at
14   that point.
15              So have you seen this document before?
16        A.    Okay.
17        Q.    Is that a yes?
18        A.    Yes, uh-huh.  If I say "okay," it means
19   yes, sorry.  That's how I speak.
20        Q.    Do you recall what you did when you
21   received this document in response?
22        A.    Immediately what I did?
23        Q.    In the aftermath.  You know, you received
24   this letter, correct?  What is your next step?
25        A.    At some juncture, I believe you and I

Page 89

1    spoke.

2         Q.    Okay.

3         A.    I don't remember the dates, honest to God.

4    I mean, I know you and I, at some juncture, did

5    speak.

6         Q.    Okay.  Did you attempt to copyright --

7    sorry.  Withdrawn.

8              Did you attempt to contact a copyright

9    attorney when you received this letter?

10        A.    I do not remember at this juncture what

11   was done with attorneys.

12        Q.    Uh-huh.  Did your company take any

13   internal actions when they received this letter?

14        A.    We -- I believe we contacted you and we

15   also -- by being alerted to this, we removed the

16   image from the website.

17        Q.    Okay.  Just so we're understanding each

18   other here, this is May 28th, 2024, you're saying

19   after you received this letter, it is your opinion

20   that you contacted my office?

21        A.    I don't -- listen, in terms of dates,

22   contacting you specifically, I do not remember the

23   date that we contacted you.  Somewhere in between

24   litigation and a letter or multiple letters, you and

25   I spoke.  I will leave it at that.  I don't know if

1    it was in May.  I don't believe it was.

2        Q.   Okay.  Okay.  When you received this

3    letter, did you try to contact my client, Bruce

4    Cameron Davidson?

5        A.   At some point, I spoke to Bruce Cameron

6    Davidson, yes.

7        Q.   But you don't recall if it was after this

8    letter?

9        A.   It certainly was after this letter.  It

10   must --

11       Q.   I'm sorry.  In the immediate aftermath of

12   this letter?  Sorry.

13       A.   I don't have the day.  I don't remember

14   exactly the date.  I don't know what you mean by

15   immediate aftermath as well.

16       Q.   Okay.  You eventually -- you eventually

17   contacted my client --

18       A.   Between litigation and this letter, at

19   some juncture, I spoke to Bruce Cameron.  Uh-huh.

20       Q.   Did you try to obtain a license for the

21   work after receiving this letter?

22       A.   Are you referencing a document that you

23   guys produced in reference to some form of

24   confirmation online?

25       Q.   I'm not referencing anything other than

Page 91

1    what's on screen, Mr. Lenzo.

2        A.   Okay.

3        Q.   Just briefly, try not to predict why I'm

4    asking questions, just answer --

5        A.   I'm not trying to.  I just have to also

6    determine --

7        Q.   It will help this go a lot more smoothly.

8        A.   Sorry.

9        Q.   Did you attempt to obtain a license for

10   this work after --

11       A.   Yes.

12       Q.   -- receiving this letter?

13       A.   Yes.

14       Q.   Okay.  When did you attempt to -- when did

15   you --

16       A.   I believe you guys presented that

17   information.  I don't have it off the top of my

18   head.  You guys have that date.  Uh-huh.

19       Q.   Okay.  So just so we're understanding each

20   other, this is a May 28th, 2024, letter.  I'm going

21   to stop sharing my screen and send -- and share

22   another document, which is -- I will mark as Exhibit

23   10.

24            Let me know when you can see my screen,

25   Mr. Lenzo.

Page 92

1          A.    Go ahead.

2                (Thereupon, the follow-up notice letter

3          was marked as Plaintiff's 10.)

4     BY MR. ABISROR:

5          Q.    Great.  So you see this top June 14th,

6     2024, correct?

7          A.    Okay.  Go ahead.

8          Q.    Okay.  So this letter was sent around two

9     weeks after that -- wherever that first letter went.

10    It was sent two weeks after this letter was sent on

11    May 28th, 2024, roughly around two weeks; do you

12    understand that?

13         A.    Okay.

14         Q.    Okay.  Do you recognize this document --

15    this June 14th, 2024, letter?

16         A.    Listen, the full extent of what's written

17    here -- but perhaps not exactly.  But, yes, I

18    remember there were multiple letters sent.  Uh-huh.

19         Q.    Okay.  So this letter states that we did

20    not receive a response from you from the May 28th

21    letter.  So this is two weeks later, "We must

22    receive a response from you so we know you are

23    taking this matter seriously, even if you need more

24    time to hire a lawyer or report this claim to your

25    your insurance carrier.  If we hear from you, then

1    we can work with you to understand your position and

2    resolve our client's claim."  It says, "Please

3    respond to us."

4            So that is an indication you did not reach

5    out to me or my client after that May 28th letter,

6    does that --

7        A.    But I did not say that either.  What I

8    said, is between the litigation -- listen,

9    obviously, you're saying this letter, this letter --

10   okay.  Between receiving letters and the litigation

11   commencing, that's what I stated.  Uh-huh.

12       Q.    Okay.

13       A.    I did not give a definitive date that in

14   between the May and June date that there was an

15   outreach.  I did not say that.

16       Q.    Just trying to orient you with the dates.

17       A.    No problem.

18       Q.    There was a May 28th, letter, 2024, that

19   we sent on behalf of our client.  We didn't receive

20   a response from you.  And then on June 14th, we sent

21   a follow-up letter to you and that's where we are

22   now.  Does that make sense?

23       A.    Fine.  That's fine.

24       Q.    Great.  So when you received this letter,

25   you know, if you can, best of your knowledge, what

Page 94

1  did you do in response to receiving it?

2       A.   This specific letter, I do not remember.

3  All I can tell you is that you and -- between the

4  letters and the litigation, I know you and I spoke.

5  I know -- I referenced that I spoke to Cameron

6  briefly.  And, you know, we were not able to make

7  headway in terms of, you know, coming to a

8  resolution prior to a litigation.  That's all.

9       Q.   When did you speak with Mr. Davidson?

10      A.   I don't have the day.  I don't have the

11 exact day.  Again -- once again, in between the

12 notice and the litigation.

13      Q.   Okay.  So do you recall a general time?

14 Was it -- were there fireworks, was it July 4th?

15 You know, how -- just trying to get -- I'm trying to

16 get some understanding of timeline here and I'm

17 hoping you can help me out with that.

18      A.   I'll have to look back if I have any

19 records specifically of what --

20      Q.   Great.

21      A.   Off the top of my head, I don't have a day

22 exactly, but I did speak with him.

23      Q.   Okay.  Was that via phone or was that via

24 email or text?

25      A.   Phone.

1      Q.   Phone.  So at some point -- you're not

2   sure if it was after the first letter or the second

3   letter, but at some point between receiving these

4   letters and the litigation being filed, you spoke on

5   the phone with my client, Cameron Davidson?

6      A.   I did.

7      Q.   What did you speak about with Cameron in

8   those calls?

9      A.   I don't remember.  Once again, I don't

10  remember holistically what was said between us.  I

11  remember him referencing Michael from your law firm.

12  I don't know if it's -- I see a Michael A-B-A-R, I

13  don't know if that's part of SRip or part of the --

14  boy -- the courts.  There was another Michael that

15  you guys had referenced as well.  I remember he said

16  he was going to speak with Michael on the matter.

17  That was how it was left between us.  Obviously,

18  here we are.  So, you know, ultimately it went to

19  litigation.

20      Q.   Okay.  Okay.  So we're going to move on.

21  So when you received this second letter -- you know,

22  you had mentioned that you -- you know, and we

23  produced that document that you had tried to -- --

24  you know what, let me start over.  Withdrawn.

25           After receiving the second letter, did you

Page 96

1    obtain a license for my client's work?

2        A.   I don't know if necessarily the licensure

3    fully went through.  I think we made an attempt to,

4    our business --

5        Q.   So -

6        A.   It says "confirmation," so my assumption

7    from the document you produced is correct.

8        Q.   Okay.  So I'm going to pro -- show the

9    document now so we can orient with that.

10           Okay.  This is going to be Exhibit 11.  I

11   will share my screen.  Okay.

12       A.   Uh-huh.

13           (Thereupon, the Blankenship photo deck was

14       marked as Plaintiff's 11.)

15     BY MR. ABISROR:

16       Q.   Can you see my screen?

17       A.   Absolutely.

18       Q.   Great.

19       A.   So it looks like there was a successful

20   purchase -- from this document, a successful

21   purchase of one-year management.  Uh-huh.

22       Q.   Okay.  So just so we're on the same page,

23   at the timeframe here, first notice letter went

24   out -- I'll pull that up again -- on May 28th, 2024,

25   we're not sure when or how, but, you know, there was

1   some contact -- or we're not sure when that contact

2   happened.  Then a second notice letter went out on

3   June 14th, some two weeks later, and then going back

4   here to -- wherever that document went.  Here it is.

5            On Exhibit 11, on June 15th, so that's one

6   day after the second notice letter --

7        A.   Actually, I'm going to answer -- I see

8   it -- I can't cut you off.  Sorry, Jordan.  Go

9   ahead.

10       Q.   After the second notice letter on

11  June 14th was sent to you, the next day it appears

12  you attempted to acquire a license for this work; is

13  that correct?

14       A.   Yeah.  I mean, it looks successful from

15  this image.  I don't know now holistically if you're

16  saying attempt or success.  To my purview now -- I

17  have to look back at my records.  It looks like we

18  successfully purchased the license from June 15th,

19  2024, from my purview of what I'm seeing.

20       Q.   So you have testified that it's your

21  understanding that the image at issue here was first

22  uploaded in August of 2020; is that correct?

23       A.   Absolutely, yeah.

24       Q.   Okay.  When you purchased this license,

25  did you think -- you can see here rights -- it says

Page 98

```
 1    it right here, "License, rights-managed image
 2    license, web media one year, future looking."  Was
 3    it your understanding that the license would cover,
 4    you know, if it was 2020?  I don't know if that's
 5    true.
 6         A.   Multiple things I can say about this.
 7    Okay?
 8         Q.   Okay.
 9         A.   Number one, as I referenced -- okay.
10    First thing I'm going to reference to you, I do
11    believe this date was the date that I spoke to
12    Cameron Davidson actually.  So now that you asked
13    that question -- I didn't see it.  Now, I see the
14    day of when you're bringing this in.  So I do
15    believe I spoke to him on this day.
16              Are you asking in -- at the time when --
17    first of all, you sent two letters -- I'll leave it
18    at this.
19              Are you asking the point of why we did
20    this?  Is that your general question?  Ask me the
21    specific question, I'll answer.  Go ahead.
22         Q.   When you purchased this license or
23    attempted to purchase this license on June 15th,
24    2024, okay, did you -- sorry.  Let's ask it that
25    way.  Did you attempt to acquire a license on
```

Page 99

1    June 15, 2024?

2        A.    Yes.

3        Q.    When you -- when you attempted to do that,

4    was it your understanding that that license would be

5    retroactive and would cover the previous years that

6    it had been posted on your website?

7        A.    At this juncture, we did not have the

8    documentation.  It took the Scott Gibbs report

9    realistically and actually an email from yourself

10   that was sent to Ms. Haddad for us to fully wrap our

11   heads around the holistic nature of this image,

12   truth be told.

13       Q.    I'm not asking for holistics.  I'm asking

14   for you, Tory Lenzo --

15       A.    I answered it, because --

16       Q.    No you didn't.

17       A.    Okay.

18       Q.    Mr. Lenzo, respectfully, you did not

19   answer it.  When you purchased this license on

20   2024 -- on June 15th, was it your factual

21   understanding that that license would cover the

22   previous years or however long it was uploaded on

23   your website?

24       A.    It's a two-part answer.  May I answer it

25   in my best ability I can?

1      Q.   Proceed, of course.

2      A.   One, at this juncture in time, we did not

3  know -- or I did not know holistically what the

4  timeline of this image was.  If -- I don't believe

5  in those two documents -- unless I missed it.  I

6  don't believe in the two letters you wrote that you

7  referenced the August 2020 date.  Is that correct?

8      Q.   That August 2020 date, I've used from your

9  testimony today.  I'm not using that here.  I'm

10 asking --

11     A.   Well, it's also in your Document 11, too.

12 You guys also reference August of 2020 as the date

13 there.

14     Q.   Mr. Lenzo --

15     A.   Uh-huh.

16     Q.   -- let's start over.

17     A.   That's number one, in terms of this.

18 You're asking why did we do this?  Number 2, no, I

19 did not feel that if just sending a purchase

20 directly, that we had resolved the claim.  I did not

21 think that.

22     Q.   I'm going to ask it again.

23     A.   Sure.

24     Q.   I'll try to ask it in a simple way.

25          So this is an order from Blankenship Dry

Page 101

1   Goods; is that correct?

2        A.   Okay.

3        Q.   This is an order to obtain a license,

4   rights-managed image license, web media for one year

5   of the image CD 2150910029; is that correct?

6        A.   Okay.

7        Q.   For one year; is that correct?

8        A.   Okay.

9        Q.   Do you think the one year started on

10  June 15th, 2024?

11       A.   Yeah.  Technically correct, yes.

12       Q.   So --

13       A.   Technically correct, absolutely.

14       Q.   So --

15       A.   Now we were not using it.  I understand

16  that that's not pertinent to the matter at hand.

17  We're not -- we never stipulated that because we did

18  this, that we had some form of a coverage with

19  Cameron Davidson and SRipLaw in reference to the

20  matter.

21            It's really almost like a good -- at the

22  time, once again, the legal element of any defenses

23  that I would learn about, any timelines that I would

24  learn about, any future defenses that we're going to

25  put up, there's no attorney hired.  There's a lot of

1  stuff obviously that has changed from this date and
2  today.
3          With that being said, I think my answer is
4  clear.
5      Q.   No, it's not.
6      A.   Okay.
7      Q.   And I'm not asking for your legal opinion,
8  Mr. Lenzo.  I'm asking for your factual
9  understanding of what happened.  Okay?
10         When you purchased this license, from what
11 you've just said to me, it was -- you understood
12 that the license was forward looking in the sense
13 that if you were obtaining -- were to obtain a
14 license, it would be until June 15th, 2025 --
15     A.   Fine.
16     Q.   -- right?  It wouldn't apply to, let's
17 say, June 14, 2024, because that would be
18 retroactive; is that correct?
19     A.   Certainly.  And we have never stated that
20 otherwise.
21     Q.   Okay.  Okay.  What was -- now, I am asking
22 for your intent, okay.  So you've tried to answer
23 that but I didn't ask for it specifically.
24     A.   Okay.
25     Q.   What was your intent behind fulfilling --

Page 103

1    trying to order this image, this rights managed.

2         A.   I will start by saying in time, can intent

3    and knowledge change?  Meaning that my intent and

4    knowledge today can be different than my intent and

5    knowledge on June 15th of 2024.

6         Q.   Let me stop you right there.

7              What was your intent on June 15th, 2024?

8         A.   Perfect.  Thank you so much.  That's all I

9    needed to clarify.

10             On June 15th, 2024, I believe the

11   chronology of how this came to be was, I believe,

12   because we received that letter, we contacted

13   Cameron to determine what was necessarily going on

14   with this matter.  I think we basically stated we're

15   a relatively small, you know, business and figured

16   he'd, you know -- assumed that he may be the same.

17   I think that we were seeking some form of goodwill

18   with the individual, in hopes to, at some juncture,

19   to move forward with a resolution.

20        Q.   Okay.  That's fair.  I understand that.

21   So -- but at this point in time on June 15th, 2024,

22   you had recognized that my client's work had been

23   uploaded to your website?

24        A.   Correct.

25        Q.   You had recognized that some form of

1    recourse, whether it be you filling out -- obtaining

2    a license or whether it be you resolving it with my

3    client was in order?

4        A.    That's why I wanted to be very careful in

5    the way I ans- -- you had framed the question.

6              On June 15th of 2024, undoubtedly, I would

7    say that without holistic knowledge of the -- you

8    know, in terms of things I've learned through

9    lawyers and things I've learned about the case, that

10   in that day, definitely it would have been our goal

11   to somehow move off the matter with this individual

12   in reference to some form of way to move off it.  I

13   mean, no doubt.

14             When I -- at that point, this was done and

15   then I believe that he didn't actually call us back,

16   is what I believe happened.  We spoke twice that

17   day.  To be honest with you, I was under the

18   impression that it could be resolved.  But it did

19   not ultimately go down that way and so here we are.

20   Or I was hopeful at the time.  But, you know, that

21   was June 15th of 2024.

22             Then there's a litigation and then once

23   you're in litigation, different things become known.

24   For example, as I referenced, the timelines on this

25   matter in reference to how long this image was there

Page 105

1    became more privy to us with the Scott Gibbs report,

2    for example, and the Masterson report.  Go ahead.

3        Q.    No, continue.  This is all good stuff.

4        A.    That's all I have.

5        Q.    Okay.  Okay.  So when you -- when you

6    placed this order, was it your understanding that

7    you had acquired a license?

8        A.    Listen, we had no intention -- look, let's

9    be realistic.  We had no intention to -- our intent

10   through doing this was not to continue to use this

11   image based on this situation, obviously.  It was --

12   the URL was not with this image, but -- I think I

13   also answered your question.

14            You asked for my intent and it was

15   basically just some form of goodwill.  I mean,

16   that's it.  There was really no desire, per se, to

17   be in the future licensing this in reference to like

18   a continuation.  Albeit -- yeah, go ahead -- for

19   use.

20            Albeit, I'm not sitting here saying it was

21   then dubbed in our brains that because this had been

22   done, that potentially this had retroactively

23   licensed a past use, which we never stated.

24       Q.    If -- you didn't answer the question.  I

25   need you to answer the question.

1      A.    Fair enough.  Go ahead.

2      Q.    From placing this order, was it your

3    understanding that you had acquired a license to use

4    the work in the future?

5      A.    I suppose technically speaking while --

6    yes, I suppose that would be ultimately what this

7    indicates.  If this did go through holistically,

8    which it does appear it did.  So -- okay.

9    Technically speaking, that is the license.

10      Q.    Do you have any other verification --

11    because we haven't received -- do you have any other

12    verification that the order went through?  Did you

13    receive a credit card receipt?  Did you receive a

14    bank statement?  Is there anything that could verify

15    that this order went through?

16      A.    I mean, I was not asked to present this.

17    I would assume that your group would have that just

18    as readily.  No?

19      Q.    That's not -- don't need that answer.

20            I was just asking if you had something

21    that showed that gave you authorization, here is the

22    license, here is the work, you, Blankenship Dry

23    Goods, are authorized --

24      A.    I'm going to answer, I do not remember at

25    this juncture.

1      Q.    Great.

2      A.    I do not remember at this juncture.  I

3   received this notification from your group, so I'm

4   currently looking at it in the lens of how you

5   stated it.  If the case -- listen, so then I must

6   alter my past statement if you're saying it like

7   that.

8           If the case is that no transaction

9   ultimately did occur, then I would have to argue

10  that this notification is somewhat misleading.

11  Because it's saying -- to me, my purview is that it

12  did go through.  If it did not, then it did not.

13  But then that means we were not licensed in 2024

14  through 2025.

15     Q.    So just so we're on the same page,

16  Mr. Lenzo, we have produced -- plaintiff has

17  produced this document.  It was sent to my client

18  from Photodeck, which is where you allegedly tried

19  to obtain the license.  I'm not sure if you received

20  any notification.  This is our production, not

21  yours.

22          So if you're asserting that you think this

23  notification --

24     A.    I don't know.

25     Q.    -- is misleading --

Page 108

1      A.   No, I didn't assert that.  You stated
2  that --
3      Q.   Okay.  All right.  We'll move on.  We'll
4  move on.
5      A.   All I want to say for the record is that
6  if -- I don't want to put it out that I have
7  obtained a license between 2024 through 2025 if
8  ultimately some form of transaction did not go
9  through.  If I stated that for the record, it's just
10  that I'm looking at the document in front of me that
11  you're presenting, which does look like it did go
12  through.  I can't be sure at this juncture.  Because
13  you said, Did you receive a confirmation in
14  reference -- like seeking at bank statements, I
15  haven't done that in reference to looking back.
16          Truth be told, I don't know how pertinent
17  in reference to if it went through or not,
18  because -- we don't -- so, I mean, at this point --
19  but you can see at the bare minimum, there was an
20  attempt at, you know, purchasing.  I don't know if
21  it went through holistically.  You would have to ask
22  your client if the funds went through.
23      Q.   So it's your understanding that you didn't
24  receive a confirmation email such as this --
25      A.   Do not remember.

1      Q.    Okay.

2      A.    Do not remember at this juncture.  It

3  wasn't necessarily the main topic of this thing.

4  You know, that would be my answer.  Is that -- to

5  me, what you're presenting appears like a successful

6  order.  If that's not the case, then that's fine.  I

7  just don't -- I just -- from my purview, what you're

8  presenting looks like a successful order.  If it's

9  not, then I don't want to say something that, Oh, we

10  had a license.

11      Q.    I'm asking for your understanding.  That's

12  all I'm asking for, Mr. Lenzo.  I'm not asking for

13  you to, again, foresee what -- any legal arguments

14  we're making.  I'm just asking --

15      A.    Yeah.

16      Q.    -- for your understanding of the

17  circumstances.

18            Did you receive confirmation that --

19      A.    I answered that.  I do not remember

20  receiving --

21      Q.    Okay.

22      A.    -- confirmation.

23      Q.    That's all.

24      A.    Okay.

25      Q.    I will stop sharing.  Then I present

Page 110

1    another -- actually, we're going to go back to the

2    amended answer.  Okay.  So this was Exhibit 7 for

3    the record.

4              Okay.  Can you see my screen, Mr. Lenzo?

5        A.   Okay.  Go ahead.

6        Q.   Okay.  So scrolling down here, we're going

7    to go to Point 14.  "Blankenship has never been

8    licensed to use the work at issue in this action for

9    any purpose."  So I'm asking, and you see your

10   answer, "Defendant is without knowledge or

11   information sufficient to form a belief as to the

12   truth of the allegations in Paragraph 4 and,

13   therefore, denies those allegations.  And then

14   defendant further states in response, there is a

15   insufficient information on copyright ownership for

16   the subject matter of the licenses of the photograph

17   to be relevant.

18             So, obviously -- I'm going to ask again

19   what we asked previously.  What is your factual

20   understanding of this answer?  Because the way I

21   read this is, it's asking -- there was an assertion

22   made in the complaint that your organization had

23   never been authorized or licensed to use the work.

24   And then you're saying in this answer that we're

25   denying that because we don't have sufficient

Page 111

1    information.  This was filed on February 25th, 2025,

2    so that's almost a year after that June 15th, 2024,

3    date, when you tried to fulfill the order.  So --

4        A.    Okay.

5        Q.    I'm asking:  Based on your answer in Point

6    14, did you think you had a license?

7        A.    Let me read it again.  Are you referencing

8    a license in terms of the purchase on June 15th?

9        Q.    Because it is coming after that exhibit,

10   yes.  But I'm asking you generally, did you think

11   you had a license based on this document?  Because

12   it's saying, you know, we assert it in our

13   complaint, Blankenship has never been licensed to

14   use the work at issue and you're saying, no, that's

15   true.  We deny that allegation.  We are without

16   information or -- knowledge or information

17   sufficient to form a belief.

18       A.    I'm asking --

19            THE STENOGRAPHER:  I'm sorry.  I didn't

20       hear the rest of your question.

21     BY MR. ABISROR:

22       Q.    I'm asking -- Tory, and again, please let

23   me finish my question.

24            What is your factual understanding of that

25   answer?  I'm not asking for your legal opinion.  I'm

Page 112

1   not asking for Mr. Haddad's legal opinion or

2   Mr. Criscione's legal opinion, for that matter.  I'm

3   not asking for your legal opinion, because as you

4   stated previously, you collaborated and you

5   authorized and approved these documents to be filed.

6   So I want to know what is your factual understanding

7   of this answer.

8          A.    Well, I mean, I can -- I'm going to direct

9   to Point -- to Paragraph 2 in reference to

10  insufficient information on copyright ownership.  I

11  believe that in Ms. Haddad's motion to dismiss --

12  to -- motion to dismiss, to my remembrance, there

13  was questions that she raised regarding copyright

14  ownership and had different rationales for that.  I

15  believe that's really the pertinence of how she

16  originally --

17         Q.    Your --

18         A.    -- at this point.

19         Q.    Tory, you're not answering the question,

20  again.  I'm asking for your factual understanding.

21  Okay?  You're asserting here that you were without

22  knowledge or information sufficient to form a

23  belief.  Okay?

24              What is -- what knowledge or information

25  would you need to form a belief?  And why did you

1    deny that you didn't have a license?  Because that,

2    to me, says that you thought -- or maybe thought you

3    had a license.  What is your factual understanding

4    of that?  I don't want to know Ms. Haddad's opinion.

5    I want to know your opinion.  Okay.

6         A.   A license -- in reference -- I'm so sorry.

7    A license in reference 2019 through 20 --

8         Q.   Any license --

9         A.   -- 24.

10        Q.   Any license for this work, is that clear?

11        A.   To my purview, from what you just sent, it

12   is possible that that document, first of all, may

13   have, at some juncture, been a license.  If you have

14   information otherwise, then I would like to see it,

15   because I -- from that document, I don't know.  It's

16   a little confusing.

17        Q.   Again, you have no confirmation that you

18   received a license --

19        A.   I said, I do not remember receiving a

20   confirmation.  I think it would be just as easy to

21   determine this to see, you know, in reference to

22   this if funds were transferred or not.  That, to me,

23   sounds like the way to double-check this thing.

24        Q.   Okay.

25        A.   Is that fair?  I mean...

1        Q.   Sure.  It's your answer.

2             We're going to go to point 15.  On a date

3    after the work at issue in this action was created,

4    but prior to filing of this action, Blankenship

5    copied the work.  In your answer, Defendants is

6    without knowledge or information sufficient to form

7    a belief as to the truth of allegations in Paragraph

8    15 and therefore denies them.

9             I'm going to show you, again, the

10   complaint and Paragraph 10 where you have previously

11   testified that you recognize this image is the same

12   as this image minus the c and the copyright

13   information, right?  But you recognize these are the

14   same image, correct?

15       A.   Okay.

16       Q.   Okay.  So then we are going back to the

17   amended answer.  So the allegation was that

18   Blankenship copied the work and then your answer,

19   which is, Defendant's without knowledge or

20   information sufficient to form a belief as to the

21   truth of the allegations in Paragraph 14 and

22   therefore denies those allegations.

23             But as you've just stated, you recognize

24   they were the -- the same images.  So I'm wondering

25   what your factual understanding of that answer was?

Page 115

1      A.    Let me read 15 one more time.  Thank you.

2      Q.    Okay.

3      A.    I think what potentially got taken here in

4  reference to this "copied" word, I find -- I think

5  that's potentially what...

6      Q.    Is it your testimony here right now that

7  this answer after you have reviewed it right now, is

8  no longer --

9      A.    I did not say that -- you -- I'll clarify.

10  I mean, once again -- let me speak holistically.

11  Once again, it's hard for me to -- because this is

12  back now with Sarah Haddad -- holistically remember

13  every single one, boom, boom, boom.  But to my

14  purview of what I'm reading the word "Blankenship

15  copied the work," is in Point 15.

16          When you originally asked me the question

17  during this deposition in reference to the amended

18  complaint and the image on the URL, I very

19  specifically stated that there is, you know, not --

20  it's not the same in reference to the watermark.  So

21  potentially that's, you know, where she's taking

22  pause here in reference to this as -- like the idea

23  of copying.  Maybe the word "copied" is problematic

24  here or what that insinuates.

25      Q.    Right now, Mr. Lenzo, on July 9th, 2015,

1  looking at our amended complaint on Paragraph 10

2  where the image is and Exhibit 2, which is the

3  infringement, would you say that your organization

4  copied the work?

5       A.   I would say that the work without a

6  copyright is on our website and the work with the

7  copyright is in the amended complaint.  That's my

8  answer.  That's what I said before.

9       Q.   So your answer is yes?

10      A.   I didn't say yes.

11      Q.   Well, I need a little bit more out of

12 that.  You're saying that they're the same, right?

13 We're not arguing that the -- okay.

14      A.   I didn't say --

15      Q.   Removing the c Cameron Davidson?

16      A.   Remove -- okay.

17      Q.   The subject of this image is a picture of

18 downtown Manhattan; is that correct?

19      A.   Okay.

20      Q.   Okay.  That was the image that was

21 included in the complaint in Paragraph 10, correct?

22      A.   Okay.

23      Q.   The image that was included in Exhibit 2,

24 which is the alleged infringement, is the same

25 picture of downtown Manhattan; is that correct?

Page 117

1      A.   Okay.

2      Q.   Okay.

3      A.   Without a watermark.

4      Q.   Okay.  Thank you.

5      A.   That's an element, though.  Unfortunately,

6  you're saying copied, but the watermark is kind of

7  an element to that.

8      Q.   Okay.

9      A.   Accept that as my answer.  Thank you.

10     Q.   Okay.  I will stop sharing my screen.

11          MR. ABISROR:  Only a few more questions,

12     Galen, and we'll wrap up here.  Okay?

13          MR. CRISCIONE:  All right.

14          MR. ABISROR:  I'm pulling up my screen.

15     Are we on Exhibit 12 now?

16          THE STENOGRAPHER:  I believe so.

17          (Thereupon, the 05/09/2025 letter was

18     marked as Plaintiff's 12.)

19   BY MR. ABISROR:

20     Q.   Okay.  I'm sharing my screen.  Let me know

21  when you can see my screen, Mr. Lenzo.

22     A.   Okay.

23     Q.   Okay.  Do you recognize this document?

24     A.   I do not remember this exactly.  Was this

25  in your documents that you sent in ZIP file?

1       Q.   This is a joint request for an extension

2   that counsel for -- my client, myself, and counsel

3   for defendant, your counsel, filed on May 9, 2025.

4       A.   Okay.

5       Q.   It is a request to extend discovery 60

6   days, do you see that?

7       A.   Okay.

8       Q.   So have you seen this document before?

9       A.   Galen, may I ask you, did you send this

10  document to me or not?

11           MR. CRISCIONE:  I don't recall.

12      A.   I don't believe I have seen it.  If you

13  guys sent it in the ZIP file, then maybe I've seen

14  it.  Past that, I don't remember seeing it.

15    BY MR. ABISROR:

16      Q.   What this is, actually, is the order that

17  the court released.  I was just orienting you to

18  what the document filed was.

19           Have you seen -- it is ECF 49.  And have

20  you seen the order that was issued on May 12, 2025,

21  by the judge in this case Arun Subramanian?

22      A.   I answered your question.  I don't

23  believe -- I do not remember reading this

24  specifically.  I believe my attorney perhaps

25  referenced this to me, though.

1      Q.   Okay.  How did -- okay.  So I won't ask

2   that.

3           Do you see here the court encourages lead

4   counsel to sit down face to face to see if this case

5   can be resolved before investing significant time

6   and resources into this case.  Do you see that?

7      A.   I see it now.

8      Q.   Okay.  That's all.

9      A.   But okay -- fine.

10          MR. ABISROR:  Why don't we take two

11      minutes, Galen.  Let me just confer with my

12      client and see if there's anything else that we

13      need.

14          MR. CRISCIONE:  Okay.  I'm going to run to

15      the restroom real quick.

16          MR. ABISROR:  I'll do that and then we'll

17      either get back on record and end it or ask

18      more questions.

19          MR. CRISCIONE:  Sounds good.

20          THE VIDEOGRAPHER:  Going off the record,

21      the time is 12:56 p.m.

22          (Recess 12:56 p.m. until 1:01 p.m.)

23          THE VIDEOGRAPHER:  We're back on the

24      record, the time is 1:01 p.m.

25          MR. ABISROR:  Thank you, Mr. Lenzo.  No

1        further questions from the plaintiff.

2              THE WITNESS:  Thank you, Jordan.  I

3        appreciate it.  Thank you, everybody, the

4        courts, and Galen.  Thank you.  Bye.

5              MR. CRISCIONE:  I don't have any

6        questions, so I'm good.

7              THE STENOGRAPHER:  Read or waive?

8              MR. CRISCIONE:  He already disappeared.

9              THE VIDEOGRAPHER:  Let me go off the

10       record, then.  Going off the record, the time

11       is 1:01 p.m.

12             THE STENOGRAPHER:  Galen, do you want to

13       say read or waive for him?

14             MR. CRISCIONE:  No.  It's fine.  We're

15       good.  I don't have any questions.

16             THE STENOGRAPHER:  Do you need to order

17       this, Jordan?

18             MR. ABISROR:  Yes.  Regular, please.

19             MR. DUNNE:  Just the transcript and not

20       the video.

21             THE STENOGRAPHER:  Do you need a copy,

22       Galen?

23             MR. CRISCIONE:  I don't think so.

24             (Thereupon, the reading and signing of

25       this deposition was waived.

Page 121

1        The proceedings concluded at 1:02 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 122

1                      CERTIFICATE OF OATH

                   (VIDEOCONFERENCE PROCEEDINGS)

2

3

4

5       STATE OF FLORIDA

6       COUNTY OF BROWARD

7

8

9                I, DAWN SCOTT, Stenographer and Notary

10      Public, State of Florida, certify that TORY LENZO

11      appeared before me via videoconference and was duly

12      sworn on the 9th day of July, 2025.

13                   Signed this 21st day of July, 2025.

14

15

16

17               _____

18               DAWN SCOTT, Stenographer

19               Notary Public, State of Florida

20               My Commission No. HH 631375

21               Expires: 2/27/29

22

23      Personally known

24      or produced identification

25      Type of identification license

Page 123

1                    CERTIFICATE OF REPORTER

2

3        STATE OF FLORIDA

4        COUNTY OF BROWARD

5

6               I, DAWN SCOTT, Stenographer, do hereby

7        certify that I was authorized to and did

8        stenographically report the foregoing Zoom

9        videotaped deposition of TORY LENZO; pages 1 through

10       123; that a review of the transcript was not

11       requested; and that the transcript is a true record

12       of my stenographic notes.

13              I FURTHER CERTIFY that I am not a

14       relative, employee, attorney, or counsel of any of

15       the parties, nor am I a relative or employee of any

16       of the parties' attorneys or counsel connected with

17       the action, nor am I financially interested in the

18       action.

19              Dated this 21st day of July, 2025.

20

21

22

23

24       _____

25              DAWN SCOTT, STENOGRAPHER

**[05/09/2025 - 30]**                                    Page 124

**0**

**05/09/2025**   3:22
 117:17
**06830**   9:5
**07544**   1:3

**1**

**1**   3:10 4:13 12:2
 12:12 49:14
 81:13 82:1,3,8,8
 83:20 123:9
**10**   3:20 19:8
 42:12 44:13,22
 47:9,10,20
 58:14 59:4
 91:23 92:3
 114:10 116:1,21
**100**   52:17 65:22
**10010**   2:10
**10021**   9:3 41:5
 41:12
**10177**   2:5
**10:05**   1:17 4:2,4
**10:14**   12:7,8
**10:15**   12:8,10
**10:32**   25:21,22
 25:22,24
**10:58**   44:4,5
**11**   3:21 14:24
 21:20 48:7
 96:10,14 97:5
 100:11
**117**   3:22

**11:05**   43:25
 44:1,5,7
**11:41**   71:10,11
**11:57**   71:11,13
**12**   3:10,22 21:24
 81:6 82:5 83:14
 83:16 84:19
 117:15,18
 118:20
**122**   3:5
**123**   3:6 123:10
**12:15**   84:25
**12:56**   119:21,22
**13th**   23:8,17
**14**   102:17 110:7
 111:6 114:21
**14th**   92:5,15
 93:20 97:3,11
**15**   14:24 38:16
 99:1 114:2,8
 115:1,15
**15th**   97:5,18
 98:23 99:20
 101:10 102:14
 103:5,7,10,21
 104:6,21 111:2
 111:8
**16**   9:4 41:4,14
**1890**   56:2
**19**   26:14 29:12
**1:01**   119:22,24
 120:11
**1:02**   1:17 121:1

**1:24**   1:3
**1st**   81:10

**2**

**2**   3:11 25:16
 26:1,13 45:14
 45:18,20 58:11
 100:18 112:9
 116:2,23
**2/27/29**   122:21
**20**   113:7
**200-8446**   2:11
**2012**   31:21
 50:18 51:4,18
**2015**   81:9,10
 82:15,16 115:25
**2018**   51:18
**2019**   20:13,21
 21:14 48:10
 49:5 50:6,24
 51:20 52:15,17
 113:7
**2020**   20:12,15
 20:20 21:8
 48:10 49:5 50:7
 51:20 52:16
 53:8 97:22 98:4
 100:7,8,12
**2023**   53:2,8,9
**2024**   86:14
 89:18 91:20
 92:6,11,15
 93:18 96:24
 97:19 98:24

99:1,20 101:10
 102:17 103:5,7
 103:10,21 104:6
 104:21 107:13
 108:7 111:2
**2025**   1:16 4:4
 23:8,13,17
 27:18 50:19
 102:14 107:14
 108:7 111:1
 118:3,20 122:12
 122:13 123:19
**21**   9:3 41:11
**2150910029**
 101:5
**21st**   122:13
 123:19
**24**   113:9
**24289**   122:16
 123:23
**250**   2:4
**251061**   81:11
**25th**   2:10 111:1
**26**   3:11 26:9
**28**   86:14
**28th**   89:18
 91:20 92:11,20
 93:5,18 96:24

**3**

**3**   3:12 38:20,23
 45:17 58:12
**30**   13:20

| | |
|---|---|
| **38** 3:12 | **7** |
| **38.2** 33:23 | **7** 3:16 66:7,15 |
| **3rd** 27:18 | 71:21 110:2 |
| **4** | **73rd** 9:3 41:11 |
| **4** 3:13 45:4,8 | **7th** 2:4 |

**abisror** 2:11 3:4
4:23,24 5:17,24
12:4,13,23 13:5
14:8 15:5 25:19
26:2 27:11,17
36:8 38:14,18
38:21 43:16,18
43:21 44:1,8
45:5 46:17,18
61:1 62:5 66:5
66:11,16 70:12
71:4,14,15 73:6
74:18,24 75:22
76:1,2,15 81:17
81:19,22 85:24
86:1,4 92:4
96:15 111:21
117:11,14,19
118:15 119:10
119:16,25
120:18

**able** 10:7 22:18
37:17 51:22
54:24 60:9
80:12 94:6

**absent** 47:22

**absolutely**
96:17 97:23
101:13

**accept** 117:9

**acceptable** 29:5

**access** 46:12,13
49:4 63:17

**accommodate**
7:11

**accountant**
35:10 36:2,20

**accountants**
37:3

**accusation** 42:3
42:4

**accusations**
22:20 63:13

**acknowledge**
82:8

**acquire** 97:12
98:25

**acquired** 105:7
106:3

**acquisition**
17:13

**action** 25:5,6
26:16 29:14
110:8 114:3,4
123:17,18

**actions** 16:25
89:13

**activities** 68:9

**actually** 8:16
25:15 61:24
97:7 98:12 99:9
104:15 110:1
118:16

**additional**
57:19

**address** 8:22,25
8:25 9:1 30:7

**38** 3:12
**38.2** 33:23
**3rd** 27:18

**4**

**4** 3:13 45:4,8
68:6 71:24
72:10,10,23
73:19 74:4 75:3
75:7 76:22,23
80:15 81:4
110:12
**41** 2:9
**45** 3:13
**49** 118:19
**4th** 94:14

**5**

**5** 3:4,14 17:12
60:20,24
**583-1780** 2:5
**5th** 23:12

**6**

**6** 3:15 13:20
17:16 61:24
62:4,7,18,19
63:22 66:6,8,10
**60** 3:14 118:5
**62** 3:15
**631375** 122:20
**66** 3:16

**7**

**7** 3:16 66:7,15
71:21 110:2
**73rd** 9:3 41:11
**7th** 2:4

**8**

**8** 3:18 81:16,17
81:21 83:21
85:2
**800** 2:5
**81** 3:18
**86** 3:19

**9**

**9** 1:16 3:19
40:17 85:24
86:3 118:3
**92** 3:20
**929** 2:11
**96** 3:21
**9th** 4:4 50:19
84:25 115:25
122:12

**a**

**a.m.** 1:17 4:2,4
12:7,8,8,10
25:21,22,22,24
44:4,5,5,7 71:10
71:11,11,13
**abarca** 2:16
**ability** 79:11
99:25

41:10,15 86:22
**admission** 23:12
**advertise** 68:8
**advertising** 18:2
68:11
**advise** 75:16
76:10
**advised** 74:10
**affiliates** 17:17
**affiliations** 4:22
**affirm** 5:11
**affirmative** 3:16
24:17 66:14,22
67:23 69:17
71:21
**affirmed** 20:14
**aftermath** 88:23
90:11,15
**age** 5:21
**agent** 41:7
**agents** 17:18
**ago** 39:19,23
**agree** 4:11
**agreement**
56:25 57:10
58:4
**agreements**
57:7,25 58:2
**ahead** 12:25
15:16 26:5
28:12 40:19,21
59:13 62:8
64:17 67:8,18
70:8 73:2 76:17

80:1,1 86:7 92:1
92:7 97:9 98:21
105:2,18 106:1
110:5
**albeit** 105:18,20
**alert** 87:4,8,9,23
**alerted** 89:15
**alerting** 86:22
88:5
**allegation** 68:14
73:18 74:3 75:3
80:15 111:15
114:17
**allegations**
68:23,25 70:6
72:10,22 73:5
74:15 110:12,13
114:7,21,22
**alleged** 18:10
20:17,18 41:22
45:19 68:10
116:24
**allegedly** 107:18
**alleges** 68:6
**alleging** 18:17
**allmighty** 86:11
**allowed** 19:1
**allude** 59:23
**alluded** 64:2
**alter** 107:6
**amazon** 32:8
**amended** 3:12
38:19 39:12
43:8 63:12 68:4

82:5 110:2
114:17 115:17
116:1,7
**amount** 34:9
**angle** 35:14
**ans** 8:13 104:5
**answer** 3:16
6:12,13,20,24
6:24 7:5,5,7
11:4 22:16
23:20 24:10,17
24:19 29:6,14
35:11 39:7
40:22 43:3 45:2
48:5 52:24
53:16 54:1,24
55:17 58:22
63:16 64:8,18
64:23 65:1
66:13,22 67:22
68:21 69:15,16
69:24 70:9,13
70:17 71:2,21
71:24 73:1,16
74:1 76:16
78:17 80:14
81:2 82:4,18,24
83:9,14,16
84:18 85:7 91:4
97:7 98:21
99:19,24,24
102:3,22 105:24
105:25 106:19
106:24 109:4

110:2,10,20,24
111:5,25 112:7
114:1,5,17,18
114:25 115:7
116:8,9 117:9
**answered** 33:12
35:24 40:9
54:20 58:21
62:20 63:24
64:9 70:17
99:15 105:13
109:19 118:22
**answering** 7:7
112:19
**answers** 3:15
35:8 61:17 62:3
70:7,22,25
80:13 85:14
86:12
**anybody** 65:22
**anyways** 38:13
41:15 64:9
84:11
**apologize** 27:6
**apparel** 9:22
30:4 55:21
**appeal** 10:12
**appear** 106:8
**appearances** 2:1
4:21
**appeared**
122:11
**appears** 14:17
97:11 109:5

**[apply - aware]**                                          Page 127

apply  102:16
appreciate  6:2
  120:3
approve  79:15
  79:22
approved  81:1
  112:5
approving  80:6
april  27:16
area  51:22
argue  107:9
arguing  116:13
arguments  76:4
  109:13
arun  118:21
aside  50:4
asked  10:20
  33:12 35:7 40:7
  48:1 49:9 50:25
  51:7,17 59:7
  62:23 63:11,11
  75:3 87:14
  98:12 105:14
  106:16 110:19
  115:16
asking  13:15,25
  18:20,21 28:15
  32:11 34:8,16
  34:17,19 37:12
  38:25 39:8 47:1
  47:15 53:10
  54:23 55:16
  61:16 69:4,11
  69:13 70:2 72:2

72:3,5,16 73:15
76:3,8 77:24,25
78:8,13 79:7
80:17,18,20
83:23,24 84:3,8
84:9,24,24
85:16,17 87:10
87:10,17 91:4
98:16,19 99:13
99:13 100:10,18
102:7,8,21
106:20 109:11
109:12,12,14
110:9,21 111:5
111:10,18,22,25
112:1,3,20
assert  108:1
  111:12
asserting
  107:22 112:21
assertion  72:6,7
  72:8 73:25
  80:10 85:10,12
  110:21
assertions  73:1
assertive  75:17
  77:2
assigned  81:10
associate  5:1
associated  18:6
assume  54:7
  106:17
assumed  103:16

assumption
  96:6
attached  45:18
  45:20 81:12
  82:7
attachments
  86:10
attempt  89:6,8
  91:9,14 96:3
  97:16 98:25
  108:20
attempted  97:12
  98:23 99:3
attend  30:14
attending  4:21
attest  19:16
attorney  7:4
  10:23,24 12:18
  14:22 17:5
  22:19 24:1,7,9
  24:13 27:13,20
  28:18,23 29:16
  29:20,21 40:12
  69:8 70:1,11,16
  71:5 72:9,11,15
  72:18,22 73:5
  73:19 74:3,7,9
  74:14,19,21
  75:2,12,25 76:9
  78:10,14 79:19
  80:12,17 82:25
  83:12 84:21
  85:14 89:9
  101:25 118:24

123:14
attorney's  68:3
  72:13 85:16
attorneys  27:7
  69:6 89:11
  123:16
attributed  48:9
atypical  11:24
audio  4:10
august  20:11,15
  20:20 21:8
  48:10 97:22
  100:7,8,12
authenticate
  21:7
authenticated
  84:23
authorization
  87:7 106:21
authorize  79:12
  79:22
authorized  79:9
  106:23 110:23
  112:5 123:7
automatically
  59:16
ave  41:4
avenue  2:4,9 9:4
  41:15
avoiding  38:11
aware  72:25

| **b** | **bathroom** 6:17 | 24:15 25:4 | 64:19,21,23 |
|---|---|---|---|
| **b** 3:8 13:20 | 43:22 | 29:12 34:21 | 65:2,4,9,13,16 |
| 95:12 | **began** 4:2 | 49:15,21,22,24 | 66:24 68:7,9 |
| **back** 12:9 20:15 | **beginning** 39:19 | 59:24 61:18 | 71:23 86:3 88:5 |
| 21:17 25:23 | 39:20,22 40:10 | 63:16 73:13 | 96:13 100:25 |
| 29:11 43:25 | **behalf** 2:2,8 5:5 | 79:11 93:25 | 106:22 110:7 |
| 44:6 47:10 48:9 | 93:19 | 99:25 | 111:13 114:4,18 |
| 49:14,23 50:6 | **belief** 40:14 | **better** 68:15 | 115:14 |
| 50:22 51:1,18 | 68:23 110:11 | **big** 30:15,15 | **blankenship's** |
| 57:24 63:4 71:6 | 111:17 112:23 | **bit** 22:10 29:25 | 3:13 8:10 16:10 |
| 71:12 72:21 | 112:25 114:7,20 | 31:5 32:5 33:20 | 16:16,20,25 |
| 74:16 75:10 | **believe** 15:1 | 36:14 67:19 | 17:13,16,23 |
| 82:18 85:13 | 20:9 21:9 27:16 | 72:1 116:11 | 18:2,11 21:21 |
| 94:18 97:3,17 | 31:21 39:20 | **blankenship** 1:7 | 21:25 23:7,11 |
| 104:15 108:15 | 49:22 51:16 | 3:19,21 4:16 | 23:16,20 24:17 |
| 110:1 114:16 | 52:1 63:9 64:4 | 9:14,16,21 10:2 | 25:4 26:15,16 |
| 115:12 119:17 | 66:7 73:18 74:2 | 11:14 13:21 | 29:13 45:3 |
| 119:23 | 79:2,16,17 | 16:3 22:12,14 | 49:16 68:13 |
| **bank** 106:14 | 81:16 84:15 | 26:9 30:3,20 | **blankenshipdr...** |
| 108:14 | 86:9 88:25 | 31:19 32:16 | 37:21 86:16,17 |
| **bare** 108:19 | 89:14 90:1 | 33:6,16 34:5,19 | 86:23 |
| **based** 10:13,14 | 91:16 98:11,15 | 35:16,21 37:25 | **blankenshipdr...** |
| 14:16 15:17 | 100:4,6 103:10 | 40:20,25 41:3,8 | 37:5,9 48:25 |
| 20:25 21:8,15 | 103:11 104:15 | 42:10 46:3 | 49:25 50:11,21 |
| 22:22 33:22 | 104:16 112:11 | 47:21 48:4,21 | 51:15 53:23 |
| 41:20 65:1 | 112:15 117:16 | 49:19 50:18 | 54:4 65:3 |
| 105:11 111:5,11 | 118:12,23,24 | 51:4 52:6 53:4 | **blanket** 55:17 |
| **basically** 15:11 | **best** 7:8,11 16:7 | 54:15,19 55:7 | **boom** 115:13,13 |
| 16:1 77:24 | 16:12,17,22 | 56:15,18,25 | 115:13 |
| 103:14 105:15 | 17:3,12,18,24 | 57:10 58:17 | **bottom** 6:5 |
| **basis** 23:20,22 | 18:4,8,12,21 | 59:15,22 60:2 | 42:16 43:9 |
| 23:23 24:3,7,9 | 19:5 21:20,24 | 61:6 62:12,20 | 44:22 |
| | 22:3,23 23:6,10 | 62:21,24 63:24 | **boy** 95:14 |
| | 23:15,19 24:2 | 63:24 64:1,12 | |

**[brains - color]**

**brains** 105:21
**brands** 30:15
**break** 6:15,18
6:20 7:23 38:16
43:19
**breakdown**
83:6
**breaks** 6:16
**briefly** 91:3
94:6
**bring** 66:3
**bringing** 98:14
**brought** 19:13
24:9
**broward** 122:6
123:4
**bruce** 1:4 5:2
39:15 61:3
62:13 90:3,5,19
**business** 8:24
9:2,4,19 10:12
16:2 22:15 30:1
31:25 32:6 41:4
42:5 51:12,12
63:4,11 68:9,11
68:13 73:23
80:24 96:4
103:15
**business's** 64:12
**button** 55:4,8
**bye** 120:4

**c**

**c** 43:2,8 44:16
47:13,17,22
58:24 114:12
116:15
**call** 104:15
**calls** 95:8
**camera** 4:7
**cameron** 1:4 5:2
39:15 43:2,8
44:16 47:23
54:10 55:23
58:7,24 61:3
62:13 90:4,5,19
94:5 95:5,7
98:12 101:19
103:13 116:15
**capacity** 79:7,9
**card** 106:13
**careful** 104:4
**carrier** 92:25
**case** 1:3 17:14
20:19 24:25
42:1 71:23 77:3
77:16 104:9
107:5,8 109:6
118:21 119:4,6
**cd** 101:5
**certain** 25:1
34:9 52:15,18
85:5
**certainly** 34:12
90:9 102:19

**certainty** 65:22
**certificate** 3:5,6
81:12 82:6,7,19
82:22 84:12
122:1 123:1
**certify** 122:10
123:7,13
**chance** 71:25
**change** 103:3
**changed** 102:1
**check** 113:23
**chronology**
103:11
**circumstances**
109:17
**city** 10:5,13
31:12,13 55:22
55:22
**claim** 6:6 42:9,9
61:19 80:8
86:24 87:1
92:24 93:2
100:20
**claims** 22:5,25
**clarification**
34:25 65:8
87:24
**clarify** 22:10
25:7 42:18
52:21 74:12
103:9 115:9
**clarifying** 74:6
**clear** 6:10 7:3
24:6 46:19

58:25 64:15
69:10 80:16
102:4 113:10
**cleared** 80:5
**clearly** 52:3
**click** 55:8 56:12
**client** 5:2 39:15
44:18 79:19
87:4,16 88:11
88:13 90:3,17
93:5,19 95:5
104:3 107:17
108:22 118:2
119:12
**client's** 17:14
18:3,18 21:25
44:16 58:18
59:1 82:12 88:6
93:2 96:1
103:22
**clients** 30:17
32:15
**close** 75:21
**clothes** 10:1
35:16,21
**clothing** 30:15
31:4
**collaborate** 76:6
77:2,5,22 78:1,2
**collaborated**
78:25 112:4
**college** 11:14,15
**color** 6:6

**[com - copyright]**

**com** 55:5
**come** 21:16 31:9
  43:25 54:7,14
  56:5 57:11 87:5
**comes** 33:17,17
  45:22
**coming** 12:21
  28:24 33:1 49:9
  94:7 111:9
**commencing**
  93:11
**commerce** 32:6
  32:7 33:8 34:13
  34:18 63:4
**commission**
  122:20
**committed**
  68:10
**common** 38:12
**communicate**
  78:6,11
**communicatio...**
  21:21 75:24
  76:9,12 78:10
  78:13 79:19
**company** 10:8
  17:21 30:4 37:6
  41:1 89:12
**compile** 36:15
**compiling** 36:9
**complaint** 3:12
  3:16 18:7,11
  20:19 22:5 23:1
  23:21 24:18

38:19 39:12
41:23 43:8
44:15,23 45:1
45:18,21 58:14
63:12 66:13,22
67:5,23 68:4
69:20 71:21
82:5 110:22
111:13 114:10
115:18 116:1,7
116:21
**complete** 6:11
**completed**
  11:13
**compliance**
  16:21 17:2
**concluded**
  121:1
**conclusion**
  84:23
**conducted** 4:6
  4:19
**confer** 72:17
  78:6 119:11
**conferring**
  74:20
**confirm** 14:14
  21:7 44:10
  45:10
**confirmation**
  90:24 96:6
  108:13,24
  109:18,22
  113:17,20

**confirmed**
  20:11 21:4
**confused** 28:1
  64:10,16 77:11
**confusing**
  113:16
**confusion** 34:12
  65:7
**connected**
  123:16
**connecticut** 9:5
  30:9 41:5
**connection** 4:8
  68:10 73:23
  80:24
**consult** 70:16
  80:13
**consultation**
  76:14
**consulting** 74:9
**contact** 56:7
  89:8 90:3 97:1,1
**contacted** 89:14
  89:20,23 90:17
  103:12
**contacting**
  89:22
**content** 37:8,20
  46:5,22 48:21
  50:11,20 51:14
  52:6 53:3 60:1
  63:2
**contention**
  83:11

**contents** 8:19
  49:8
**context** 39:5
  44:15,23 49:8
**continuation**
  105:18
**continue** 4:11
  55:3 105:3,10
**contract** 57:20
**contractual**
  58:4
**conversation**
  8:20 76:20
  77:13 80:17
**conversations**
  10:21 24:8 72:3
  78:3,5
**cool** 11:24
**copied** 68:7
  114:5,18 115:4
  115:15,23 116:4
  117:6
**copies** 18:10
**copy** 120:21
**copying** 115:23
**copyright** 3:18
  16:22 17:2
  37:24,25 39:12
  42:3,8 43:2,6,13
  43:14,15 44:16
  44:17 45:19
  47:22 58:18,19
  59:3 81:20
  82:12 86:24

87:1 89:6,8
110:15 112:10
112:13 114:12
116:6,7
**copyrightable**
73:22
**copyrighted**
68:7 80:22
**copyrights** 81:8
**core** 42:8
**corporate** 13:21
**correct** 21:13
23:24 24:13
27:20 30:10,24
32:13,17 33:10
35:17 39:4
40:17 41:2,6,9
41:13,19 42:11
42:12,14,15,18
46:20,23 47:24
47:25 48:22
49:21 51:9,10
54:5,8,15 55:11
57:5 60:3 61:22
62:16 63:5 64:8
64:24 75:13,18
77:16 79:1,2,5
79:23 88:24
92:6 96:7 97:13
97:22 100:7
101:1,5,7,11,13
102:18 103:24
114:14 116:18
116:21,25

**correctly** 39:6,7
49:13 51:3
**costs** 36:23
**counsel** 4:14,20
5:16 8:16,16
13:18 25:12
71:25 76:20
118:2,2,3 119:4
123:14,16
**counterclaim**
3:16 66:14,23
67:23 71:22
**county** 122:6
123:4
**course** 68:12
100:1
**court** 1:1 4:17
5:7 6:9,25 26:12
66:5 81:17
118:17 119:3
**courts** 95:14
120:4
**cover** 98:3 99:5
99:21
**coverage** 22:4
22:19,25 101:18
**created** 114:3
**creative** 73:21
80:22
**credit** 106:13
**criscione** 2:3,6
5:4,5,5 12:22
13:4 15:1 25:17
27:10,12,16,19

28:24 29:22
38:17 43:20,24
44:2 69:9 70:8
71:5,8 72:4 73:2
74:13,22 75:19
75:23 76:10
77:16 78:16
87:16 117:13
118:11 119:14
119:19 120:5,8
120:14,23
**criscione's**
112:2
**crop** 59:16
**curious** 9:18,24
10:18
**current** 9:12
76:13
**currently** 107:4
**customer** 34:16
**customer's**
34:14
**customers** 30:13
30:17 32:15
35:17,22
**cut** 97:8
**cv** 1:3

| **d** |
| --- |

**d** 3:1 42:3
**dangerously**
75:20
**data** 34:14,16

**date** 11:5 13:19
13:19 20:4,6,11
20:21 21:2,4,14
26:25 27:14
28:22 39:7
40:10 46:7
50:12,14,17
51:2 63:19
89:23 90:14
91:18 93:13,14
98:11,11 100:7
100:8,12 102:1
111:3 114:2
**dated** 23:8,17
27:18 86:14
123:19
**dates** 50:6,24
89:3,21 93:16
**davidson** 1:4
4:15 5:3 39:15
43:2,9 44:16
47:23 58:24
68:6 81:7 82:5
90:4,6 94:9 95:5
98:12 101:19
116:15
**davidson's** 61:3
62:13 68:7
**dawn** 1:25
122:9,18 123:6
123:25
**day** 90:13 94:10
94:11,21 97:6
97:11 98:14,15

104:10,17
122:12,13
123:19
**days** 118:6
**dcma** 42:4
**december** 81:10
**decided** 10:11
**deck** 3:21 96:13
**defendant** 1:8
2:8 5:6 26:9
61:6 62:12
66:24 68:21
73:21 80:21
82:19 84:12
85:8 110:10,14
118:3
**defendant's**
68:11 114:19
**defendants**
114:5
**defense** 69:23
**defenses** 3:16
24:17 66:14,22
67:23 69:17
71:22 101:22,24
**definitely** 20:15
104:10
**definitions**
64:20
**definitive** 93:13
**demand** 3:17
66:15,23 67:24
71:22

**denial** 23:24
24:3,7 73:18
80:15 84:19
**denials** 23:20
**denied** 72:22
73:5 74:14 75:2
**denies** 68:25
70:6 72:9 82:19
84:12 85:8
110:13 114:8,22
**deny** 111:15
113:1
**denying** 74:3
81:3 110:25
**department**
31:22 50:23
**depends** 4:7
**deponent** 16:2
**deposed** 9:6
**deposing** 13:20
**deposition** 1:10
3:10 4:5,14,19
6:4 7:17,21,24
8:17 10:20,22
12:12 13:18
14:15 83:21
115:17 120:25
123:9
**derivation** 63:9
**derives** 43:5
**describe** 19:5
**description** 3:9
**designing** 10:1

**desire** 105:16
**detail** 57:21
**detected** 86:25
87:2,3 88:7
**detection** 87:14
87:23
**determine** 20:4
91:6 103:13
113:21
**dictated** 83:12
**different** 14:13
35:13 38:7
48:17 52:25
57:15 77:9 83:1
83:17 103:4
104:23 112:14
**difficult** 48:12
**direct** 3:4 5:23
112:8
**directed** 51:20
61:6
**directly** 33:2
57:4 100:20
**directors** 17:17
**disappeared**
120:8
**disclosure** 26:16
**disclosures** 3:11
25:5,6,25 26:10
26:15 29:14
**discovery** 118:5
**discuss** 71:6
85:13

**discussed** 24:11
24:12,13 84:21
**discussions** 76:5
**dismiss** 25:11
70:19,22 112:11
112:12
**display** 57:12
**displayed** 47:21
**distribute** 33:9
**distribution**
32:2
**district** 1:1,1
4:17,17
**division** 1:2
**divulge** 24:8
**divulging** 78:3,4
79:19
**dmca** 42:4,9
**doctor** 42:23
**doctor's** 42:24
**document** 13:6
13:14,16 14:1
14:13,23 15:20
15:25 19:2,14
19:20,21,25
20:2,7,10,16
22:18 23:2
26:17 27:1,2,18
27:23 28:6,16
28:18 38:22
39:2,5,9,18,23
43:6 48:6,7,8,14
50:8 61:9,12,12
61:16,16 62:9

63:20 66:3,20
67:9,14 75:6,17
78:19 79:14
81:15 84:4 85:1
86:8 88:1,4,15
88:21 90:22
91:22 92:14
95:23 96:7,9,20
97:4 100:11
107:17 108:10
111:11 113:12
113:15 117:23
118:8,10,18
**documentation**
51:21,23 52:12
54:22 58:7 60:8
60:11 61:10,13
99:8
**documents** 7:19
7:22,24,25 8:1,2
8:4 14:24 19:4
19:24 36:19
52:25 57:15
60:16 76:4,19
77:3,4,6,15,21
78:24 79:5,9,21
80:6,25 86:9,11
100:5 112:5
117:25
**doing** 32:21,22
32:23 35:12
37:4 57:23
105:10

**domestic** 10:4,8
**double** 113:23
**doubt** 104:13
**downtown**
116:18,25
**draft** 75:17 77:2
79:20
**drafted** 72:19
74:9 77:4,15,21
**drafting** 72:18
74:21 75:6 76:6
77:6,23
**drafts** 78:19
**drag** 55:9
**dresses** 31:8
**dry** 1:7 4:16
9:14,16,21
13:21 16:3
22:12,14 26:9
30:3,20 31:19
32:16 33:6
34:19 35:16
37:25 40:20,25
41:3,8 42:10
46:3 47:21 48:4
48:21 49:20
50:18 51:4 52:6
53:4 54:15,19
55:7 56:15,18
56:25 57:10
58:17 59:15,22
60:2 61:6 62:12
62:20,21,24
63:24 64:1,12

64:19,21,24
65:2,5,9,13,16
66:24 71:23
88:5 100:25
106:22
**dubbed** 105:21
**due** 52:15
**duly** 5:21
122:11
**dunne** 2:12 4:25
13:8 120:19

**e**

**e** 3:1,8 32:7
34:13,18
**earlier** 46:9
**earliest** 20:11
**east** 9:3 41:11
**easy** 113:20
**ecf** 118:19
**education** 11:13
**effect** 29:3 49:6
**either** 12:22
93:7 119:17
**element** 52:25
70:18 73:22
80:23 101:22
117:5,7
**elements** 21:1
**email** 86:14,15
86:21,22 94:24
99:9 108:24
**employee** 65:9
123:14,15

**employees**
17:17
**employer** 9:13
**encourages**
119:3
**enforcement**
17:1
**entire** 37:10
**equipped** 34:21
59:24
**error** 68:24 70:5
**esq** 2:6,11,12,12
**essentially**
18:15
**events** 30:14
**eventually**
90:16,16
**everybody**
120:3
**exact** 11:4 14:12
40:9 51:2 94:11
**exactly** 15:2
21:13 25:7 53:5
57:17 84:20
90:14 92:17
94:22 117:24
**examination** 3:4
5:23
**example** 47:2
104:24 105:2
**examples** 79:8
**excuse** 12:3 27:5
40:3,3,6,21,24

exhibit  3:9,10
  3:11,12,13,14
  3:15,16,18,19
  3:20,21,22 12:2
  12:17,19 25:16
  26:13 38:23
  45:7,13,17,18
  45:20 49:14
  60:20 62:7 66:6
  71:20 81:13
  82:1,3,8,8 83:20
  83:21 85:2,23
  85:24 91:22
  96:10 97:5
  110:2 111:9
  116:2,23 117:15
exhibits  14:24
existence  19:14
existing  29:21
expect  16:1
experience
  33:22 77:20
expert  19:14
  52:16
expert's  19:15
  20:17
expertise  21:8
expires  122:21
export  36:19
exporting  36:18
extend  118:5
extension  118:1
extent  92:16

eye  42:23,23
eyes  42:22

**f**

face  19:23 119:4
  119:4
fact  52:15 59:23
factory  31:14
  33:1
facts  24:16,25
factual  72:6,7,8
  72:25 73:16,25
  80:7,9,20 81:1
  82:22 84:14
  85:10,17 99:20
  102:8 110:19
  111:24 112:6,20
  113:3 114:25
factually  80:7
  84:14
fair  17:6 21:5
  34:2 39:17 69:3
  76:1 103:20
  106:1 113:25
family  31:24
far  20:14 51:1
  51:17,17
fashion  10:1,11
  10:12 11:14,23
february  111:1
feel  15:12 25:2
  75:20 100:19
feels  24:21

figured  103:15
file  14:25 15:16
  34:6 35:4,9
  117:25 118:13
file's  21:15
filed  4:16 5:20
  39:15 71:22
  79:10,14,23
  87:1 95:4 111:1
  112:5 118:3,18
files  55:9
filing  29:2 114:4
filling  104:1
finance  11:19
  11:21,22,22,23
financially
  123:17
find  50:15 51:21
  51:22 115:4
fine  10:15 15:13
  15:19 16:9,13
  16:14,15 24:14
  29:9,10 44:25
  54:1 55:12
  76:24 93:23,23
  102:15 109:6
  119:9 120:14
finish  21:17
  111:23
fireworks  94:14
firm  4:25 19:24
  95:11
first  3:12,14
  5:21 7:14 9:2

20:4,19 38:19
  44:20 48:5
  60:23 61:3
  62:14 66:23
  92:9 95:2 96:23
  97:21 98:10,17
  113:12
five  13:12 28:10
  43:19
floor  2:4,10
florida  122:5,10
  122:19 123:3
follow  3:20
  73:10 92:2
  93:21
following  4:2
follows  5:22
foregoing  123:8
foremost  48:5
foresee  109:13
form  7:6 68:23
  90:23 101:18
  103:17,25
  104:12 105:15
  108:8 110:11
  111:17 112:22
  112:25 114:6,20
formats  59:16
forth  16:1 24:9
  33:14 53:1
forward  38:14
  78:18 102:12
  103:19

**found** 20:6
  48:14 68:24
  70:5
**founded** 51:4
**frame** 39:4,6
**framed** 104:5
**frankly** 80:19
**friends** 31:24
**front** 19:22
  21:10 108:10
**fulfill** 111:3
**fulfilling** 102:25
**full** 8:22 13:9
  92:16
**fully** 17:9 28:20
  58:5 96:3 99:10
**funds** 108:22
  113:22
**further** 73:21
  80:22 110:14
  120:1 123:13
**future** 98:2
  101:24 105:17
  106:4

**g**

**galen** 2:6 5:4
  14:22 27:9,12
  27:14 38:15
  43:18 69:10
  71:7 76:7 78:8
  84:21 117:12
  118:9 119:11
  120:4,12,22

**gcriscione** 2:6
**general** 19:11
  19:12 22:15,17
  33:24 35:1
  37:12 46:7,9,24
  46:25 54:11
  75:11 76:14
  84:7 94:13
  98:20
**generally** 37:12
  37:14,18,19,22
  43:1 48:20
  49:17 50:1,18
  57:8,9 76:3,5,18
  76:21 77:1,20
  78:15,18 80:9
  87:25 111:10
**generate** 30:23
**generated** 17:23
**generates** 36:25
**getting** 75:20
**gibbs** 19:16,18
  99:8 105:1
**give** 5:12 11:25
  15:4 25:1,13
  31:5 36:5 38:23
  43:21 45:8
  60:18 66:4 71:2
  72:1 93:13
**giving** 13:24
  45:16
**gmail.com**
  86:17,23

**gmail.com.**
  86:16
**go** 4:12 6:16
  11:13,16 12:4
  12:15,25 14:19
  15:15,16 16:4
  25:17 26:5 27:9
  28:8,11,12,14
  30:13 32:15
  36:16 37:2 40:5
  40:19,21,23
  43:21 47:10
  49:14 59:13,20
  62:8,18 64:17
  67:7,18 69:8,21
  70:8 71:4,6 73:2
  76:17 80:1,1,3
  85:13 86:7 91:7
  92:1,7 97:8
  98:21 104:19
  105:2,18 106:1
  106:7 107:12
  108:8,11 110:1
  110:5,7 114:2
  120:9
**goal** 104:10
**god** 86:11 89:3
**goes** 38:7 88:12
**going** 6:9,9,24
  7:1 10:4 11:25
  12:6 15:6 16:4,5
  21:17 22:8
  25:14,15,20
  28:4,7,11 29:23

  36:1,14 38:22
  43:16,23 44:3
  45:6,7 47:11
  48:2 49:11,14
  49:23 59:19
  60:19 62:6
  64:11 66:2,3
  67:12 71:9,16
  73:10 74:6
  75:19 77:18
  78:16 80:3 81:6
  82:18 83:15,17
  84:2 85:22
  91:20 95:16,20
  96:8,10 97:3,7
  98:10 100:22
  101:24 103:13
  106:24 110:1,6
  110:18 112:8
  114:2,9,16
  119:14,20
  120:10
**gonna** 21:11
**good** 4:23 5:4
  5:25 16:8 26:6
  38:15 39:11
  40:5,23 44:2
  71:7 101:21
  105:3 119:19
  120:6,15
**goods** 1:7 4:16
  9:14,16,21
  13:22 16:3
  22:12,14 26:9

**[goods - hopeful]**

30:3,21 31:19
32:16 33:6,13
34:19 35:16
37:25 40:20,25
41:3,8 42:10
46:3 47:22 48:4
48:21 49:20
50:18 51:4 52:7
53:4 54:16,19
55:7 56:16,18
56:25 57:10
58:17 59:15,22
60:2 61:7 62:12
62:21,24 63:25
64:1,12,19,21
64:24 65:2,5,9
65:14,17 66:24
71:23 88:5
101:1 106:23
**goodwill** 103:17
105:15
**gotcha** 8:14
**granted** 88:11
**great** 5:17 7:19
9:6,15,24 10:18
11:12,16 12:14
21:19 22:22
29:5 42:7 44:9
44:13 45:6
58:25 59:6 62:9
67:9 68:5 71:14
81:19 82:11
86:8 92:5 93:24
94:20 96:18

107:1
**greenwich** 9:4,4
30:9 41:4,5,15
**group** 8:5 81:9
82:13,20,21,23
83:22,25 84:1,7
84:13,13,15,17
85:2,9 106:17
107:3
**growing** 10:2
**guess** 33:22
34:12,24 35:22
53:14 60:13
**guy** 34:20 59:24
59:25
**guys** 11:1 14:6
20:10 30:13,14
30:15,16,23
31:17 32:6 33:9
36:6 46:15 48:8
49:8 51:24
60:13 90:23
91:16,18 95:15
100:12 118:13

|               h               |
| --- |

**h** 3:8
**haddad** 28:3
66:25 72:4
75:12,15 76:6
76:21 77:1,4,5
77:15,21 78:6
78:18,25 79:18
79:20 84:6

99:10 115:12
**haddad's** 84:9
84:10 112:1,11
113:4
**hammer** 52:3
**hand** 5:10,15
57:7 101:16
**happened** 6:5
97:2 102:9
104:16
**hard** 25:1 74:5
115:11
**hate** 39:3
**hats** 31:6
**head** 7:1 28:14
33:19,21 91:18
94:21
**header** 69:21
**heads** 99:11
**headway** 94:7
**hear** 92:25
111:20
**heard** 4:9
**help** 60:18 63:2
91:7 94:17
**helped** 51:8
63:4
**helpers** 32:24
32:25
**helpful** 26:19
**helping** 33:8
**hereto** 81:12
**heretofore** 5:20

**hh** 122:20
**highest** 11:12
**hinting** 72:12
**hire** 31:14,16
56:18,23 57:1,3
57:11 92:24
**hired** 20:3
101:25
**hold** 14:6 26:21
26:21,24,24
27:4 36:6
**holistic** 61:10,13
83:5 99:11
104:7
**holistically**
13:11 15:15
29:8 57:21,25
60:9,12 70:16
75:5 85:4,15,20
95:10 97:15
100:3 106:7
108:21 115:10
115:12
**holistics** 99:13
**home** 8:25 9:1
41:10
**honest** 82:24
89:3 104:17
**honestly** 14:11
15:11 57:7 58:5
75:9 83:5
**hop** 69:11
**hopeful** 104:20

**[hopefully - interrogatory]**

**hopefully** 72:1
**hopes** 103:18
**hoping** 94:17
**hour** 43:23
**house** 32:22
**huh** 19:20 30:11
  32:14 39:10
  40:15 44:12,25
  46:21 50:2 51:6
  54:6 59:6 60:16
  64:13 65:24
  70:22 83:16
  88:3,18 89:12
  90:19 91:18
  92:18 93:11
  96:12,21 100:15
**hyperlink** 48:15

**i**

**idea** 115:22
**ideally** 38:9,11
**identification**
  122:24,25
**identified** 18:7
  44:22 62:10
**identify** 62:19
  63:23
**illustrate** 45:21
**illustration**
  45:19
**image** 17:14
  20:4,18,25 42:6
  42:13,16,19,19
  42:20 43:5,7

44:23 47:2,6,8,9
47:18,20,21,22
48:4,9,16,25
49:8,10 50:4
51:19,19 52:9
53:24 54:10
55:10,23 56:5,8
56:14,15,15
58:8,13,13,16
58:24 59:1,2,4
59:14,17 82:13
88:8 89:16
97:15,21 98:1
99:11 100:4
101:4,5 103:1
104:25 105:11
105:12 114:11
114:12,14
115:18 116:2,17
116:20,23
**images** 16:17
38:1,3 49:16
53:19,22 54:3
54:11,14,19
55:14,15,18,22
57:24 59:8 87:5
87:6 114:24
**imagine** 35:19
57:13
**immediate**
90:11,15
**immediately**
88:22

**impression**
  27:21,22 84:3
  104:18
**included** 116:21
  116:23
**includes** 88:8,9
  88:10
**increase** 27:6
**indicated** 59:3
**indicates** 106:7
**indication** 93:4
**individual** 24:2
  65:14,15 103:18
  104:11
**individuals** 38:7
**information**
  18:6 40:17
  47:23 60:7
  61:17 68:22
  78:4 85:11
  88:10 91:17
  110:11,15 111:1
  111:16,16
  112:10,22,24
  113:14 114:6,13
  114:20
**infringement**
  39:13 42:3,9
  45:19,21 49:23
  86:24 87:1 88:9
  116:3,24
**initial** 3:11 25:5
  25:6,25 26:9,15
  26:16 29:13

**insinuates**
  115:24
**instructs** 7:4
**insufficient**
  110:15 112:10
**insurance** 22:4
  22:14,24 92:25
**insurer** 22:6
**intent** 102:22,25
  103:2,3,4,7
  105:9,14
**intention** 105:8
  105:9
**intents** 60:1
  65:18
**interested** 10:11
  123:17
**internal** 65:9
  89:13
**internet** 4:7
  68:8
**interpretation**
  23:22
**interrogating**
  87:21
**interrogatories**
  3:14,15 8:7,9
  10:25 11:7
  14:12 15:13,19
  23:17 60:14,24
  61:4 62:3,11,14
  86:12
**interrogatory**
  8:11 62:19

**interrogatory's**
  86:10
**interrupt** 28:13
**introduce** 15:20
**introductory**
  15:7
**investing** 119:5
**involved** 22:21
  50:15 61:20
  62:24 65:23
**issue** 17:13
  20:18 42:1 43:7
  74:8 82:13 88:8
  97:21 110:8
  111:14 114:3
**issued** 118:20

**j**

**joining** 4:24 5:3
**joint** 118:1
**jordan** 2:11
  4:24 6:3 13:8
  97:8 120:2,17
**jordan.abisror**
  2:13
**joseph** 2:12 4:25
**judge** 118:21
**july** 1:16 4:4
  40:2,3 50:19
  84:25 94:14
  115:25 122:12
  122:13 123:19
**juncture** 28:17
  28:18 51:23

57:6 58:5 70:15
72:9,20 75:4
82:25 83:2
88:25 89:4,10
90:19 99:7
100:2 103:18
106:25 107:2
108:12 109:2
113:13
**june** 23:8,12,17
  40:1 92:5,15
  93:14,20 97:3,5
  97:11,18 98:23
  99:1,20 101:10
  102:14,17 103:5
  103:7,10,21
  104:6,21 111:2
  111:8
**jury** 3:16 66:14
  66:23 67:24
  71:22

**k**

**keep** 34:4 35:19
  36:22
**kind** 24:18 28:1
  28:3 117:6
**knew** 63:17
**know** 6:6,16,17
  6:23,25 7:10,13
  7:14 8:2,8,13
  10:7,20,21 11:4
  12:16 15:11,16
  15:24 16:6

18:16 20:14
21:3,12 22:6,23
26:3 28:5 29:3,6
29:15,19 30:2
30:13,14 31:4,5
32:20 33:8,12
33:13,19,21,23
34:1,3,8,17
35:10 36:3
37:16 38:8,9,11
38:24 39:4 42:5
44:14 48:1,14
50:13,22 51:14
52:14,19 53:1
54:21 55:16
57:12,15,16,16
57:21,22 58:5
59:7,18,23,25
60:6,21 61:19
62:7,24 65:21
66:17 70:10,13
70:21,23 71:17
71:25 76:3 77:8
77:25 78:1,14
79:11 80:5,7,13
81:23 85:4 86:6
87:15 88:10,13
88:23 89:4,25
90:14 91:24
92:22 93:25
94:4,5,6,7,15
95:12,13,18,21
95:22,24 96:2
96:25 97:15

98:4,4 100:3,3
103:15,16 104:8
104:20 107:24
108:16,20,20
109:4 111:12
112:6 113:4,5
113:15,21
115:19,21
117:20
**knowledge**
  49:20 50:4
  61:20 68:22
  93:25 103:3,4,5
  104:7 110:10
  111:16 112:22
  112:24 114:6,19
**known** 104:23
  122:23
**kornhauser**
  2:12 5:1

**l**

**lacked** 54:22
**lager** 56:2
**larger** 13:10
**law** 16:22 17:2
  95:11
**lawcrt.com** 2:6
**lawful** 5:21
**lawyer** 92:24
**lawyer's** 73:14
  73:15
**lawyers** 104:9

**layman**  83:24 84:3
**layman's**  69:14 73:14
**lead**  119:3
**learn**  10:7 101:23,24
**learned**  104:8,9
**leave**  89:25 98:17
**left**  44:21 95:17
**legal**  23:23 24:2 24:3,7,21 25:2 69:7,12 70:18 72:2 73:24 76:4 80:18 83:23 101:22 102:7 109:13 111:25 112:1,2,3
**legalese**  57:16
**legs**  43:22
**lens**  107:4
**lenzo**  1:11 3:3 4:14 5:19,25 8:24 13:7 14:9 26:3 27:3 28:13 34:20 41:7 44:10 45:11 48:20 50:5 51:8 52:7 60:2,21 63:6 65:4,10 66:18 69:4,12 70:2,14 71:18 76:5 80:16

81:24 86:5,23 87:13 91:1,25 99:14,18 100:14 102:8 107:16 109:12 110:4 115:25 117:21 119:25 122:10 123:9
**lenzo's**  80:20
**letter**  3:19,20,22 86:2,15,22 88:24 89:9,13 89:19,24 90:3,8 90:9,12,18,21 91:12,20 92:2,8 92:9,10,15,19 92:21 93:5,9,9 93:18,21,24 94:2 95:2,3,21 95:25 96:23 97:2,6,10 103:12 117:17
**letters**  89:24 92:18 93:10 94:4 95:4 98:17 100:6
**letting**  39:4
**level**  11:12
**liability**  22:17 41:1
**license**  56:24 57:9 88:11 90:20 91:9 96:1 97:12,18,24

98:1,2,3,22,23 98:25 99:4,19 99:21 101:3,4 102:10,12,14 104:2 105:7 106:3,9,22 107:19 108:7 109:10 111:6,8 111:11 113:1,3 113:6,7,8,10,13 113:18 122:25
**licensed**  105:23 107:13 110:8,23 111:13
**licenses**  110:16
**licensing**  105:17
**licensure**  96:2
**liked**  15:14
**limited**  41:1
**line**  58:1,1
**lines**  32:11
**link**  88:9
**listed**  19:8 22:9 32:13 47:9,20 58:13,14 64:23
**listen**  57:14 89:21 92:16 93:8 105:8 107:5
**litigation**  89:24 90:18 93:8,10 94:4,8,12 95:4 95:19 104:22,23

**little**  13:9 22:10 29:25 31:5 32:5 33:20 38:15 57:22 64:15 67:19 72:1 113:16 116:11
**llc**  1:7 4:16 40:25 66:24
**llp**  2:3 5:5
**locate**  22:18
**location**  30:6,18 30:22 34:18
**long**  31:17 39:19,23 67:14 99:22 104:25
**longer**  38:15 115:8
**look**  14:3 58:16 60:17 74:16 94:18 97:17 105:8 108:11
**looking**  15:24 42:12,23 43:7 52:25 60:8 71:23 83:20 85:1 98:2 102:12 107:4 108:10,15 116:1
**looks**  14:10,11 67:13 96:19 97:14,17 109:8
**lost**  56:9
**lot**  10:4 29:1 53:16 59:21

91:7 101:25
**lower**  28:12

**m**

**made**  31:12,13
81:3 96:3
110:22
**madison**  2:9
**main**  109:3
**maintain**  37:17
37:22 46:5 47:3
49:6 51:25 60:9
**maintained**
52:19 53:7,17
**maintaining**
55:7 65:24
**maintains**  37:20
**maintenance**
37:16 65:11
**make**  8:20 13:9
21:5 26:12 28:2
45:23 46:19
52:3 53:15
64:14 67:11
71:24 77:10
93:22 94:6
**makes**  30:21
**making**  6:1
31:14 53:7 72:6
73:25 80:10
109:14
**managed**  65:3
98:1 101:4
103:1

**management**
47:23 96:21
**manages**  59:25
**managing**  55:5
55:7
**manhattan**  1:2
116:18,25
**manufacturer**
9:22
**manufacturing**
10:4,8 31:10
**marcation**
44:17 58:19
59:3
**march**  20:13,21
21:14 27:18
48:11
**mark**  25:15,16
38:23,23 43:13
45:8,9 60:20
81:15 91:22
**marked**  12:12
26:1 38:20 45:4
60:24 62:4
66:15 67:6
81:21 83:20
85:1 86:3 92:3
96:14 117:18
**market**  68:8
**marketing**  18:3
**marking**  62:6
**markmarcation**
43:15

**marks**  26:13
**masterman**  48:7
**masterson**
105:2
**masterson's**
48:7
**matter**  4:15
22:20 72:5
92:23 95:16
101:16,20
103:14 104:11
104:25 110:16
112:2
**maximize**  13:8
**mean**  17:4
18:25 22:7 24:6
27:8 33:1,2
39:20 40:18
43:2 47:11,12
54:1 55:15,18
57:13 60:1,12
64:4 67:13,16
69:23 78:1,2,14
80:1 82:4 87:3
89:4 90:14
97:14 104:13
105:15 106:16
108:18 112:8
113:25 115:10
**meaning**  13:20
87:4 103:3
**means**  18:16
43:12 68:1 69:2
69:13 70:4,7

77:8 88:18
107:13
**meant**  87:24
**media**  4:13 98:2
101:4
**meet**  78:6
**meeting**  19:11
**memory**  84:20
**mention**  62:25
63:1,3
**mentioned**  6:3
63:3 95:22
**messed**  66:12
**michael**  2:16
48:7 95:11,12
95:14,16
**mind**  14:19
15:12 26:25
28:9 30:1 35:14
39:3 52:4 64:16
**minimum**
108:19
**minus**  58:24
114:12
**minute**  15:4
43:19,19
**minutes**  38:16
43:25 119:11
**misleading**
107:10,25
**missed**  100:5
**mixed**  15:18
**mixing**  15:12

**moment**  12:1
48:13 50:7
57:23
**money**  30:21
**month**  20:9 34:9
35:22
**morning**  4:23
5:4,25
**motion**  25:10
70:19,22 112:11
112:12
**move**  21:18 29:9
58:9 85:23
95:20 103:19
104:11,12 108:3
108:4
**multiple**  89:24
92:18 98:6

**n**

**n**  3:1
**name**  8:3,22
19:15,23 21:15
**named**  5:20
**narragansett**
56:2
**nature**  7:10
41:22 42:8
61:19 63:11,14
64:5 99:11
**necessarily**  29:1
96:2 103:13
109:3

**need**  6:10,13,15
6:16,17 7:2,9
24:22 28:8
33:23,24 34:11
35:9 67:10
73:12 82:25
92:23 105:25
106:19 112:25
116:11 119:13
120:16,21
**needed**  75:16
103:9
**needing**  35:2
**needs**  87:20
**never**  19:10
50:24 65:22
101:17 102:19
105:23 110:7,23
111:13
**new**  1:1 2:5,5,10
2:10 4:17 9:3,3
10:5,13 31:12
31:13 40:25
41:11,11 55:22
55:22
**nice**  5:25
**nods**  7:1
**notary**  122:9,19
**note**  4:5 6:8
**notes**  123:12
**notice**  3:10,19
3:20 5:20 12:11
13:19,20 58:17
86:2,14,22 92:2

94:12 96:23
97:2,6,10
**noticed**  44:14
**notification**
107:3,10,20,23
**november**  81:10
82:15
**number**  17:12
17:16 19:8
21:20,24 26:14
29:12 33:24
81:11 98:9
100:17,18
**nyu**  11:17,18

**o**

**oath**  3:5 5:22
122:1
**object**  7:5 75:20
**objected**  74:7
**objecting**  76:13
**objection**  70:8
73:2 74:13,22
76:11
**objections**
62:13
**objective**  6:4
**objects**  78:16
**obligation**  7:16
**observational**
5:1
**obtain**  90:20
91:9 96:1 101:3
102:13 107:19

**obtained**  108:7
**obtaining**  30:12
102:13 104:1
**obvious**  47:12
**obviously**  6:6
18:16 19:10
20:9 28:17,25
34:9 38:9 43:3
50:24 54:3,14
63:10,11,14
83:10,11 93:9
95:17 102:1
105:11 110:18
**occupation**  9:12
**occur**  107:9
**offer**  32:7
**office**  89:20
**oh**  40:7 109:9
**okay**  8:2,6,14,14
9:9,12 10:19
11:6,9 12:1,9
13:1,17 15:6,11
15:17,21 17:6
17:10,16 18:2
18:15 20:24
21:16,18,20
23:5 24:4,14,15
24:15,20 25:3
25:14 26:3,11
27:21 28:2,8
29:6,9,11,18,23
29:23 33:4 34:2
35:3,5,13,15,16
35:18 36:9,13

| | | | |
|---|---|---|---|
| 36:21 37:5,24 | 83:8,17,19 | 78:9 80:11 83:1 | 110:22 116:3 |
| 38:14,24 39:11 | 84:13 85:7,21 | 84:18 94:11 | **organization's** |
| 39:14,21,25 | 85:21 86:5,7,18 | 95:9 101:22 | 59:22 |
| 40:13,16 41:18 | 86:21 87:18 | 104:22 115:10 | **orient**  28:6 |
| 42:12 43:16 | 88:8,16,18 89:2 | 115:11 | 60:18 61:9 88:1 |
| 44:9 45:9,12,12 | 89:6,17 90:2,2 | **online**  30:16,19 | 93:16 96:9 |
| 45:15,16 46:22 | 90:16 91:2,14 | 30:22 32:4,6,13 | **oriented**  10:1 |
| 47:5,19 49:23 | 91:19 92:7,8,13 | 33:18 51:13 | **orienting**  61:15 |
| 52:2 53:6,18,18 | 92:14,19 93:10 | 59:10 63:5 87:6 | 71:20 82:11 |
| 54:1,9,13 55:4 | 93:12 94:13,23 | 90:24 | 118:17 |
| 55:20,25 56:7 | 95:20,20 96:8 | **operate**  30:3 | **originally**  58:23 |
| 56:11,21,23 | 96:10,11,22 | 86:17 | 70:19 112:16 |
| 58:9,10,11,15 | 97:24 98:7,8,9 | **operates**  51:13 | 115:16 |
| 59:12,19 60:5 | 98:24 99:17 | **operating**  63:7 | **outreach**  93:15 |
| 60:15,17,19,19 | 101:2,6,8 102:6 | **operation**  32:21 | **outside**  8:15 |
| 60:22 61:2,5,8 | 102:9,21,21,22 | **opinion**  20:17 | 45:1 50:17 |
| 61:14,14,15,23 | 102:24 103:20 | 22:13 47:8 | 54:15 |
| 61:24 62:6,15 | 105:5,5 106:8 | 69:12,13 72:2,5 | **outsourcing** |
| 62:17,22 63:22 | 108:3 109:1,21 | 73:14,15,24 | 31:11 |
| 64:7,22,25 65:6 | 109:24 110:2,4 | 80:18 83:23 | **own**  10:12 20:1 |
| 65:13,25 66:11 | 110:5,6 111:4 | 84:8 85:17 | 30:2,16 31:23 |
| 66:19 67:2,17 | 112:21,23 113:5 | 89:19 102:7 | 32:20 33:16 |
| 67:20,25 68:17 | 113:24 114:15 | 111:25 112:1,2 | 41:25 42:15 |
| 68:20 70:10,13 | 114:16 115:2 | 112:3 113:4,5 | 43:1,10 44:17 |
| 70:20,23 71:1 | 116:13,16,19,20 | **order**  20:3 68:8 | 48:3 68:2 69:2 |
| 71:19 72:16 | 116:22 117:1,2 | 100:25 101:3 | 86:16 |
| 73:7,10,20 | 117:4,8,10,12 | 103:1 104:3 | **owned**  65:2 |
| 74:25 75:8,22 | 117:20,22,23 | 105:6 106:2,12 | **owner**  9:17,18 |
| 76:18 77:9,17 | 118:4,7 119:1,1 | 106:15 109:6,8 | 62:19 63:23 |
| 77:19 78:12,12 | 119:8,9,14 | 111:3 118:16,20 | 64:18 |
| 78:21,24 79:3 | **once**  39:5 52:13 | 120:16 | **ownership** |
| 79:24,24,25 | 52:15,24 54:20 | **organization** | 110:15 112:10 |
| 80:2,3 81:5,5,25 | 57:14 65:20 | 18:17,23 42:10 | 112:14 |
| 82:2,10,17 83:4 | 66:19,20 73:4 | 87:2 88:5 | |

| p |
|---|

**p.m.** 1:17 84:25
  119:21,22,22,24
  120:11 121:1
**page** 3:2,9 58:11
  61:21 77:11
  96:22 107:15
**pages** 13:12
  67:16 123:9
**pants** 31:6,8
**paragraph**
  40:17 42:12
  44:13,22 47:9
  47:10,20 58:14
  59:4 66:23
  68:24 70:4
  72:10,23 74:3
  110:12 112:9
  114:7,10,21
  116:1,21
**park** 2:4
**part** 23:25 33:2
  73:20 81:8
  82:21 85:7,9
  95:13,13 99:24
**participants** 4:8
**parties** 4:11
  123:15,16
**partner** 4:25
**partnership**
  56:13
**party** 63:20

**past** 28:18 50:23
  52:8 63:15
  105:23 107:6
  118:14
**pause** 115:22
**paying** 57:3
**people** 17:19
  31:15,16 33:4,7
  50:10,20 51:8
  52:18 54:22
  56:13 63:3
**percent** 33:23
  52:17 65:22
**percentage**
  33:16
**perfect** 103:8
**perfectly** 29:5
  85:5
**period** 40:11,12
  49:5 51:23
**periods** 35:8
**person** 16:7,12
  16:18,22 17:3,5
  17:12,18,24
  18:4,8,12,21
  19:7 21:20,24
  22:3,23 23:6,10
  23:15,19 24:16
  25:4 29:13
  36:24 37:20
  49:15,19,21,22
  49:24 50:3
  51:13 52:13,22
  61:18 65:19

83:24
**personally**
  122:23
**perspective**
  20:12 69:15,25
  70:21
**pertaining**
  83:14
**pertinence**
  112:15
**pertinent** 87:19
  101:16 108:16
**phone** 94:23,25
  95:1,5
**phonetic** 68:4
**photo** 3:21
  56:14 96:13
**photodeck**
  107:18
**photograph**
  73:22 80:23
  81:9 82:15,21
  85:8,9 110:16
**photographer**
  56:6,7,10,23
  57:3
**photographers**
  56:19 57:1,11
  58:3
**photographic**
  38:3
**photographs**
  16:11 56:24
  82:14 83:23

85:3 88:6,7
**photos** 56:19
  57:11
**physical** 30:6,18
  30:22
**physically** 21:4
**pick** 7:1
**picture** 116:17
  116:25
**place** 4:11 41:4
  78:5 79:8
**placed** 105:6
**placing** 106:2
**plaintiff** 1:5 2:2
  4:15,24 21:22
  61:3 62:13
  107:16 120:1
**plaintiff's** 3:9
  12:12 22:1 23:7
  23:11,16 26:1
  38:20 45:4
  60:24 62:4,10
  66:15 81:21
  86:3 92:3 96:14
  117:18
**platform** 32:7
**please** 4:5 5:9
  6:10,22,24 7:7
  12:16 14:19
  25:7,8 27:9 28:9
  28:12 44:10
  45:10 58:22
  62:19 63:22
  66:17 76:16

78:17 93:2
111:22 120:18
**point**　11:5 13:23
15:3,10,12,14
18:18 27:7 29:7
29:17,22 34:13
34:15 36:12
37:15 43:5
47:12,14 48:12
50:15,22 53:7
64:8,9,10 68:6
69:14 72:10,20
73:19 74:6,14
74:17 75:3,5,7
76:22,23 80:2
80:15 81:4,6
82:5 83:14,16
84:14,19,22
85:19 88:14
90:5 95:1,3
98:19 103:21
104:14 108:18
110:7 111:5
112:9,18 114:2
115:15
**points**　81:3
**policies**　16:10
16:21 17:1 22:4
22:24 37:24
38:1
**policy**　38:5,5,8
38:13
**pop**　30:13

**portion**　28:22
28:23 40:19
44:20
**position**　9:15
53:14 72:13
93:1
**possession**
18:11,14,18,22
**possible**　20:12
57:19,20 113:12
**possibly**　85:6,6
**posted**　20:19,22
52:6 87:6 88:9
99:6
**posting**　21:2
**potentially**
15:12 20:13,14
25:9 48:10
51:21 52:8
54:25 70:1,18
105:22 115:3,5
115:21
**predict**　91:3
**prefer**　6:19
53:25
**preparation**
7:20,24 8:17
11:11
**prepare**　10:19
10:22
**prepared**　16:5
19:7
**presence**　30:16
30:23 63:5

**present**　2:16
35:9 50:16 59:4
106:16 109:25
**presented**　8:1,5
8:8 19:24 20:5
48:8 91:16
**presenting**
108:11 109:5,8
**presume**　28:19
49:10
**pretty**　63:17
**previous**　75:12
80:17 99:5,22
**previously**
110:19 112:4
114:10
**primarily**　65:23
**primary**　30:12
32:2 52:13,22
65:14,19
**principal**　41:4
**prior**　11:4 14:14
15:15 20:21
40:12 50:25
51:18 54:21
62:23 68:3 69:8
70:17 72:9,11
72:14,22 73:5
73:19 74:2,7,9
74:14,19,21
75:2,24 76:20
77:15,16 84:21
94:8 114:4

**privileged**　75:23
**privy**　24:22
105:1
**pro**　96:8
**probably**　24:2
29:21 33:20
35:4 49:11 56:9
69:8 82:25
**problem**　78:7
93:17
**problematic**
115:23
**procedures**
16:11,21 17:1
**proceed**　5:16
7:7 100:1
**proceedings**　4:2
40:11 121:1
122:1
**process**　16:16
37:2 49:16
53:22 54:18
59:8,15
**produced**　27:2
90:23 95:23
96:7 107:16,17
122:24
**producing**
57:24
**product**　56:16
57:4
**production**　23:8
107:20

**products** 31:1,3
  31:9 32:2,8,13
  32:16 33:9
  34:10 35:23
  56:19 57:12,12
**profit** 36:24
**profits** 34:23
**progress** 35:23
**project** 57:1
**promote** 68:9
**promoting**
  68:12
**proprietor**
  31:25 32:1 33:7
  34:20 51:5,9,12
  65:4
**provide** 22:4,25
**provided** 12:17
  12:18 22:18
**provider** 32:9
**public** 68:12
  122:10,19
**publication**
  20:12 21:14
  52:16
**pull** 12:20 25:12
  45:7 61:25
  96:24
**pulling** 117:14
**purchase** 32:16
  96:20,21 98:23
  100:19 111:8
**purchased**
  97:18,24 98:22

99:19 102:10
**purchasing**
  108:20
**purpose** 15:25
  110:9
**purposes** 5:2
  36:10 37:1 60:2
  65:18 68:11
**purview** 97:16
  97:19 107:11
  109:7 113:11
  115:14
**push** 38:14
**put** 5:15 29:20
  65:14,16 101:25
  108:6
**putting** 21:3

**q**

**quality** 4:6,7
**question** 6:11
  6:11,14,19,20
  6:22 7:2,6,15
  15:8 17:8 18:20
  24:18,21 25:2
  29:12 33:11,12
  35:8,25 37:11
  40:6,22 48:17
  49:4,11 50:13
  52:2,10 53:15
  53:24 54:21
  58:6,21 61:24
  62:18 63:12,22
  64:5,11 65:8,11

69:7,24,25
  70:11 75:11
  76:14,16 77:25
  78:17 87:14
  98:13,20,21
  104:5 105:13,24
  105:25 111:20
  111:23 112:19
  115:16 118:22
**questions** 13:15
  14:11 28:7,10
  29:1 37:13 49:9
  51:17 55:24
  67:12,14 70:24
  74:6 91:4
  112:13 117:11
  119:18 120:1,6
  120:15
**quick** 119:15
**quite** 17:8

**r**

**r** 95:12
**raise** 5:9
**raised** 112:13
**range** 46:7
  50:12,14,17
**rather** 18:21
  86:12
**rationale** 35:1
  83:12
**rationales**
  112:14

**ravala** 2:3 5:5
**reach** 93:4
**reaction** 28:20
**read** 15:4 17:11
  26:22 67:10
  70:10 73:16
  81:7 110:21
  111:7 115:1
  120:7,13
**readily** 106:18
**reading** 39:6
  115:14 118:23
  120:24
**real** 119:15
**realistic** 52:24
  105:9
**realistically**
  99:9
**really** 6:2 24:19
  28:1 35:11 58:6
  64:5 101:21
  105:16 112:15
**reason** 34:25
  35:7 48:24 49:1
**rebecca** 2:12
  4:25
**recall** 20:6 40:7
  53:3 58:2 74:20
  88:20 90:7
  94:13 118:11
**receipt** 106:13
**receive** 11:2,7
  92:20,22 93:19
  106:13,13

108:13,24
109:18
**received** 7:25
10:25 11:2
26:25 27:8
87:23 88:21,23
89:9,13,19 90:2
93:24 95:21
103:12 106:11
107:3,19 113:18
**receiving** 90:21
91:12 93:10
94:1 95:3,25
109:20 113:19
**recent** 52:8
53:11,11
**recess** 12:8
25:22 44:5
71:11 119:22
**recognize** 13:6
14:1 26:17
28:15 42:13
45:24 46:20
47:5,15 58:12
58:19 59:1,9
85:2 86:8 92:14
114:11,13,23
117:23
**recognized** 15:9
44:15 103:22,25
**recollect** 59:10
**recollection**
48:3 56:4

**record** 4:4,12,22
6:10 7:3 8:23
12:4,7,10 25:17
25:21,24 44:3,7
71:5,7,10,12
108:5,9 110:3
119:17,20,24
120:10,10
123:11
**recorded** 4:10
4:13
**recording** 4:6
4:10
**records** 51:1
60:7 94:19
97:17
**recourse** 88:12
104:1
**refer** 60:11 69:6
**reference** 8:7
18:14 19:2,9,10
20:9,10 28:10
33:11,13 36:11
37:10,11 40:18
41:14 42:5,17
42:18 43:4
49:10 53:24
55:15 57:2,2,16
62:9 63:10,16
67:16 68:24
69:3 70:5,18
74:15,16 76:8
78:8 80:14 83:6
83:13 84:5,22

90:23 98:10
100:12 101:19
104:12,25
105:17 108:14
108:15,17 112:9
113:6,7,21
115:4,17,20,22
**referenced**
51:19 87:18
94:5 95:15 98:9
100:7 104:24
118:25
**referencing**
25:8 34:13
35:12 48:15
54:9,11 55:18
55:21 57:17
63:20 90:22,25
95:11 111:7
**referred** 64:19
82:4
**referring** 8:10
8:12 19:19
25:10 42:19
60:14 61:11
**refers** 61:12
**regarding** 18:22
19:14 21:21
112:13
**regards** 14:23
**registered** 41:7
81:7 82:6
**registrar** 81:8

**registration**
3:18 81:9,11,12
81:20 82:7,12
82:14,20,20,23
82:23 83:22,25
84:1,6,7,13,13
84:16,17 85:3,5
**registrations**
83:3
**regular** 120:18
**relationship**
83:3
**relative** 123:14
123:15
**relatively**
103:15
**released** 118:17
**relevance** 22:20
**relevancy** 51:24
53:16
**relevant** 35:25
50:23 51:21
110:17
**remains** 10:3
**remember** 15:2
20:8 28:20 29:2
29:7 39:24 40:9
40:10 42:4 49:7
53:5 57:7,20,25
59:13 72:21
74:17 75:5
79:16,17 84:20
85:19,21 89:3
89:10,22 90:13

92:18 94:2 95:9
95:10,11,15
106:24 107:2
108:25 109:2,19
113:19 115:12
117:24 118:14
118:23
**remembrance**
112:12
**remind** 66:19
**reminding**
26:25
**remotely** 4:20
**remove** 116:16
**removed** 89:15
**removing**
116:15
**repetitive** 73:12
**rephrase** 6:23
22:8 53:25 54:2
64:6,6,14
**report** 20:16,25
21:10,16 48:11
92:24 99:8
105:1,2 123:8
**reported** 1:24
**reporter** 3:6 5:7
6:9,25 66:5
81:17 123:1
**reporting** 35:6
36:2
**reports** 35:10
36:5,9,15,25

**representative**
13:21 16:2
**representatives**
17:18
**represents**
43:11
**request** 23:7,11
118:1,5
**requested** 51:24
61:11 123:11
**requests** 61:17
**research** 50:25
**resolution** 94:8
103:19
**resolve** 93:2
**resolved** 100:20
104:18 119:5
**resolving** 104:2
**resources** 119:6
**respectfully**
99:18
**respond** 93:3
**respondature**
68:3
**responded**
63:13
**response** 64:3
67:5 69:1,19,22
70:3 72:18,19
74:11,21 84:10
88:21 92:20,22
93:20 94:1
110:14

**responses** 8:11
23:7,11,16
61:25 62:12
76:6 77:2
**responsible**
53:3
**responsive**
75:17
**rest** 111:20
**restroom**
119:15
**retain** 27:12
**retaining** 77:16
**retrieve** 55:13
**retrieved** 59:9
59:14
**retrieving** 54:18
**retroactive** 99:5
102:18
**retroactively**
105:22
**revenue** 17:23
18:6 30:23
33:15,17 34:17
36:23
**review** 15:14
78:20 79:21
123:10
**reviewed** 7:19
7:23 10:20
78:24 79:5 80:9
80:25 115:7
**reviewing** 80:5

**revisit** 28:9
**reworded** 7:9
**rft** 1:3
**right** 5:9 9:10
9:18 13:1 14:16
14:18 18:19
25:3,9 26:12
27:10 30:20
34:10 35:4
36:15,22,23
37:13 39:8,17
39:17 44:2,24
48:15 54:4 58:9
59:8 61:16,19
61:22 62:21
64:20 66:21
67:7,21 71:9
73:20 80:24
81:16 84:11,25
84:25 85:18
88:2 98:1
102:16 103:6
108:3 114:13
115:6,7,25
116:12 117:13
**rights** 97:25
98:1 101:4
103:1
**room** 9:9
**roughly** 92:11
**rule** 26:9
**rules** 7:13
**run** 20:3 57:4
119:14

**[safe - sent]**

**s**

**safe**  10:10 30:21
**sale**  35:2
**sales**  18:3 34:4
   34:22,24 35:9
   36:22 68:12
**sarah**  28:3
   66:25 75:12
   77:4 115:12
**saw**  40:14 48:6
**saying**  11:10
   20:17,20 21:2
   22:23 24:22
   27:22 29:4 32:9
   34:6 38:5 43:4
   44:24 53:11
   63:13 72:25
   74:8 76:12
   79:13 83:6
   89:18 93:9
   97:16 103:2
   105:20 107:6,11
   110:24 111:12
   111:14 116:12
   117:6
**says**  13:19 26:8
   39:12 45:13
   52:16 55:8 61:2
   66:22 67:22
   68:6 70:4 73:21
   81:7 82:1,5 93:2
   96:6 97:25
   113:2

**school**  11:16
**science**  11:20
**scope**  68:13
**scott**  1:25 19:16
   19:18 20:3 99:8
   105:1 122:9,18
   123:6,25
**scott's**  48:6
**screen**  4:9 11:25
   12:14,21 13:9
   25:14 26:4
   29:24 39:9
   43:17 44:10
   45:7,10 54:5
   56:1 59:20
   60:20,21,22
   62:7 66:2,18
   71:16,18 81:23
   85:22 86:5,6
   91:1,21,24
   96:11,16 110:4
   117:10,14,20,21
**screenshot**
   58:17
**screenshotting**
   59:10
**scroll**  13:11
   14:2,5,9 26:18
   47:5 81:6
**scrolling**  40:16
   58:11 68:5 81:5
   110:6
**se**  105:16

**search**  20:3
**second**  12:1,3,5
   25:14,18 26:24
   38:23 43:21,22
   45:9 60:19 66:4
   73:20 85:7 95:2
   95:21,25 97:2,6
   97:10
**secondary**  50:8
   65:15
**section**  86:11
**see**  5:25 12:16
   12:22 13:2,3,3
   26:4,8,14 28:20
   38:24,25 39:2,8
   39:10,11 43:6
   44:11,12 45:10
   45:13 54:5 56:1
   58:23 60:21,22
   61:2 62:7,11
   66:17,21 67:15
   67:22 68:6,13
   68:18,21 70:6
   71:17 80:14
   81:23 82:1,3,14
   86:6,13 91:24
   92:5 95:12
   96:16 97:7,25
   98:13,13 108:19
   110:4,9 113:14
   113:21 117:21
   118:6 119:3,4,6
   119:7,12

**seeing**  40:7
   42:22 97:19
   118:14
**seek**  67:15
**seeking**  23:23
   58:7 65:8 87:23
   88:13 103:17
   108:14
**seen**  4:8 10:3
   14:1,14,17 15:8
   15:22 28:16
   39:18,23 52:12
   57:15 67:9
   88:15 118:8,12
   118:13,19,20
**select**  55:9
**sell**  31:3 34:9
**selling**  35:23
**sells**  35:16,21
**send**  36:1,10,19
   79:21 91:21
   118:9
**sending**  100:19
**sense**  21:5 28:2
   38:12 45:17
   93:22 102:12
**sent**  11:10 13:24
   14:23 15:2
   28:19 39:14
   66:25 86:10,15
   86:21 88:4 92:8
   92:10,10,18
   93:19,20 97:11
   98:17 99:10

107:17 113:11
117:25 118:13
**sentence** 80:21
**september** 81:9
82:15
**seriously** 92:23
**serve** 25:5 41:14
**served** 13:16
23:12,12 25:6
26:15 29:14
41:14
**service** 36:17,19
87:10
**set** 3:14 16:1
60:23 61:3
62:14
**seven** 43:25
**several** 48:20
**share** 11:25
25:14 44:10
60:20 71:16
91:21 96:11
**sharing** 12:14
29:23 43:17
44:11 45:6
59:19 66:2
85:22 86:5
91:21 109:25
117:10,20
**ship** 32:20
**shipping** 33:13
**shirts** 31:6,8
**shoot** 57:4,23

**shops** 30:14
**shorts** 31:8
**show** 38:22 47:9
71:16 81:14
84:9 96:8 114:9
**showed** 106:21
**sic** 43:15
**side** 33:8 36:21
45:23
**signature**
122:16 123:23
**signed** 74:11
122:13
**significant**
119:5
**signing** 120:24
**similar** 14:11
58:24
**simple** 77:10
100:24
**simply** 76:11
**single** 115:13
**sir** 47:15
**sit** 119:4
**sitting** 105:20
**situation** 38:10
38:11 65:21
76:8 105:11
**small** 103:15
**smoothly** 91:7
**socks** 31:6
**software** 32:10
36:11

**sole** 31:25 32:1
33:7 34:20 51:5
51:9,12 65:4
**solely** 31:23
**somewhat** 35:7
39:22 40:10
51:1 63:15
107:10
**sorry** 9:20 11:14
11:21 13:23
14:20 15:10
18:13 19:3,6,9
20:24 22:13,15
26:19 27:5,22
28:13 31:1,17
32:12 34:11
40:4,21 41:17
42:17 43:14
44:19,21 46:17
47:16 53:8,21
55:2,3,23 57:2
61:11 75:19
87:3,8 88:19
89:7 90:11,12
91:8 97:8 98:24
111:19 113:6
**sort** 76:12 88:12
**sought** 34:25
60:16
**sound** 16:8
40:23 71:7
73:12
**sounds** 21:19
25:2 44:2

113:23 119:19
**source** 30:12
49:10 68:24
70:5
**sourced** 38:1,3
**southern** 1:1
4:17
**speak** 6:1 8:15
8:16 36:7 71:25
88:19 89:5 94:9
94:22 95:7,16
115:10
**speaking** 37:18
37:19 75:7
78:15,18 106:5
106:9
**specific** 31:4
42:25 43:7
55:24 74:17
75:6 76:4,4,19
76:19,25 79:8
94:2 98:21
**specifically**
28:21 34:8 47:1
48:2 49:7 54:24
57:18 70:3
89:22 94:19
102:23 115:19
118:24
**specifics** 37:13
37:19
**spoke** 10:23,24
72:17 75:4 89:1
89:25 90:5,19

94:4,5 95:4
98:11,15 104:16
**spoken**   7:20
**srip**   7:25 8:5,8
95:13
**sriplaw**   2:9 7:22
39:14 101:19
**sriplaw.com**
2:13
**srips**   8:13
**stamp**   25:1
**standpoint**   24:3
**start**   7:14 9:20
10:8,12 32:12
95:24 100:16
103:2
**started**   28:24
31:19,23 50:19
101:9
**starting**   10:13
**state**   4:21 47:13
122:5,10,19
123:3
**stated**   21:13
46:11 51:25
58:23 63:21
72:14 75:1,1,2
93:11 102:19
103:14 105:23
107:5 108:1,9
112:4 114:23
115:19
**statement**
106:14 107:6

**statements**
108:14
**states**   1:1 4:17
17:2 73:21
80:22 92:19
110:14
**stenographer**
1:25 5:9,15 14:6
27:4 36:6 46:15
66:7 81:18
85:25 111:19
117:16 120:7,12
120:16,21 122:9
122:18 123:6,25
**stenographic**
123:12
**stenographica...**
1:24 123:8
**step**   75:10 88:24
**stipulated**   58:1
101:17
**stop**   29:23 43:16
45:6 59:19 66:2
85:22 91:21
103:6 109:25
117:10
**store**   30:4 32:21
32:23 33:17,20
34:18
**storefront**   9:23
**stores**   32:4
**street**   41:11
**stretch**   43:22

**study**   11:18
**stuff**   27:8 59:24
61:19 102:1
105:3
**stupid**   53:15
**subject**   110:16
116:17
**submitted**   66:20
**submitting**
27:23
**subramanian**
118:21
**subsidiaries**
17:17
**substance**   19:25
20:2
**success**   97:16
**successful**   96:19
96:20 97:14
109:5,8
**successfully**
97:18
**sufficient**   68:22
110:11,25
111:17 112:22
114:6,20
**suit**   41:22 42:8
**support**   24:16
50:8 72:12
85:12
**suppose**   106:5,6
**sure**   7:25 8:18
8:20 12:6 14:10
17:4 21:6,23

22:2,11 23:3
25:19,20 26:12
26:20,20,20
33:15 37:15
38:17 43:4,20
43:24 45:23
46:14,19 47:2,4
48:18 49:9,18
52:3 53:13 54:2
54:3,9,17 62:2
66:1 67:11,18
71:8,24 73:11
75:14 79:6,12
80:1 87:19 95:2
96:25 97:1
100:23 107:19
108:12 114:1
**swear**   5:8,11
**sweatshirt**   56:2
**sworn**   5:22
122:12

**t**

**t**   3:8
**table**   6:19
**take**   4:11 6:15
6:15,18,20 12:1
25:13 38:16
43:18 56:19,24
57:11 60:17
73:17 75:10
77:18 89:12
119:10

**[taken - told]**

**taken** 4:14
  115:3
**talk** 14:7
**talked** 36:22
**talking** 31:6,6
  42:25 43:1
  59:21 76:18,19
  76:22,23,25
  77:1 84:16,17
**talks** 45:17
**tandem** 23:2
  28:24
**tax** 36:10 37:1
**taxes** 34:7 35:1
  35:4,9 36:25
**technically**
  101:11,13 106:5
  106:9
**technology** 4:20
**tell** 7:16 16:7
  24:11 32:5 94:3
**ten** 43:5,19
  85:25
**term** 87:25
**terms** 7:12
  16:10,16,20,25
  28:21,22 29:11
  30:20 31:5 32:1
  32:10 33:8,15
  35:1,6 36:9
  37:16,24 38:4
  46:7 54:22
  57:24 59:7
  62:23 63:5

69:21 73:14
  79:12 89:21
  94:7 100:17
  104:8 111:8
**terrible** 41:23
**tertiary** 50:8
**testified** 5:22
  46:9 53:19
  58:12 62:25
  77:22 80:8,25
  97:20 114:11
**testify** 16:3,6,8
  16:12,18,22
  17:3,12,19,24
  18:4,8,12,22
  19:7 21:21,25
  22:3,23 23:6,10
  23:15,19 24:16
  25:4 29:13
  34:21 49:15,24
  57:8 59:24
  61:18
**testimony** 3:3
  5:11 14:16
  15:17 47:19
  48:19 49:15
  51:11,14 63:6,8
  74:20 100:9
  115:6
**text** 94:24
**thank** 6:1 8:14
  9:6 16:20 23:6
  28:11,12 65:25
  68:5 81:19 86:1

103:8 115:1
  117:4,9 119:25
  120:2,3,4
**thing** 74:2 98:10
  109:3 113:23
**things** 6:8 50:23
  53:1 83:1 98:6
  104:8,9,23
**think** 10:3 15:18
  17:5 24:1 35:24
  41:25 48:24
  49:1 51:19
  52:23 58:21
  60:6 63:9 65:6
  66:11 69:24
  70:11 96:3
  97:25 100:21
  101:9 102:3
  103:14,17
  105:12 107:22
  111:6,10 113:20
  115:3,4 120:23
**thinking** 27:8
  40:4
**third** 63:20
**thought** 113:2,2
**thrown** 41:13
**thumbs** 7:1
**time** 4:4 6:1
  12:7,10 13:20
  14:7 25:21,24
  31:22 33:3 35:8
  35:12 39:19
  40:11,12 44:4,7

46:15,16 49:5
  51:18,23 52:20
  53:2 60:10
  63:18 67:10
  71:10,13 73:17
  74:5,17 78:5
  79:8 83:3 92:24
  94:13 98:16
  100:2 101:22
  103:2,21 104:20
  115:1 119:5,21
  119:24 120:10
**timeframe**
  96:23
**timeline** 65:20
  94:16 100:4
**timelines** 101:23
  104:24
**times** 36:1 48:20
**titled** 81:9
**today** 6:2,3 11:6
  11:7 13:18
  14:16 37:16
  52:5 100:9
  102:2 103:4
**today's** 7:20,24
  8:17 10:22
  13:19 14:15
  19:11
**together** 75:15
**token** 25:1
**told** 41:10 83:2
  99:12 108:16

**took** 56:13 99:8
**top** 33:19,21
  39:11 61:2
  66:21 67:22
  91:17 92:5
  94:21
**topic** 16:12,23
  17:3 18:20 19:7
  26:14 29:12
  109:3
**topics** 15:7,24
  16:1,5,8 21:18
  34:21
**tory** 1:11 3:3
  4:14 5:19 8:24
  31:24 34:20
  41:7 50:5 51:8
  52:7 60:2 63:6
  65:4,10 70:9
  73:3 80:20
  86:23 99:14
  111:22 112:19
  122:10 123:9
**totally** 17:6 28:5
**tough** 29:20
**towards** 60:8
**track** 34:4,22,24
  35:2,19,23
  36:22
**transaction**
  107:8 108:8
**transcript**
  120:19 123:10
  123:11

**transferred**
  113:22
**transpired**
  41:21
**tricky** 77:12
**tried** 95:23
  102:22 107:18
  111:3
**true** 23:1 98:5
  111:15 123:11
**truth** 5:12,13,13
  7:16 68:23 83:9
  99:12 108:16
  110:12 114:7,21
**try** 6:23 7:10
  35:13 51:20
  64:16 77:10
  90:3,20 91:3
  100:24
**trying** 28:6
  47:13 88:1,2
  91:5 93:16
  94:15,15 103:1
**twelve** 81:6
**twice** 104:16
**two** 21:1,1 27:7
  63:13 92:8,10
  92:11,21 97:3
  98:17 99:24
  100:5,6 119:10
**type** 122:25
**typically** 32:23
  55:13

**u**

**u.s.** 10:13
**uh** 19:20 30:11
  32:14 39:10
  40:15 44:12,25
  46:21 50:2 51:6
  54:6 59:6 60:16
  64:13 65:24
  70:22 83:16
  88:3,18 89:12
  90:19 91:18
  92:18 93:11
  96:12,21 100:15
**ultimately** 95:18
  104:19 106:6
  107:9 108:8
**under** 5:22 7:15
  27:21,22 43:6
  77:7 104:17
**understand**
  6:22 7:15 17:9
  18:13,24 24:22
  28:3,5 45:22
  47:20 49:13
  51:3 64:5 67:7
  67:11 68:1,18
  69:1,14 70:7
  72:8 77:8,12
  82:16 92:12
  93:1 101:15
  103:20
**understanding**
  28:2,11 29:3

33:25 41:22
  42:2,7 43:11
  55:6 61:22 65:7
  70:3 72:7,24
  73:16 74:5
  77:14 79:12
  80:8,21 81:1,15
  82:22 83:22
  85:10,17 89:17
  91:19 94:16
  97:21 98:3 99:4
  99:21 102:9
  105:6 106:3
  108:23 109:11
  109:16 110:20
  111:24 112:6,20
  113:3 114:25
**understood**
  25:3 102:11
**underwear** 31:7
**undesirable**
  38:10
**undoubtedly**
  104:6
**unfortunately**
  24:19 29:19
  77:7,24 78:7
  85:14 117:5
**unit** 4:13
**united** 1:1 4:16
  17:2
**unsure** 14:17
  15:18

| | | | |
|---|---|---|---|
| **upload**  46:5,22 | **validity**  83:13 | **waived**  120:25 | 21:3 30:5 32:10 |
| 48:21,25 51:25 | 84:2,16 | **walk**  15:6 67:19 | 32:16 34:14 |
| 55:4,8 56:8 63:2 | **various**  88:10 | **want**  6:8 7:14 | 37:6,8,10,16,17 |
| **uploaded**  38:1,4 | **verbally**  6:25 | 8:20,24 12:20 | 37:23 38:2 |
| 48:3 49:25 50:4 | **verbiage**  57:19 | 14:14 21:9 34:1 | 42:20 45:3,24 |
| 50:10,20 59:1,2 | **verification** | 42:17 43:18,24 | 46:1,6,12,20,22 |
| 59:2 97:22 | 106:10,12 | 45:23 46:19 | 47:3,21 48:9 |
| 99:22 103:23 | **verify**  106:14 | 52:2 64:15 | 49:5,17 50:1 |
| **uploading**  16:17 | **versa**  8:8 | 65:21 67:11 | 51:15 52:1,9,19 |
| 49:16 53:3,18 | **versus**  4:15 22:6 | 69:11,14 70:6 | 53:19 54:12 |
| 53:22 54:19 | **vice**  8:8 | 71:2,24 76:11 | 55:5,10 59:2,15 |
| 59:8 | **video**  4:10,13 | 77:11 80:4 | 59:16,22 60:1 |
| **uploads**  37:8,20 | 120:20 | 82:24 108:5,6 | 60:10 62:20 |
| 51:14 55:10 | **videoconferen...** | 109:9 112:6 | 63:7,18,23 |
| 59:25 | 1:20 122:1,11 | 113:4,5 120:12 | 64:12,19,21 |
| **url**  20:5 37:11 | **videographer** | **wanted**  10:11 | 65:3,11,24 88:7 |
| 105:12 115:18 | 2:16 4:3 5:7 | 15:7,19 74:11 | 89:16 99:6,23 |
| **use**  16:11 17:24 | 12:6,9 25:20,23 | 104:4 | 103:23 116:6 |
| 21:25 32:7 | 44:3,6 66:9 71:9 | **water**  6:17 | **websiteinfrin...** |
| 36:17 69:3 | 71:12 119:20,23 | **watermark** | 3:13 |
| 105:10,19,23 | 120:9 | 115:20 117:3,6 | **wednesday**  1:16 |
| 106:3 110:8,23 | **videotaped**  1:10 | **way**  19:5 32:2 | **weeks**  92:9,10 |
| 111:14 | 123:9 | 50:23 73:13 | 92:11,21 97:3 |
| **used**  58:18 | **view**  69:14 | 77:9 78:25 | **went**  11:15 73:1 |
| 73:23 78:9 | 83:25 84:15 | 83:18 98:25 | 92:9 95:18 96:3 |
| 80:23 100:8 | **violations**  68:10 | 100:24 104:5,12 | 96:23 97:2,4 |
| **using**  4:20 18:3 | **virtual**  4:20 | 104:19 110:20 | 106:12,15 |
| 87:25 100:9 | **virtually**  4:6 | 113:23 | 108:17,21,22 |
| 101:15 | **vs**  1:6 | **we've**  10:3 | **werecoverdat...** |
| | | 43:23 57:15 | 19:22 |
| **v** | **w** | 70:17 80:4 | **withdraw**  22:13 |
| | | **web**  98:2 101:4 | 41:23 |
| **va**  81:11 | **waiting**  40:6 | **website**  16:11 | **withdrawn**  31:2 |
| **valid**  84:1,6 | **waive**  120:7,13 | 16:17 20:20 | 31:18 35:20 |

**[withdrawn - zoom]** Page 154

53:21 76:1 89:7
95:24
**witness** 3:2 4:9
5:8,14,20 27:14
120:2
**women's** 31:8
**wondering**
114:24
**word** 57:22
58:18 78:9,11
79:2 115:4,14
115:23
**words** 20:1 30:2
30:16 33:16
41:25 42:15
43:1,10 44:17
68:2 69:2 79:18
85:11
**work** 12:24
17:13,24 18:3,7
18:10,19,22
21:25 22:1
31:11,24 32:8
32:19 43:6
45:20 53:12
59:9,10 68:7
73:22 80:23
81:8 82:6,13
90:21 91:10
93:1 96:1 97:12
103:22 106:4,22
110:8,23 111:14
113:10 114:3,5
114:18 115:15

116:4,5,6
**worked** 54:23
63:1 75:15
**working** 28:25
40:12
**works** 56:24
71:8
**worries** 14:4,21
26:23
**wrap** 99:10
117:12
**written** 38:5,8
38:13 42:16
58:4 69:7 72:14
73:19 92:16
**wrong** 63:6
**wrote** 19:17,18
39:5 100:6

**x**

**x** 3:1,8

**y**

**yeah** 6:7 7:12
10:6,17 12:25
14:4,4,21 23:3
24:5 26:7,21
28:14 30:8 33:5
34:3 38:6 40:24
40:24 43:20,24
44:1 46:11
47:17 48:23
55:1,2 56:12
66:9 85:24
87:13,21 97:14

97:23 101:11
105:18 109:15
**year** 20:8 96:21
98:2 101:4,7,9
111:2
**years** 52:6 99:5
99:22
**yep** 32:18 45:13
56:3 71:8 77:19
**yesterday** 52:5
**york** 1:1 2:5,5
2:10,10 4:18 9:3
9:3 10:5,13
31:12,13 40:25
41:11,11 55:22
55:22

**z**

**zip** 14:24 15:15
117:25 118:13
**zoom** 1:10 68:15
123:8

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to the witness for examination and shall be read to or by him or her, and any changes in form or substance which the witness desires to make shall be entered at the end of the deposition with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness before any officer authorized to administer an oath. If the witness fails to sign and return the deposition within sixty days, it may be used as fully as though signed. No changes to the transcript may be made by the witness more than sixty days after submission to the witness for examination.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.